UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Civil Action No. _____

|  |  |
|---|---|
| MONTE A. ROSE, JR.<br>728 W. Dixie St., Apt. 12<br>Bloomington, IN 47403 | )<br>)<br>)<br>) |
| RHONDA CREE<br>636 Bringhurst St.<br>Logansport, IN 46947 | )<br>)<br>)<br>) |
| MARY HOLBROCK<br>1326 W. Foster Parkway<br>Fort Wayne, IN 46807 | )<br>)<br>)<br>) |
| ERIN NICOLE TOMLINSON<br>829 Ravenswood Dr.<br>Evansville, IN 47713 | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>) |
| ALEX M. AZAR II<br>SECRETARY, UNITED STATES<br>DEPARTMENT OF HEALTH AND<br>HUMAN SERVICES<br>in his official capacity<br>200 Independence Avenue, S.W.<br>Washington, DC 20201 | )<br>)<br>)<br>)<br>)<br>)<br>) |
| SEEMA VERMA<br>ADMINISTRATOR, CENTERS FOR<br>MEDICARE AND MEDICAID SERVICES<br>in her official capacity<br>7500 Security Boulevard<br>Baltimore, MD 21244 | )<br>)<br>)<br>)<br>)<br>)<br>) |
| DEMETRIOS L. KOUZOUKAS<br>PRINCIPAL DEPUTY ADMINISTRATOR<br>CENTERS FOR MEDICARE AND<br>MEDICAID SERVICES, | )<br>)<br>)<br>)<br>)<br>) |

in his official capacity                              )
7500 Security Boulevard                               )
Baltimore, MD 21244                                   )
                                                      )
UNITED STATES DEPARTMENT OF                           )
HEALTH AND HUMAN SERVICES                             )
200 Independence Avenue, S.W.                         )
Washington, DC 20201                                  )
                                                      )
CENTERS FOR MEDICARE AND                              )
MEDICAID SERVICES                                     )
7500 Security Boulevard                               )
Baltimore, MD 21244                                   )
                                                      )
             Defendants.

_____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

_____

### PRELIMINARY STATEMENT

1.      This case challenges the ongoing efforts of the Executive Branch to bypass the

legislative process and act unilaterally to fundamentally transform Medicaid, a cornerstone of the

social safety net. Purporting to invoke a narrow statutory waiver authority that allows experimental

projects "likely to assist in promoting the objectives" of the Medicaid Act, the Executive Branch

has instead effectively rewritten the statute, ignoring congressional restrictions, overturning a half-

century of administrative practice, and threatening irreparable harm to the health and welfare of the

poorest and most vulnerable in our country.

2.      The Medicaid Act establishes a health insurance program that covers more than 65

million people in the United States. Medicaid enables states to provide a range of federally specified

preventive, acute, and long-term health care services and supports to individuals "whose income

and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C.

§ 1396-1. The core populations covered by Medicaid include low-income children; parents and other caretaker relatives; pregnant women; the aged, blind, or disabled; and, as added by the Affordable Care Act ("ACA"), adults who do not fit into another eligibility category and have household incomes less than 133% of the federal poverty level ("FPL") (currently $16,612 for an individual; $22,490 for a family of two). The group added by the ACA is referred to as the "expansion population."

3.      The Medicaid program offers a deal for states. If a state chooses to participate, the federal government will contribute the lion's share of the cost of providing care. In return, the state agrees to pay the remaining portion of the costs of care and to follow all federal requirements, including those regarding the scope of coverage and eligibility for the program. States may not impose additional eligibility requirements other than those set forth in the Medicaid Act, and states must cover all individuals that fit within a covered population group.

4.      The Social Security Act, of which the Medicaid Act is a part, does permit the Secretary of Health and Human Services ("Secretary") to waive certain federal Medicaid requirements, but only in narrow circumstances – when necessary to allow a state to carry out a time-limited, experimental project that is likely to promote the objectives of the Medicaid Act.

5.      In 2007, Indiana applied for a waiver project to expand health coverage to certain adults who, at the time, were not eligible for coverage under the Medicaid Act. In approving the Healthy Indiana Plan (HIP) project, the Secretary allowed Indiana to impose limits on coverage for this not-otherwise-eligible group, including charging monthly premiums and terminating coverage for failure to pay, imposing lockout penalties for noncompliance with certain features of the project, and eliminating the retroactive coverage required by the statute. Indiana began implementing the project on January 1, 2008.

6.      In 2010, Congress passed the Affordable Care Act, which required states to expand Medicaid coverage to certain non-elderly adults who do not fall within another Medicaid eligibility category, including many of the adults covered by HIP. Following a series of short-term extensions, in 2015, the Secretary authorized Indiana to modify HIP to include populations that were otherwise eligible for the Medicaid program, including parents/caretaker relatives and the entire Medicaid expansion population. The State rebranded the project "HIP 2.0."

7.      In 2017, Indiana requested yet another extension of the HIP 2.0 project, this time for three years, despite the fact that the State had been "testing" the key features of the project on low-income individuals for nearly a decade. As part of that request, Indiana also asked to impose a new, unprecedented restriction on coverage – conditioning Medicaid eligibility on compliance with mandatory work and community engagement requirements. The State estimated that once fully implemented, the work requirements would result in roughly 24,000 individuals losing Medicaid coverage each year for failing to comply.

8.      On January 11, 2018, long after the comment period closed on the HIP 2.0 extension application, the Centers for Medicare & Medicaid Services ("CMS") announced a new approach to Medicaid waivers. Reversing decades of agency guidance, and consistent with the administration's expressed view of the need to "fundamentally transform Medicaid," CMS issued a letter to State Medicaid Directors announcing its intention to, for the first time, approve waiver applications containing work requirements and outlining "guidelines" for states when submitting such applications.

9.      Less than a month later, the Secretary relied on the letter to approve the HIP 2.0 extension application, allowing Indiana to impose work requirements as a condition of Medicaid eligibility beginning in 2019. The approval also permitted the State to maintain the other existing

restrictions on coverage and to add an additional lockout period for failure to complete the eligibility renewal process on time.

10. Indiana began implementing the work requirements on January 1, 2019. The State will begin suspending the coverage of individuals who have not met the work requirements on December 31, 2019.

11. The HIP 2.0 extension approval has harmed and will continue to harm Plaintiffs and individuals throughout the State who need a range of health services, including treatment for diabetes, high blood pressure, asthma, inner-ear problems, mental health conditions, and vision loss, as well as gender-affirming health care. Without access to Medicaid coverage, Medicaid enrollees will be forced to forgo treatment for their conditions or will incur significant medical debt when their conditions become so severe that they have no choice but to seek treatment in acute care and emergency department settings.

12. The Secretary's issuance of the letter to State Medicaid Directors and approval of the HIP 2.0 extension are unauthorized attempts to re-write the Medicaid Act, and the use of the statute's waiver authority to "transform" Medicaid is an abuse of that authority. Defendants' approval thus violates both the Administrative Procedure Act and the Constitution and should be vacated.

## JURISDICTION AND VENUE

13. This case seeks declaratory and injunctive relief for violation of the Administrative Procedure Act, the Social Security Act, and the United States Constitution.

14. The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1361 and 5 U.S.C. §§ 702 to 705. This action and the remedies it seeks are further authorized by 28 U.S.C. §§ 1651, 2201, and 2202, and Federal Rule of Civil Procedure 65.

15.     Venue is proper under 28 U.S.C. § 1391(b)(2) and (e).

**PARTIES**

16.     Plaintiff Monte A. Rose, Jr. is a 48-year-old resident of Bloomington, Indiana and is enrolled in HIP 2.0.

17.     Plaintiff Rhonda Cree is a 61-year-old resident of Logansport, Indiana and is enrolled in HIP 2.0.

18.     Plaintiff Mary Holbrock is a 54-year-old resident of Fort Wayne, Indiana and is enrolled in HIP 2.0.

19.     Plaintiff Erin Nicole Tomlinson is a 25-year-old resident of Evansville, Indiana and is enrolled in HIP 2.0.

20.     Defendant Alex M. Azar is Secretary of the United States Department of Health and Human Services ("HHS") and is sued in his official capacity. Defendant Azar has overall responsibility for implementation of the Medicaid program, including federal review and approval of state requests for waivers pursuant to Section 1115 of the Social Security Act.

21.     Defendant Seema Verma is Administrator of the Centers for Medicare & Medicaid Services ("CMS") and is sued in her official capacity. Defendant Verma is responsible for implementing the Medicaid program as required by federal law, including as amended by the ACA. Secretary Verma recused herself from consideration of the Indiana HIP 2.0 extension application because she was a paid consultant with the State of Indiana and helped design the project.

22.     Defendant Demetrios L. Kouzoukas is Principal Deputy Administrator of CMS and is sued in his official capacity. Defendant Kouzoukas is responsible for disposition of all matters, including the Indiana HIP 2.0 extension, from which Administrator Verma is recused.

23.     Defendant HHS is a federal agency with responsibility for overseeing implementation of provisions of the Social Security Act, of which the Medicaid Act is a part.

24.     Defendant CMS is the agency within HHS with primary responsibility for overseeing federal and state implementation of the Medicaid Act as required by federal law.

## STATUTORY AND REGULATORY BACKGROUND

### A.     The Medicaid Program

25.     Title XIX of the Social Security Act establishes the cooperative federal-state medical assistance program known as Medicaid. *See* 42 U.S.C. §§ 1396 to 1396w-5. Medicaid's stated purpose is to enable each state, as far as practicable, "to furnish [ ] medical assistance" to individuals "whose income and resources are insufficient to meet the costs of necessary medical services" and to provide "rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." *Id*. § 1396-1.

26.     The statute defines "medical assistance" to include a range of care and services that participating states must cover or are permitted to cover. *Id*. § 1396d(a).

27.     Although states do not have to participate in Medicaid, all states do.

28.     Each participating state must maintain a comprehensive state Medicaid plan for medical assistance that the Secretary has approved. *Id*. § 1396a.

29.     The state Medicaid plan must describe the state's Medicaid program and affirm its commitment to comply with the requirements imposed by the Medicaid Act and its associated regulations.

30.     States and the federal government share responsibility for funding Medicaid. Section 1396b requires the Secretary to pay each participating state the federal share of "the total amount

expended . . . as medical assistance under the State plan." 42 U.S.C. §§ 1396b(a)(1), 1396d(b). In general, the federal reimbursement rate is based on the state's relative per capita income.

**B.    Medicaid Eligibility and Coverage Requirements**

31.    Using household income and other specific criteria, the Medicaid Act sets forth who is eligible to receive Medicaid coverage. *Id*. § 1396a(a)(10)(A), (C). The Act identifies required coverage groups as well as options for states to extend Medicaid to additional groups. *Id*.

32.    To be eligible for federal Medicaid funding, states must cover, and may not exclude from Medicaid, individuals who: (1) are part of a mandatory population group; (2) meet the minimum financial eligibility criteria applicable to that population group; (3) are residents of the state in which they apply; and (4) are U.S. citizens or certain qualified immigrants. *Id*. §§ 1396a(a)(10)(A), 1396a(b)(2), (3); 8 U.S.C. §§ 1611, 1641.

33.    Before the ACA, mandatory Medicaid population groups included children; parents and other caretaker relatives; pregnant women; and the elderly, blind, and disabled. 42 U.S.C. § 1396a(a)(10)(A)(i). States must also provide at least twelve months of transitional medical assistance ("TMA") to certain parents and caretaker relatives when they lose eligibility for Medicaid due to an increase in hours of, or income from, work. *Id*. §§ 1396r-6, 1396u-1(b)(1)(A).

34.    In 2010, Congress passed, and the President signed, comprehensive health insurance reform legislation, the Patient Protection and Affordable Care Act.  Pub. L. No. 111-148, 124 Stat. 119 (2010), as amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029. "The Act aims to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012).

35.     As part of the ACA, Congress amended the Medicaid Act to add a mandatory population group. Effective January 1, 2014, the Medicaid Act requires states to cover adults who are under age 65, are not eligible for Medicare, do not fall within another Medicaid eligibility category, and have household income below 133% of the federal poverty level ("FPL"). 42 U.S.C. §§ 1396a(a)(10)(A)(i)(VIII), 1396a(e)(14). This group, often called the "expansion population," includes adults in a variety of family circumstances: parents living with children (whose incomes exceed the state-established limit for the mandatory parent/caretaker population group); parents of older children who have left the home; and adults without children.

36.     States receive enhanced federal reimbursement for medical assistance provided to the Medicaid expansion population: 93% federal dollars in 2019, and 90% in 2020 and each year thereafter. *Id.* § 1396d(y).

37.     In *National Federation of Independent Business v. Sebelius*, the U.S. Supreme Court held that HHS could not terminate all Medicaid funding to states if they fail to extend Medicaid coverage to the expansion population. 567 U.S. 519 (2012).

38.     States that cover the expansion population submit state plan amendments electing to provide this coverage. To date, 34 states (including DC) have implemented the Medicaid expansion.

39.     Indiana has an approved state Medicaid plan that covers the expansion population. State Plan Amendment IN-15-0001-MM1, https://www.medicaid.gov/State-resource-center/Medicaid-State-Plan-Amendments/Downloads/IN/IN-15-0001-MM1.pdf.

40.     Once a state elects to expand coverage to the expansion population, it becomes a mandatory coverage group.

41.     As noted above, the Medicaid Act also allows states to extend Medicaid eligibility to certain optional population groups, including children and pregnant women with incomes between

133% and 185% of FPL, *see* 42 U.S.C. § 1396a(a)(10)(A)(ii)(IX), limited-income aged, blind, and/or disabled individuals receiving home and community-based services, *id.* § 1396a(a)(10)(A)(ii)(VI), and "medically needy" individuals who would fall within a mandatory population but for excess income or resources, *id.* § 1396a(a)(10)(C).

42.     The Medicaid Act requires a participating state to cover *all* members of a covered population group. The state may not cover subsets of a population group described in the Medicaid Act. *See id.* § 1396a(a)(10)(B). This requirement applies to optional and mandatory population groups: if a state elects to cover an optional group, it must cover all eligible individuals within that group. *Id.*

43.     States cannot impose additional eligibility requirements that are not explicitly allowed by the Medicaid Act. *See id.* § 1396a(a)(10)(A).

44.     In addition to addressing *who* is eligible for medical assistance, the Medicaid Act delineates how states must make and implement eligibility determinations to ensure that all eligible people who apply are served and get coverage.

45.     States must determine eligibility and provide medical assistance to all eligible individuals with "reasonable promptness." 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 435.912(c)(3) (requiring states to determine eligibility within 90 days for individuals who apply on the basis of disability and 45 days for all other individuals). An individual may apply for and enroll in Medicaid at any time. 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 435.906.

46.     In addition, the Medicaid Act requires states to provide retroactive coverage to individuals who have been determined eligible to ensure that low-income individuals can obtain timely care and avoid incurring medical debts. Social Security Amendments of 1965, Pub. L. No. 89-97, § 1905(a), 79 Stat. 286, 351. Specifically, states must provide medical assistance for care

provided in or after the third month before the month of application, as long as the enrollee would have been eligible for Medicaid at the time the services were received. 42 U.S.C. §§ 1396a(a)(34), 1396a(a)(10), 1396d(a).

47. When re-determining the eligibility of Medicaid enrollees, states must follow certain procedures to ensure continuity of coverage for eligible individuals. Among other requirements, states must complete the renewal process on the basis of information available to the agency (for example through state or federal data sources), without seeking additional information from the individual, if possible. Otherwise, the state must provide the enrollee with a pre-populated eligibility renewal form and at least 30 days to return the form. It then must timely reconsider (without a new application) the eligibility of an individual who was terminated for failure to submit the renewal form or necessary information, but who then submitted the form within 90 days after termination. *See* 42 C.F.R. § 435.916(a)(3).

48. The Medicaid Act sets forth mandatory services that participating states must include in their Medicaid programs and optional services that participating states may include in their Medicaid programs. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a).

49. States must ensure that Medicaid enrollees have necessary transportation, often referred to as non-emergency medical transportation ("NEMT"), to and from Medicaid services. 42 U.S.C. § 1396a(a)(4); 42 C.F.R. § 431.53.

50. The Medicaid Act also establishes the states' options for imposing premiums and cost sharing on enrollees. To ensure affordability, the Act permits states to impose premiums and cost sharing only in limited circumstances.

51. Congress amended the Medicaid Act in 1982 to remove the substantive premium and cost sharing provisions from 42 U.S.C. § 1396a, amend them, and place them in a new provision,

Section 1396*o*. Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, 96 Stat. 324, 367.

52.     As a result of that amendment, Section 1396a, which generally lists the requirements that a state plan must satisfy, provides that "enrollment fees, premiums, or similar charges, and deductions, cost sharing, or similar charges" may be imposed "only as provided in section 1396*o*." 42 U.S.C. § 1396a(a)(14).

53.     With respect to premiums, Section 1396*o* of the Medicaid Act provides that "no enrollment fee, premium, or similar charge will be imposed under the plan (except for a premium imposed under subsection (c))." *Id.* § 1396*o*(a)(1). Subsection (c), in turn, authorizes limited premiums, but generally prohibits a state from imposing any premiums on individuals whose income falls below 150% of the federal poverty line. *Id.* § 1396*o*(c)(1).

54.     Section 1396*o*-1, which Congress passed in 2006 to give states additional flexibility to impose premiums and cost sharing on enrollees, likewise prohibits a state from imposing any premiums on individuals with household incomes below 150% of FPL. Deficit Reduction Act of 2005, Pub. L. No. 109-171, 120 Stat. 4, 82 (codified at 42 U.S.C. § 1396*o*-1(b)(1)(A)).

55.     Nothing in Section 1396*o* or 1396*o*-1 gives the Secretary authority to waive these limits on premiums.

56.     The Medicaid Act requires states to "provide such safeguards as may be necessary to assure that eligibility for care and services . . . and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients." 42 U.S.C. § 1396a(a)(19).

## C.    The Secretary's Section 1115 Waiver Authority

57.    Section 1115 of the Social Security Act, codified at 42 U.S.C. § 1315, grants the Secretary authority to waive a state's compliance with certain requirements of the Medicaid Act under certain conditions.

58.    The Secretary may grant a Section 1115 Medicaid waiver only in the case of an "experimental, pilot, or demonstration project which . . . is likely to assist in promoting the objectives" of the Medicaid Act. *Id*. § 1315(a).

59.    The Secretary may only waive requirements of Section 1396a of the Medicaid Act. *Id*. § 1315(a)(1).

60.    The Secretary may not waive compliance with requirements that Congress has placed outside of Section 1396a.

61.    The Secretary may grant a Section 1115 waiver "only to the extent and for the period necessary" to enable the state to carry out the experimental, pilot, or demonstration project. *Id*.

62.    The costs of such a project, upon approval, are included as expenditures under the state Medicaid plan. *Id*. § 1315(a)(2).

63.    The Secretary must follow certain procedural requirements before approving a Section 1115 project. *Id*. § 1315(d); 42 C.F.R. §§ 431.400 to 431.416. In particular, after receiving a complete application from a state (following a state-level public comment period), the Secretary must provide a 30-day public notice and comment period. 42 U.S.C. § 1315(d); 42 C.F.R. § 431.416.

64.    The Secretary does not have the authority to waive compliance with other federal laws, such as the United States Constitution, the Americans with Disabilities Act, or other federal statutes.

65.     For example, the Fair Labor Standards Act ("FLSA") requires that all individuals, including individuals receiving public benefits, be compensated at least the minimum wage in exchange for hours worked. *See* 29 U.S.C. § 206(a)(1)(C); Dep't of Labor, *How Workplace Laws Apply to Welfare Recipients* at 2 (1997), http://nclej.org/wp-content/uploads/2015/11/LaborProtectionsAndWelfareReform.pdf. Notably, the Supplemental Nutrition Assistance Program ("SNAP") and Temporary Assistance for Needy Families ("TANF") statutes specifically refer to work requirements and further describe how the benefits interact with the FLSA minimum wage protections. *See* 7 U.S.C. § 2029(a)(1) (SNAP); 42 U.S.C. § 607 (TANF). In contrast, there is no such reference or description in the Medicaid Act. And, according to the Department of Labor, medical assistance, unlike SNAP and TANF cash benefits, may not be substituted for a wage. *See How Workplace Laws Apply to Welfare Recipients* at 4.

### D.     Medicaid in Indiana and the Healthy Indiana Plan

66.     Indiana, like all other states, has elected to participate in Medicaid. *See* Ind. Code §§ 12-15-1 to 12-15-44.5 (2019); 405 Ind. Admin. Code. The Indiana Family and Social Services Administration ("FSSA") administers the program at the state level.

67.     The federal government generally reimburses Indiana for approximately 66% of the cost of providing medical assistance through its Medicaid program. *See* 82 Fed. Reg. 55385 (Nov. 21, 2017) (fiscal year 2019); 83 Fed. Reg. 61159 (Nov. 28, 2018) (fiscal year 2020).

68.     In 2007, Indiana passed legislation to provide health care coverage to certain low-income adults who were not otherwise eligible for coverage under the Medicaid Act. 2007 Ind. Acts 3525.

69.     To implement that legislation, Indiana submitted an application for a Section 1115 project called the Healthy Indiana Plan ("HIP"). CMS approved the project, effective January 1,

2008 through December 31, 2012. Letter from Kerry Weems, Acting Adm'r., Ctrs. for Medicare & Medicaid Servs., to Mr. E. Mitchell Roob, Jr., Sec'y, Ind. Family & Soc. Servs. Admin. (Dec. 14, 2007) ("2007 Approval Letter") (Exh. A, hereto).

70.    The approval allowed the State to cover adults who were not otherwise eligible for Medicaid or Medicare, had been uninsured for six months, did not have access to coverage through their job, and had household income up to 200% of FPL. CMS, Special Terms and Conditions HIP, 9 (2007) ("2007 STCs") (Exh. B, hereto).

71.    Indiana designed HIP to resemble a commercial high-deductible health plan. *Id*. at 2. According to the Secretary's approval, the State was "test[ing] a model of health coverage that emphasizes private health insurance, personal responsibility, and 'ownership' of health care." 2007 Approval Letter at 2.

72.    As such, the Secretary permitted Indiana to impose a number of restrictions on coverage, including: setting an annual and lifetime limit on benefits, 2007 STCs at 18; charging enrollees monthly premiums, *id*. at 20-21; terminating coverage for enrollees who do not pay their premiums and prohibiting them from re-enrolling in the project for 12 months, *id*. at 25; imposing a lockout penalty on individuals who do not complete the redetermination process by the deadline, *id*. at 26; eliminating retroactive eligibility, *id*. at 48; and eliminating NEMT, *id*. at 47.

73.    Enrollees paid their monthly premiums into a Personal Wellness and Responsibility ("POWER") account. *Id*. at 10. Generally, enrollees used the account to pay for services (other than preventive services) until they reached their deductible. *Id*. Enrollees with money remaining in the POWER account at the end of the 12-month eligibility period could rollover the balance to the following year to reduce the amount of their monthly premiums. *Id*. at 24. However, enrollees who

14

did not receive all recommended preventive services during the eligibility period could only rollover the amount that they – as opposed to the State – contributed to the account. *Id.*

74.     HIP began operation on January 1, 2008.

75.     After passage of the ACA in 2010, the Indiana legislature gave the Secretary of FSSA permission to amend HIP "in a manner that would allow Indiana to use the plan to cover" the Medicaid expansion population. 2011 Ind. Acts 16535.

76.     Between 2012 and 2015, CMS approved several short-term extensions of HIP while it continued negotiations with Indiana regarding coverage of the expansion population. These extensions also included some modifications to the project. For example, in 2013, the Secretary allowed Indiana to extend the project through the end of 2014 and to drop the income eligibility limit to 100% of FPL. *See* Letter from Cindy Mann, Dir., Ctr. for Medicaid & CHIP Servs., to Debra F. Minott, Sec'y, Ind. Family & Soc. Servs. Admin. (Sept. 3, 2013).

77.     Indiana contracted with an outside evaluator to assess the effect of HIP. *See* Ind. Family & Soc, Servs. Admin., *HIP 2.0 1115 Waiver Application*, 10 (2014), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/ downloads/in/Healthy-Indiana-Plan-2/in-healthy-indiana-plan-support-20-exp-app-07022014.pdf ("2014 Waiver Application").

78.     In July 2014, Indiana submitted an application to extend HIP for five more years, with several modifications. In particular, Indiana proposed to include parents/caretakers and the entire Medicaid expansion population in the project as a way to "replace traditional Medicaid for all non-disabled adults ages 19-64." 2014 HIP 2.0 Waiver Application, at 4. Indiana referred to the new version of the project as HIP 2.0. *See id.*

15

79.     In January 2015, CMS approved HIP 2.0 for three years, effective February 1, 2015. Letter from Marilyn Tavenner, Adm'r. Ctrs. for Medicare & Medicaid Servs., to Joseph Moser, Medicaid Dir., Ind. Family & Soc. Servs. Admin. (Jan. 27, 2015), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/in/Healthy-Indiana-Plan-2/in-healthy-indiana-plan-support-20-appvl-01272015.pdf ("2015 Approval Letter"); CMS, Waiver List for HIP 2.0 ("2015 Waiver List"); CMS, Special Terms and Conditions HIP 2.0 (2015) ("2015 STCs") (collectively Exh. C, hereto). As approved, HIP 2.0 included parents/caretaker relatives, individuals receiving TMA, and the Medicaid expansion population. 2015 STCs at 8-9.

80.     Also effective February 1, 2015, Indiana amended its state plan to cover the Medicaid expansion population. State Plan Amendment IN-15-0001-MM1, https://www.medicaid.gov/State-resource-center/Medicaid-State-Plan-Amendments/Downloads/IN/IN-15-0001-MM1.pdf.

81.     The features of HIP 2.0 mirrored those of the initial HIP project. In approving HIP 2.0, the Secretary allowed Indiana to: charge enrollees monthly premiums; terminate coverage for individuals with household incomes above 100% of FPL who do not pay their premiums and prohibit them from re-enrolling in the project for six months; eliminate retroactive eligibility; and eliminate NEMT for the expansion population. 2015 Waiver List at 1-3; *see also* Letter from Eliot Fishman, Dir., Ctrs. for Medicare & Medicaid Servs. State Demonstrations Group, to Joseph Moser, Medicaid Dir., Ind. Family & Soc. Servs. Admin. (Nov. 25, 2016), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/in/Healthy-Indiana-Plan-2/in-healthy-indiana-plan-support-20-nemt-temp-ext-ltr-11252016.pdf (extending the NEMT waiver through January 31, 2018).

82.     In addition, the approval allowed Indiana to offer two different benefit packages to individuals in the expansion population – HIP Basic and HIP Plus, with HIP Plus covering all HIP Basic services plus vision and dental care. 2015 STCs at 14. With the exception of medically frail individuals, expansion enrollees with household incomes at or below 100% of FPL who did not pay their monthly premiums received HIP Basic. *Id.*

83.     HIP 2.0 also included a "Gateway to Work" initiative. The State referred all eligible HIP participants – adults who did not have a disability, were working fewer than 20 hours per week, and were not full time students – to its workforce training and work search resources. *See* 2014 HIP 2.0 Waiver Application at 20-21.

84.     Participation in Gateway to Work was voluntary and not linked to health insurance coverage. 2015 HIP 2.0 Approval Letter at 3.

85.     Indiana contracted with an outside evaluator to assess certain features of the HIP 2.0 project. *See, e.g.,* Lewin Group, *HIP 2.0 Interim Evaluation* (2016) ("Lewin Interim Evaluation"), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/in/Healthy-Indiana-Plan-2/in-healthy-indiana-plan-support-20-interim-evl-rpt-07062016.pdf; Lewin Group, *Indiana HIP 2.0: POWER Account Contribution Assessment* (2017), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/in/Healthy-Indiana-Plan-2/in-healthy-indiana-plan-support-20-POWER-acct-cont-assesmnt-03312017.pdf; Lewin Group, *Indiana HIP 2.0: Final Evaluation of Non-Emergency Medical Transportation (NEMT) Waiver* (2016), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/in/Healthy-Indiana-Plan-2/in-healthy-indiana-plan-support-20-nemt-final-evl-rpt-11022016.pdf.

### E.  Extension and Amendment of the Healthy Indiana Plan

86.     In January 2017, Indiana applied to extend HIP 2.0 for three years. *See* Ind. Fam. & Soc. Servs. Admin., *Healthy Indiana Plan: Section 1115 Waiver Extension Application* (Jan. 31, 2017), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/ downloads/in/Healthy-Indiana-Plan-2/in-healthy-indiana-plan-support-20-demo-app-02152017.pdf ("2017 HIP 2.0 Extension Application"); Letter from Gov. Eric J. Holcomb to Norris Cochran, Acting Sec'y, Dep't of Health & Human Servs. (Jan. 31, 2017) (collectively Exh. D, hereto).

87.     In its extension application, Indiana requested permission to "maintain and develop" HIP 2.0 "as Congress and the Administration develop much needed plans for repealing and replacing ObamaCare." Letter from Gov. Eric J. Holcomb to Norris Cochran, Acting Sec'y, Dep't of Health & Human Servs. (Jan. 31, 2017).

88.     The Extension Application stated that available data demonstrated that Gateway to Work "is facilitating member access" to job training and stable work. 2017 HIP 2.0 Extension Application at 17.

89.     It also reiterated that it designed HIP 2.0 to "align with standard commercial market policies" to educate members and prepare them to use private insurance coverage. *Id*. at 4.

90.     Similarly, Indiana stated that HIP 2.0 "empower[s] enrollees to become active consumers of healthcare services." Specifically, the POWER account and premiums "give[] participants 'skin in the game' and provide[] a financial incentive for members . . . to adopt healthy behaviors and to seek price transparency to make value conscious decisions, leading to better health outcomes. . . ." *Id*.

91.     CMS provided a public comment period on the extension application from February 15, 2017 through March 17, 2017. Ninety-eight public comments were submitted through the CMS website. *See* Medicaid.gov, Healthy Indiana Plan, List of Responses, https://public.medicaid.gov/ connect.ti/public.comments/questionnaireVotes?qid=1889411 (last visited Sept. 20, 2019).

92.     In March 2017, former Secretary Price and Defendant Verma sent a letter to every Governor indicating their "intent to use existing Section 1115 demonstration authority to review and approve meritorious innovations that build on the human dignity that comes with" work. *See* Sec'y of Health & Human Servs., Dear Governor Letter, 2 https://www.hhs.gov/sites/default/ files/sec-price-admin-verma-ltr.pdf (Exh. E, hereto).

93.     Indiana responded directly to that letter by submitting an amendment to its application to extend HIP 2.0. *See* Letter from Gov. Eric J. Holcomb to "Fellow Hoosiers" (May 24, 2017), https://www.in.gov/fssa/hip/files/HIP_Amendment_EJH_Letter.pdf.     The     State     requested permission to make participation in the Gateway to Work initiative mandatory. *Id.* To maintain their Medicaid eligibility, enrollees would need to work or complete work-related activities. Ind. Family & Soc. Servs. Admin., *Amendment Request to Healthy Indiana Plan Section 1115 Waiver Extension Application*, 4-8 (May 24, 2017), https://www.in.gov/fssa/hip/files/HIP_Amendment_- _FINAL_Publication_Version.pdf ("May 2017 HIP 2.0 Extension Application Amendment") (Exh. F, hereto).

94.     Indiana opened a state comment period on the amended extension application from May 24, 2017 to June 23, 2017. CMS opened a concurrent comment period on June 8, 2017.

95.     On July 3, 2017, the National Health Law Program informed CMS that the overlapping comment periods violated federal regulations. Letter from Jane Perkins, Legal Dir., Nat'l Health

Law Program, to Thomas Price, Sec'y, Dep't of Health & Human Servs. (July 3, 2017) (Exh. G, hereto).

96.     Two weeks later, Indiana sent HHS a "final submission" in support of the amendment and requested that HHS leave the comment period open for another 30 days. Letter from Gov. Eric J. Holcomb to Thomas Price, Sec'y, Dep't of Health & Human Servs. (July 20, 2017); Ind. Fam. & Soc. Servs. Admin., *Amendment Request to Healthy Indiana Plan Section 1115 Waiver Extension Application* (July 20, 2017), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/in/Healthy-Indiana-Plan-2/in-healthy-indiana-plan-support-20-demo-app-07202017.pdf ("July 2017 HIP 2.0 Extension Application Amendment") (collectively Exh. H, hereto).

97.     In this final submission, the State made an about-face, now stating that the voluntary Gateway to Work program had not been successful in connecting individuals to sustained work. July 2017 HIP 2.0 Extension Application Amendment at 4; *cf.* 2017 HIP 2.0 Extension Application at 17 (stating that available data demonstrate that Gateway to Work "is facilitating member access" to job training and stable work). Without explaining or assessing the reasons for the purported failure of the Gateway to Work program, the State asked for permission to "strengthen" it by making participation mandatory. July 2017 HIP 2.0 Extension Application Amendment at 4.

98.     The actuary hired by the State estimated that, of HIP enrollees who: (1) are enrolled for the full calendar year; (2) do not qualify for an exemption; and (3) are not currently working 20 hours every week, approximately 25% would not comply with the work requirements. July 2017 HIP 2.0 Extension Application Amendment, Attachment A at 11. According to the actuary, once the State has fully implemented the work requirements, approximately 24,000 individuals will lose coverage every year for failure to comply. *See id*. The estimate does not include individuals who

will lose coverage for failure to seek an exemption or for failure to report their work and community engagement hours. *See id*.

99.     CMS held the initial public comment period open through August 31, 2017. In total, eighty-one comments were submitted online between June 8, 2017 and August 31, 2017. Medicaid.gov, Healthy Indiana Plan, List of Responses, https://public.medicaid.gov/connect.ti/public.comments/questionnaireVotes?qid=1890851 (last visited Sept. 20, 2019).

100.    On February 1, 2018, CMS approved Indiana's amended request to renew HIP 2.0 through December 31, 2020. Letter from Demetrios L. Kouzoukas, Principal Dep. Adm'r., Ctrs. for Medicare & Medicaid Servs. to Allison Taylor, Medicaid Dir., Ind. Family & Soc. Servs. Admin. (Feb. 1, 2018) ("2018 Approval Letter"); CMS, HIP 2.0 Special Terms and Conditions ("2018 STCs"); CMS, HIP Waiver List ("2018 Waiver List") (collectively Exh. I, hereto).

101.    The extended HIP 2.0 project applies to the same population groups as the initial HIP 2.0 project, as well as pregnant women with household incomes up to 133% of FPL. *See* 2018 STCs at 8-9.

102.    All individuals enrolled in HIP 2.0 derive their eligibility through the Medicaid state plan. *Id*.

103.    In approving the extended HIP 2.0 project, the Secretary described the objectives of the project as to "improve health outcomes, promote increased upward mobility and improve quality of life, increase individual engagement in health care decisions, and prepare individuals who transition to commercial health insurance coverage to be successful in this transition." 2018 Approval Letter at 6; *see also id*. at 3 (listing the factors CMS examined in considering the project).

104.     The Secretary did not provide a bottom-line estimate of how many people would lose Medicaid with the HIP 2.0 extension in place.

105.     On information and belief, as of the date of this complaint, Indiana does not have an approved plan for how to evaluate the success or failure of the extended HIP 2.0 project.

106.     On July 25, 2019, Indiana submitted an application to amend the project by: (1) adding two exemptions to the work requirement; and (2) providing individuals who lose Medicaid eligibility due to an increase in their household income with up to $1000 to pay for certain health care expenses. *See* Letter from Gov. Eric J. Holcomb to Calder Lynch, Acting Dep. Adm'r & Dir., Ctrs. for Medicare & Medicaid Servs. (July 25, 2019), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/in/in-healthy-indiana-plan-support-20-pa6.pdf. The amendment is pending with CMS.

107.     The key features of the approved HIP 2.0 extension are described in detail below.

 Work and Community Engagement Requirements

108.     Indiana began implementing the work requirements on January 1, 2019. Ind. Family & Soc. Servs. Admin., *Learn about Gateway to Work*, https://www.in.gov/fssa/hip/2592.htm (last visited Sept. 18, 2019). Under the approval, HIP 2.0 enrollees aged 19 to 59 must engage in specified work or work-related activities for a certain number of hours each week. The number of required hours increases as follows: 0 hours per week in months 1 through 6 of implementation; 5 hours per week in months 7 through 9; 10 hours per week in months 10 through 12; 15 hours per week in months 13 through 18; and 20 hours per week thereafter. 2018 STCs at 14. Enrollees who complete more hours than required in a particular week can transfer the extra hours to another week in the same calendar month. *Id.*

109. Currently, individuals must complete 5 hours of work or work-related activities every week. *Id*; Ind. Family & Soc. Servs. Admin., *Learn about Gateway to Work*, https://www.in.gov/fssa/hip/2592.htm (last visited Sept. 18, 2019). The number of hours required will increase to: 10 hours per week on October 1, 2019; 15 hours per week on January 1, 2020; and 20 hours per week on July 1, 2020. *Id*.

110. The work requirements do not apply to pregnant women or individuals who are medically frail. 2018 STCs at 12-13. Individuals are medically frail if they are determined to have a disabling mental disorder, chronic substance abuse disorder, serious and complex medical condition, or physical, intellectual, or developmental disability that significantly impairs their ability to perform one or more activities of daily living. 405 Ind. Admin. Code 10-2-1(30); *see also id*. 10-6-1 (describing the medically frail screening process); Ind. Fam. & Soc. Servs. Admin., *Conditions that may qualify you as medically frail*, https://www.in.gov/fssa/hip/2465.htm (last visited Sept. 18, 2019).

111. In addition, enrollees who meet certain other criteria are exempt from the requirements. 2018 STCs at 12-13.

112. Every December, the State will review enrollees' compliance with the work requirements over the course of the calendar year. *Id*. at 15. If an enrollee who was subject to the requirements failed to meet them in more than four months of the year, the State will suspend coverage on the first day of the next calendar year. *Id*.

113. The suspension will last until: (1) the month after the State receives notice that the individual has completed the required hours for one month; (2) the month the State receives notice that the individual qualifies for an exemption; or (3) the individual is subject to redetermination, at which point the State will terminate Medicaid coverage. *Id*. at 16. However, if a suspended enrollee

23

becomes pregnant or eligible for Medicaid under a population group not included in HIP 2.0, the State will reactivate coverage. *Id*.

114.    In approving the work requirements, the Secretary stated that they would "test whether requiring some beneficiaries to engage in community engagement requirements will lead to improved health outcomes." 2018 Approval Letter at 2. The Secretary also based the approval on the grounds that the work requirements would "encourage beneficiaries to gain independence and to transition to private coverage." *Id*. at 7.

115.    The Secretary did not mention fiscal sustainability as a basis for approving the project. *See* 2018 Approval Letter.

116.    The Secretary did not mention the estimate of coverage loss submitted by the State. *Id.*

Monthly Premiums and Penalties for Failure to Pay

117.    With the exception of pregnant women, HIP 2.0 enrollees at all income levels are required to pay monthly premiums. 2018 STCs at 19.

118.    The Secretary has approved Indiana to charge the following premiums: $1 per month for individuals with incomes 0-22% of FPL; $5 per month for individuals with incomes 23-50% of FPL; $10 per month for individuals with incomes 51-75% of FPL; $15 per month for individuals with incomes 76-100% of FPL; $20 per month for individuals with incomes 101-138% of FPL. 2018 STCs at 21.

119.    Spouses each pay half of the monthly amount, with the exception of those with incomes below 22% of FPL, who each pay $1. *Id*.

120.    The Secretary also approved a surcharge for tobacco use. Beginning in their second year of enrollment in HIP 2.0, individuals who use tobacco are charged an additional 50% on their premiums. *Id*.

24

121.    In general, HIP 2.0 enrollees subject to the premium requirement do not receive Medicaid coverage until the first day of the month in which they pay their initial premium. *Id*. at 9-10.

122.    Individuals with household incomes above 100% of FPL who do not pay their initial premium within 60 days of receiving an invoice are not enrolled in Medicaid. *Id*. at 19. Individuals who do enroll, but do not pay a subsequent monthly premium within 60 days of the due date, are terminated from Medicaid and prohibited from re-enrolling for six months, unless they are medically frail. *Id*. at 19, 24. To end the lockout penalty early, enrollees must re-apply and show that they meet one of the narrow "good cause" exceptions. *Id*. at 24-25.

123.    Individuals with household incomes at or below 100% of FPL who do not pay an initial or subsequent premium within 60 days of receiving an invoice are subject to copayments. *Id*. at 19-20. Expansion enrollees who are not medically frail are subject to an additional penalty – they are moved into HIP Basic and, thus, receive fewer benefits (*i.e.*, no vision, dental, and chiropractic services). *Id*. at 11, 19, 24.

124.    Enrollees in HIP Basic cannot regain access to HIP Plus until their annual redetermination period, unless the State, at its sole discretion, adds additional times for transition back to HIP Plus. *Id*. at 19.

125.    Enrollees may be required to spend up to 5% of household income per quarter on premiums and cost sharing combined. *See id*. at 24.

126.    Indiana contracts with managed care organizations to deliver services to HIP 2.0 enrollees. The managed care organizations are responsible for billing for and collecting premiums from enrollees. *Id*. at 20.

127.    The Secretary described the purpose of the premiums and associated consequences for inability to pay as "to prepare beneficiaries to participate in the commercial market." 2018 Approval Letter at 7.

128.    The imposition of premiums has been authorized in Indiana under Section 1115 for more than 11 years – since January 1, 2008.

129.    Data show the premiums and associated consequences for failure to pay have reduced enrollment in Medicaid in Indiana. *See, e.g.*, Lewin Power Account Assessment at ii, 8-12.

130.    Commenters cited many previous studies of the effects of premiums on low-income individuals' health coverage. This redundant research consistently concludes that such premiums reduce enrollment in Medicaid.

Lockout Penalty for Not Completing Redetermination Paperwork

131.    Consistent with federal Medicaid law, Indiana redetermines the Medicaid eligibility of HIP 2.0 enrollees every 12 months and terminates coverage for those who do not complete the redetermination process by the end of their eligibility period. Also consistent with federal law, individuals who have been terminated have a 90-day period to re-enroll by submitting their redetermination forms; no new application is required. 2018 STCs at 26.

132.    The HIP 2.0 extension authorizes Indiana to impose a lockout penalty on individuals who do not submit the specified information by the end of the 90-day period. *Id*. The approval allows the State to prohibit these individuals from re-enrolling in Medicaid for an additional three months. *Id*.  The lockout penalty does not apply to those who are pregnant, parents/caretakers, or medically frail. *Id*.

133.    Individuals can re-enroll in Medicaid before the end of the lockout period only if they: (1) demonstrate that one of the narrow "good cause" exceptions applies; (2) become pregnant; or (3) are determined to be medically frail. *Id*. at 26-27.

134.    In 2016, Indiana had requested permission to impose the identical lockout penalty on HIP 2.0 enrollees. CMS denied that request, stating that the penalty was not consistent with the objectives of the Medicaid program, "which include ensuring access to affordable coverage." Letter from Vikki Wachino, Dir., Ctrs. for Medicare & Medicaid Servs., to Tyler Ann McGuffee, Ins. & Healthcare  Pol.  Dir.,  Office  of  the  Gov.  of  Ind.  1  (July  29,  2016), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/in/Healthy-Indiana-Plan-2/in-healthy-indiana-plan-support-20-lockouts-redetermination-07292016.pdf.

135.    CMS noted that, at that time, 5% of HIP 2.0 enrollees were not completing the renewal process by the deadline, meaning that the lockout penalty would exclude approximately 18,850 people from coverage each year. *Id*. at 2.

136.    In approving the HIP 2.0 extension, the Secretary stated that "CMS has reconsidered its earlier position and believes the state should be given the opportunity to test the efficacy of this policy. . . ." 2018 Approval Letter at 4. According to the approval, "[w]ith this policy, the state will test whether incentivizing beneficiaries to follow established procedures and engage in maintaining their healthcare coverage will lead to improved health outcomes." *Id*. at 3.

No Retroactive Eligibility

137.    Under the HIP 2.0 extension approval, enrollees (other than pregnant women), will not receive three months' retroactive eligibility required by the Medicaid Act. 2018 Waiver List at 3. Instead, as outlined above, the State will generally only pay for services received on or after the

first day of the month in which an individual pays their initial monthly premium. 2018 STCs at 9-10.

138.   According to the approval, "[t]he waiver of retroactive eligibility encourages beneficiaries to obtain and maintain health coverage, even when healthy," and as a result, "is intended to increase continuity of care. . . ." 2018 Approval Letter at 5.

139.   The termination of retroactive coverage has been authorized in Indiana pursuant to Section 1115 for more than 11 years – since January 1, 2008.

<u>Elimination of NEMT</u>

140.   The Secretary approved Indiana's request not to cover NEMT for HIP 2.0 enrollees, with the exception of individuals determined medically frail, parents/caretakers, and pregnant women. 2018 Waiver List at 2.

141.   The Secretary did not mention the waiver of NEMT in the approval letter.

142.   The elimination of NEMT has been authorized in Indiana under Section 1115 for more than 11 years – since January 1, 2008.

**F.  Action Taken by the Defendants to Allow Work Requirements**

143.   Prior to 2017, CMS's website stated that the purpose of Section 1115 waivers is to "demonstrate and evaluate policy approaches such as:

- Expanding eligibility to individuals who are not otherwise Medicaid or CHIP eligible;

- Providing services not typically covered by Medicaid; or

- Using innovative service delivery systems that improve care, increase efficiency, and reduce costs."

Medicaid.gov, *About Section 1115 Demonstrations*, https://www.medicaid.gov/medicaid/section-1115-demo/about-1115/index.html (last visited September 5, 2017). The "general criteria" CMS used when assessing waiver applications looked at whether the demonstration would:

1. Increase and strengthen overall coverage of low-income individuals in the state;

2. Increase access to, stabilize, and strengthen providers and provider networks available to serve Medicaid and low-income populations in the state;

3. Improve health outcomes for Medicaid and other low-income populations in the state; or

4. Increase the efficiency and quality of care for Medicaid and other low-income populations through initiatives to transform service delivery networks.

*Id.*

144.     Prior to 2017, CMS recognized that work requirements do "not support the objectives of the [Medicaid] program" and "could undermine access to care." Letter from Andrew M. Slavitt, Acting Adm'r, Ctrs. for Medicare & Medicaid Servs., HHS to Thomas Betlach, Dir. Az. Health Care Cost Containment System (Sept. 30, 2016); *see also* Sec'y of Health & Human Servs. Sylvia Burwell, Hearing on The President's Fiscal Year 2017 Budget, Responses to Additional Questions for the Record, U.S. House of Rep. Energy & Commerce Health Subcommittee, 13 (Feb. 24, 2016), http://docs.house.gov/meetings/IF/IF14/20160224/104521/HHRG-114-IF14-Wstate-BurwellS-20160224-SD002.pdf.

145.     The current HHS abruptly reversed course to authorize work requirements in Medicaid as part of President Trump's vow to "explode" the ACA and its Medicaid expansion. Amy Goldstein & Juliet Eilperin, *Affordable Care Act Remains "Law of the Land," but Trump Vows to Explode It*, Wash. Post, Mar. 24, 2017, https://wapo.st/2Do6m8v.

146.     On the day he took office, President Trump signed an Executive Order calling on federal agencies to undo the ACA "[t]o the maximum extent permitted by law." Executive Order 13765, Minimizing the Economic Burden of the Patient Protection and Affordable Care Act Pending Repeal, 82 Fed. Reg. 8351 (Jan. 20, 2017), https://www.federalregister.gov/documents/2017/01/

24/2017-01799/minimizing-the-economic-burden-of-the-patient-protection-and-affordable-care-act-pending-repeal.

147.    On March 14, 2017, Defendant Seema Verma was sworn in as the Administrator of CMS. Defendant Verma and former Secretary Price immediately issued a letter to state governors announcing CMS's disagreement with the Medicaid Act, stating that "[t]he expansion of Medicaid through the Affordable Care Act ("ACA") to non-disabled, working-age adults without dependent children was a clear departure from the core, historical mission of the program." *See* Sec'y of Health & Human Servs., Dear Governor Letter 1, https://www.hhs.gov/sites/default/files/sec-price-admin-verma-ltr.pdf.

148.    Since then, Defendant Verma has made repeated public statements criticizing the expansion of Medicaid to "able-bodied individual[s]," advocating for lower enrollment in Medicaid, and outlining plans to "reform" Medicaid through agency action. Casey Ross, *Trump health official Seema Verma has a plan to slash Medicaid rolls, Here's how*, Stat, Oct. 26, 2017, https://www.statnews.com/2017/10/26/seema-verma-medicaid-plan/ (last visited Sept. 18, 2019).

149.    For instance, on June 27, 2017, Defendant Verma wrote an opinion piece in the Washington Post observing that "U.S. policymakers have a rare opportunity, through a combination of congressional and administrative actions, to fundamentally transform Medicaid." Seema Verma, *Lawmakers have a rare chance to transform Medicaid.  They should take it*, Wash. Post, June 27, 2017, https://wapo.st/2yQ9XIE.

150.    On November 7, 2017, at a speech before the National Association of Medicaid Directors, Defendant Verma declared that the ACA's decision to "move[] millions of working-age, non-disabled adults into" Medicaid "does not make sense" and announced that CMS would resist that change by approving state waivers that contain work requirements. Speech: Remarks by

Administrator Seema Verma at the National Association of Medicaid Directors (NAMD) 2017 Fall

Conference, CMS.gov (Nov. 7, 2017), https://go.cms.gov/2PELxLW.

151.    On November 10, 2017, Defendant Verma gave an interview in which she declared that

one of the "major, fundamental flaws in the Affordable Care Act was putting in able bodied adults,"

declaring that Medicaid was "not designed for an able bodied person," and announcing that CMS

is "trying" to "restructure the Medicaid program." Wall Street Journal, *The Future of: Health Care*

(Nov. 10, 2017), https://on.wsj.com/2AMeGMW (last visited Sept. 18, 2019).

152.    In early November 2017, CMS revised its website to invite states to submit Section 1115

waivers that would:

1. Improve access to high-quality, person-centered services that produce positive health
   outcomes for individuals;

2. Promote efficiencies that ensure Medicaid's sustainability for beneficiaries over the
   long term;

3. Support coordinated strategies to address certain health determinants that promote
   upward mobility, greater independence, and improved quality of life among
   individuals;

4. Strengthen beneficiary engagement in their personal healthcare plan, including
   incentive structures that promote responsible decision-making;

5. Enhance alignment between Medicaid policies and commercial health insurance
   products to facilitate smoother beneficiary transition; and

6. Advance innovative delivery system and payment models to strengthen provider
   network capacity and drive greater value for Medicaid.

Medicaid.gov, *About Section 1115 Demonstrations*, https://www.medicaid.gov/medicaid/section-

1115-demo/about-1115/index.html (last visited Sept. 18, 2019).

153.    On January 11, 2018, well after the federal comment period for the Indiana HIP 2.0

extension application had closed, Defendant CMS issued a letter to State Medicaid Directors titled

"Opportunities to Promote Work and Community Engagement Among Medicaid Beneficiaries."

Letter from Brian Neale, Dir., Ctr. for Medicaid & CHIP Servs., to State Medicaid Directors (Jan. 11, 2018), https://www.medicaid.gov/federal-policy-guidance/downloads/smd18002.pdf ("Dear State Medicaid Director Letter") (Exh. J, hereto).

154.    The nine-page document "announc[es] a new policy" that allows states to impose "work and community engagement" requirements on certain Medicaid recipients – specifically, "non-elderly, non-pregnant adult Medicaid beneficiaries who are eligible for Medicaid on a basis other than disability." *Id*. at 1.

155.    The Dear State Medicaid Director Letter acknowledges that allowing states to implement work requirements "is a shift from prior agency policy." *Id*. at 3.

156.    The Dear State Medicaid Director Letter was not submitted for notice and comment and was not published in the Federal Register.

157.    The same day CMS issued the Dear State Medicaid Director Letter, it received several letters critical of this novel policy position, including from members of Congress and nonprofit organizations. The National Health Law Program ("NHeLP") noted that by announcing the policy change after the HIP 2.0 comment period had closed, CMS had not given the public the ability to comment meaningfully on the pending waiver requests in light of the policy change. NHeLP explained that the Dear State Medicaid Director Letter "entirely ignore[d] the wealth of literature regarding the negative health consequences of work requirements, which was repeatedly cited by NHeLP and others in those state-specific comments." Letter from Jane Perkins, Legal Dir., Nat'l Health Law Program, to Brian Neale, Dir., Ctrs. for Medicare & Medicaid Servs. (Jan. 11, 2018), https://9kqpw4dcaw91s37kozm5jx17-wpengine.netdna-ssl.com/wp-content/uploads/2018/01/NHeLP-Letter-Re-Work-DSMD.pdf.

158.    NHeLP requested that CMS re-open public comment on the HIP 2.0 extension application to allow the public a meaningful opportunity to comment on the work requirements. Defendants ignored this request.

159.    On or about January 18, 2018, CMS further emphasized that it disagrees with the legislative expansion of Medicaid under the ACA and that it had announced the "new policy guidance" to support state implementation of work requirements intended to target that expansion population. CMS, Community Engagement Initiative Frequently Asked Questions, https://www.medicaid.gov/medicaid/section-1115-demo/community-engagement/index.html.

160.    On February 1, 2018, Defendant HHS approved the HIP 2.0 extension application.

161.    In issuing the approval, CMS emphasized that the terms and conditions of Indiana's work requirements "are aligned with the guidance provided to states through" the Dear State Medicaid Director Letter. *See* 2018 HIP 2.0 Approval at 2; *see also id.* at 4 (again citing the DSMD Letter).

162.    The Secretary has also implemented the policy guidance in the Dear State Medicaid Director Letter by approving similar work requirements in several other states: Kentucky, Arkansas, Wisconsin, New Hampshire, Michigan, Maine, Arizona, Ohio, and most recently, on March 29, 2019, Utah. *See also* Seema Verma, Adm'r, Ctrs. for Medicare & Medicaid Servs. (@Seema CMS), Twitter (Mar. 5, 2018, 9:45 AM), https://twitter.com/SeemaCMS/status/1076221399390478336 (last visited Sept. 18, 2019) ("Maine marks the 7th community engagement demonstration we have approved since announcing this important opportunity earlier this year.").

163.    The Defendants have continued to express their opposition to the Medicaid expansion and their intent to transform the Medicaid program through work requirements. For example, Defendant Verma stated: "As you know, Obamacare put millions of people, millions of able-bodied

individuals, into a program that was built for our most needy, for our most vulnerable citizens. And so, we think that the program needs change. It needs to be more adaptable and more flexible to address the needs of the newly-covered population." Interview by Bertha Coombs, CNBC, with Seema Verma, Adm'r, Ctrs. for Medicare & Medicaid Servs., (May 1, 2018).

164.    In July 2018, after *Stewart v. Azar*, 313 F. Supp. 3d 237 (D.D.C. 2018) vacated and remanded HHS's approval of the Kentucky HEALTH project, which included work requirements, Defendant Verma reiterated that CMS is "very committed" to work requirements and wants "to push ahead with our policy initiatives and goals." Dan Goldberg, *Verma: Court ruling won't close door on other Medicaid work requests*, Politico, July 17, 2018, https://www.politico.com/story/2018/07/17/trump-medicaid-work-requests-states-verma-726303 (last visited Sept. 18, 2019).

165.    In July 2018, Defendant Azar similarly stated: "We are undeterred. We are proceeding forward. . . . We're fully committed to work requirements and community participation in the Medicaid program. . . . we will continue to litigate, we will continue to approve plans, we will continue to work with states. We are moving forward." Colby Itkowitz, *The Health 202: Trump administration 'undeterred' by court ruling against Medicaid work requirements,* Wash. Post, July 25, 2018, https://www.washingtonpost.com/news/powerpost/paloma/the-health-202/2018/07/27/the-health-202-trump-administration-undeterred-by-court-ruling-against-medicaid-work-requirements/5b5a10bb1b326b1e64695577/?utm_term=.7ba76e8a0719; *see also* Alex M. Azar II, Sec'y, U.S. Dep't of Health & Human Servs., Remarks on State Healthcare Innovation at the American Legislative Exchange Council Annual Meeting (Aug. 8, 2018) ("[Defendant Verma] is now overseeing the next great generation of transformation in Medicaid, through our efforts to encourage work and other forms of community engagement.").

34

166.    In a speech on September 27, 2018, Defendant Verma explained that the Dear State Medicaid Director Letter "guidance was followed by four approvals of innovative Medicaid demonstrations" and elaborated that "[w]e are committed to this issue and we are moving closer to approving even more state waivers. As such, I'm happy to share with you today that we have finalized the terms for our next innovative community engagement demonstration, which we expect to deliver to the state very soon." SPEECH: Remarks by Administrator Seema Verma at the 2018 Medicaid Managed Care Summit, CMS.gov (Sep. 27, 2018), https://www.cms.gov/newsroom/press-releases/speech-remarks-administrator-seema-verma-2018-medicaid-managed-care-summit.

167.    On December 21, 2018, Administrator Verma tweeted, "The Christmas sleigh has made deliveries to Kansas, Rhode Island, Michigan, and Maine to drop off signed #Medicaid waivers. Christmas came early for these Governors. . . ." Seema Verma, Adm'r, Ctrs. for Medicare & Medicaid Servs. (@Seema CMS), Twitter (Dec. 21, 2018, 1:13 PM), https://twitter.com/seemacms/status/1076224135037108224?lang=en (last visited Sept. 18, 2019).

168.    On March 11, 2019, President Trump issued his 2020 budget. That budget proposes legislation to impose work requirements nationally and estimates they will save $130 billion over ten years. *See* Dep't of Health & Human Servs., *FY 2020 Budget in Brief*, 100 (Mar. 11, 2019), https://www.hhs.gov/sites/default/files/fy-2020-budget-in-brief.pdf.

169.    On March 14, 2019, CMS issued new guidance, further implementing the policies announced in the Dear State Medicaid Director Letter. The new guidance provides "standard monitoring metrics" that states must use to evaluate projects that require work or community engagement among working age adults. *Press Release: CMS Strengthens Monitoring and Evaluation Expectations for Medicaid 1115 Demonstrations*, CMS.gov (Mar. 14, 2019),

https://www.cms.gov/newsroom/press-releases/cms-strengthens-monitoring-and-evaluation-expectations-medicaid-1115-demonstrations.

170.    The guidance repeatedly notes CMS will continue to apply the guidelines set forth in the January 11, 2018 Dear State Medicaid Director Letter and clarifies that the letter communicates "CMS's expectation that states test the effects of community engagement requirements on health, well-being, independence, and the sustainability of the Medicaid program." Ctrs. for Medicare & Medicaid Servs., *Evaluation Design Guidance for Section 1115 Eligibility and Coverage Demonstrations*, 2, https://www.medicaid.gov/medicaid/section-1115-demo/downloads/evaluation-reports/ce-evaluation-design-guidance.pdf; *see also* Ctrs. for Medicare & Medicaid Servs., *Appendix to Evaluation Design Guidance for Section 1115 Eligibility & Coverage Demonstrations: Community Engagement*, 1, https://www.medicaid.gov/medicaid/section-1115-demo/downloads/evaluation-reports/ce-evaluation-design-guidance-appendix.pdf; Seema Verma, *Good Ideas Must Be Evaluated*, Ctrs. for Medicare & Medicaid Servs. Blog (Mar. 14, 2019), https://www.cms.gov/blog/good-ideas-must-be-evaluated (last visited Sept. 18, 2019).

171.    On March 27, 2019, after *Stewart v. Azar*, 366 F. Supp. 3d 125 (D.D.C. 2019) and *Gresham v. Azar*, 363 F. Supp. 3d 165 (D.D.C. 2019) vacated and remanded HHS's approval of work requirements and other eligibility restrictions in Kentucky and Arkansas, Defendant Verma said: "We will continue to defend our efforts to give states greater flexibility to help low income Americans rise out of poverty." Abigail Abrams, *Medicaid Work Requirements Stall in Several States*, Time, March 28, 2019, https://time.com/5560629/medicaid-work-requirements-arkansas-kentucky/.

172.    A CMS spokesperson issued an identical statement on July 29, 2019 in response to *Philbrick v. Azar*, 2019 WL 3414376 (D.D.C. 2019), which vacated and remanded HHS's approval

of New Hampshire's Section 1115 project containing work requirements. Amy Goldstein, *Federal judge strikes down New Hampshire's Medicaid work requirements*, Wash. Post, July 29, 2019, https://wapo.st/2YyegXf.

### G.   Effects of the HIP 2.0 Extension Approval on the Plaintiffs

173.    In the last quarter of 2018, HIP 2.0 enrollment totaled more than 378,000 individuals. *HIP 2.0 DY4 Annual Report, Appendix X* (2019), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/in/Healthy-Indiana-Plan-2/in-healthy-indiana-plan-support-20-annl-rpt-dy4-20190411.pdf.

174.    The HIP 2.0 work requirements, premiums and associated consequences for inability to pay, redetermination lockout penalty, elimination of retroactive coverage, and elimination of NEMT benefits have harmed and will continue to harm Plaintiffs. Specifically:

175.    Plaintiff Monte A. Rose, Jr. is 48 years old and lives alone in Bloomington, Indiana.

176.    He completed high school and took some college courses. In the past he has collected scrap metal, worked as a research assistant at Indiana University, and written columns for local newspapers.

177.    Mr. Rose is not currently working and does not have any income.

178.    He receives a housing subsidy from the Bloomington Housing Authority to pay for his rent. Mr. Rose goes to his local food pantry for food, and he eats organic vegetables that he grows himself.

179.    Given his interest in gardening, Mr. Rose is thinking about a gardening invention.

180.    Mr. Rose does not have internet in his home. He goes to the library to access the internet. He does not have a driver's license or a car. To get around he rides his bike, asks for rides, or takes public transportation.

181.    He has Meniere's disease, an inner ear condition that periodically causes migraines, dizzy spells, and headaches. He applied for disability in 2007 or 2008 but was denied.

182.    Mr. Rose has been enrolled in Medicaid for approximately two years. During that time, he has used his coverage to obtain new glasses. He believes it is important to keep his Medicaid coverage in case his health declines and he needs to see a doctor or he has a medical emergency.

183.    Under the HIP 2.0 extension, he is required to pay a premium of $1 per month. In the past, he has been able to rely on the kindness of others to pay the premium. He does not know where he will be able to get the money to pay his premiums in the future.

184.    Mr. Rose has received a notice indicating that he would be required to participate in Gateway to Work to keep his Medicaid.

185.    Mr. Rose has not yet reported any work hours. He is not sure if he can count the time he has spent planning inventions or helping his 82-year-old neighbor read his mail and do housecleaning. While he has asked both Indiana and his Medicaid health plan whether or not those activities qualify as work or community engagement activities, he has not gotten an answer.

186.    Mr. Rose finds the reporting process confusing. Because he does not have internet access at home, it will be more difficult for him to report hours.

187.    Mr. Rose is concerned that he will lose his health insurance at the end of the year because he has not met the work requirement.

188.    Plaintiff Rhonda Cree is 61 years old and lives with her husband in Logansport, Indiana.

189.    In the past, Ms. Cree worked in retail management. She also owned a bar and restaurant. She is not able to work outside her home because of significant vision impairment, a complication of diabetes. She is the caregiver for her husband.

190.    Her husband receives $1548 per month in Social Security Disability Income. Their annual income is approximately $18,576, which is roughly 110% of FPL for a family of two ($16,910). After they pay their bills each month, there is only enough money left over for food. Ms. Cree must maintain a strict diet to manage her diabetes. As a result, her grocery bills are high.

191.    Ms. Cree has several health conditions. In addition to diabetes, which has led to vision loss in both eyes, she has high blood pressure and high cholesterol. To treat these conditions, she takes three prescription medications. She has also been prescribed monthly injections that keep her eyes strong and prevent hemorrhaging. The longer she goes without these injections, the weaker her eyes become.

192.    Ms. Cree enrolled in Medicaid in April 2017. Since then, she has had serious problems with the HIP premium requirement.

193.    Due to her vision loss, she has trouble reading the premium notices. Her husband must read them to her.

194.    She is required to pay a monthly premium of $20. She can only pay the premium after her husband receives his disability check. In the past, her premium invoice has come on different days of the month and was due on different days of the month, which made it impossible to plan or set money aside to pay the premium. Sometimes, she paid a few days late.

195.    In 2018, Ms. Cree paid what she could afford every month, usually the full $20. In August 2018, the invoice she received indicated that she owed $68.96. In November 2018, she received a bill for $60. She was not able to determine why she owed that much, and she was not able to pay more than $20.

196.    On December 1, 2018, Indiana terminated her Medicaid coverage for failure to pay the premium on time. After she lost coverage, she was locked out of Medicaid until May 31, 2019.

197.    While she was locked out, she was not able to get the injections that keep her eyes strong. She has not had an injection since October 2018. During the lockout period, she only went to the doctor once, and she had to borrow $100 from friends to pay for that visit. She also had to pay out-of-pocket for her regular prescriptions. Because Indiana eliminated retroactive coverage, the medical bills she incurred during that time were not covered.

198.    Her health has suffered as a result of this gap in coverage. She experienced a hemorrhage in her right eye, causing significant additional vision loss. She is concerned that her doctor will recommend surgery due to the severity of the vision loss. She has had this surgery before, and it was a serious and frightening procedure.

199.    Ms. Cree re-applied for Medicaid coverage in June 2019 when the lockout penalty ended. In July, she received an invoice for $10 from her previous Medicaid health plan, which she paid. In August, she received another bill asking for $50. She was told this was for her July, August, and September premiums. Fearing that she would lose coverage again, she took money out of her food budget to pay the $50.

200.    Despite having paid $60 in premiums, Ms. Cree has yet to receive a notice from Indiana informing her that she is enrolled in Medicaid again. Her health plan did tell her that she could go to the doctor. This is critical, as she needs to resume the eye injections.

201.    Ms. Cree is worried that the requirements set forth in the approved HIP 2.0 project, including monthly premiums, will once again make her unable to maintain Medicaid coverage.

202.    Plaintiff Mary Holbrock is 54 years old and lives in Fort Wayne, Indiana.

203.    She has a Ph.D. in Linguistics and taught at the university level until 2010, when she lost her job in the recession. She was not able to find another job in academia.

204.    Ms. Holbrock now works part-time grading standardized tests, and her hours fluctuate significantly. Some weeks she works 20 to 30 hours, and some weeks she does not work at all.

205.    She has no control over and little advance notice of her schedule. At the beginning of the month, she submits her availability to the testing company, and the company assigns shifts to her. In August 2019, for example, Ms. Holbrock indicated that she could work eight hours per day, and the company assigned her 8 hours for the entire month. In addition, the company can cancel most assigned shifts at any time, even after they have started.

206.    On average, Ms. Holbrock earns $400 per month. Her annual income is about $4800, which is approximately 38% of FPL for a single person ($12,490). She also receives $180 in SNAP benefits. All of her income goes to covering her basic needs. She has no money left over at the end of the month.

207.    Ms. Holbrock enrolled in Medicaid in 2011 or 2012 after she lost her job.

208.    She has Lyme disease, which has caused a number of health problems, including memory loss, muscular weakness, and chronic pain. Ms. Holbrock also has post-traumatic stress disorder, anxiety, and depression.

209.    Ms. Holbrock uses her Medicaid coverage to get regular treatment for these conditions. Medicaid covers her lab tests, multiple prescription medications, and doctors' visits.

210.    Ms. Holbrock is currently classified as medically frail. Her health plan has revoked her medically frail status twice without explanation, even though her health conditions had not improved. Ms. Holbrock frequently receives notices that the health plan is evaluating her status.

211.    Ms. Holbrock received a letter informing her that she is exempt from the HIP work requirements. The letter did not contain an explanation why. She believes this is because she is medically frail.

212.    If she loses her exemption, she will ultimately have to work at least 20 hours per week to maintain Medicaid coverage. She is concerned that she will not be able to meet that requirement given that her work hours often dip below 20 hours per week. Because her hours and income change every month and sometimes without any prior notice, reporting those changes would be difficult. Ms. Holbrock is concerned that she could lose her Medicaid coverage and end up with medical bills that would not be covered due to the elimination of retroactive coverage.

213.    Currently, Ms. Holbrock is required to pay a $5.00 monthly premium. While she has been able to pay that amount, she has had ongoing issues with her managed care plan over the processing of her premiums. Around 2015, she paid too much in premiums and was not reimbursed. On multiple occasions she has received multiple billing statements in the same envelope, with each one showing a different amount owed.

214.    Given how confusing the billing process has been, she does not even look at the bills now. Instead, she has her bank mail a check for $5.00 every month. However, several times the bank has mailed a check, and her managed care organization has said that it did not receive it. When the managed care plan makes this kind of mistake, she is required to pay a copay to visit the doctor or fill a prescription. If the plan makes a mistake at a time when she is not considered medically frail, she will also lose coverage for dental, vision, and chiropractic services.

215.    Ms. Holbrock has used NEMT in the past. If she needs transportation when her medically frail status has been revoked, Medicaid will not cover NEMT.

216.    Plaintiff Erin Nicole Tomlinson is 25 years old and lives alone in Evansville, Indiana.

217.    Ms. Tomlinson studied Media Arts, Animation, and Fashion Design for a year at the Art Institute of Indianapolis. She has worked in retail for most of her adult life. Currently, she works as a cashier, fabric cutter, and stock person at JoAnn Fabrics.

218.    As a retail employee, she has no control over her hours, which fluctuate constantly. In a given week, she may work as few as 8 hours or as many as 23. She usually only finds out when she will work about two weeks in advance. Occasionally, her employer will ask an employee to go home early from a shift if business is slow. On average, she works roughly 17 hours per week.

219.    Ms. Tomlinson earns approximately $7,956 per year, which is 64% of the federal poverty level for a single person ($12,490). She lives in her grandmother's old house and does not pay rent. Still, after she has paid her bills, she has no money left at the end of the month.

220.    She has been enrolled in Medicaid since 2014 or 2015, when she needed health insurance to pay for an inhaler to treat her asthma. Currently, she uses her Medicaid coverage to pay for two inhalers and a breathing machine. When her asthma is not under control, it can affect her ability to work.

221.    Ms. Tomlinson has several other medical conditions, including scoliosis and poor vision. She has used her Medicaid coverage to get glasses. Before she was insured, a pair of glasses cost her over $300. Medicaid also covered her visit to the emergency room earlier this year. She had a pain in her tooth that was so severe she had to leave work to seek treatment.

222.    Ms. Tomlinson is transgender. She experiences gender dysphoria and depression, and access to gender-affirming care is keeping her alive. Medicaid coverage has allowed her to receive hormone replacement therapy and will allow her to receive gender-affirming surgeries. These health care services are a matter of life and death for her.

223.    Ms. Tomlinson was not aware of the work requirement until it had already been in effect for some time. She has yet to receive any mail or other communication from the State regarding the work requirement. To the extent that her health plan noted her compliance with the work requirement on her POWER account statement, she was not aware of it.

224.    On September 12, 2019, Indiana Legal Services helped her call her health plan to determine whether or not the work requirement applied to her. She learned that her work requirement status is "Reporting Met," meaning that the State knows how many hours she works, and she does not need to report her hours every month.

225.    However, given how frequently her work hours fluctuate, she is concerned that if she loses hours, she will need to start reporting her hours to the State. In addition, she is not certain that she would be able to pick up additional hours to meet the work requirement. While she could look for additional work, she is not certain that she would be able to land another retail job depending on the season.

226.    Ms. Tomlinson is required to pay a $15 monthly premium to maintain her coverage. Sometimes she has had to pay her premium bill after its due date in order to pay other pressing bills.

## CLAIMS FOR RELIEF

## COUNT ONE: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
## (DEAR STATE MEDICAID DIRECTOR LETTER)

227.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

228.    The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

229.    The 2018 HIP 2.0 extension approval was explicitly based in substantial part on the policy announced in the January 11, 2018 Dear State Medicaid Director Letter. 2018 Approval Letter at 2, 4.

230. The Dear State Medicaid Director Letter was required to be, but was not, issued through notice and comment rulemaking. *See* 5 U.S.C. § 553.

231. In issuing the Dear State Medicaid Director Letter, the Defendants purported to act pursuant to Section 1115 of the Medicaid Act.

232. Authorization of work and community engagement requirements is categorically outside the scope of the Secretary's Section 1115 waiver authority.

233. In the Dear State Medicaid Director Letter, the Defendants relied on factors that Congress has not intended them to consider, entirely failed to consider several important aspects of the problem, and offered an explanation for their decision that runs counter to the evidence.

234. The Defendants' issuance of the Dear State Medicaid Director Letter exceeded the Secretary's Section 1115 waiver authority, otherwise violated the Medicaid Act, and was arbitrary and capricious and an abuse of discretion.

## COUNT TWO: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
### (HIP 2.0 PROJECT AS A WHOLE)

235. Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

236. The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

237. In approving the HIP 2.0 extension, the Secretary purported to waive various requirements of the Medicaid Act pursuant to Section 1115.

45

238.    The HIP 2.0 extension project is not an experimental, pilot, or demonstration project that is likely to promote the objectives of the Medicaid Act.

239.    In approving the HIP 2.0 extension, the Secretary relied on factors which Congress has not intended him to consider, entirely failed to consider several important aspects of the problem, and offered an explanation for his decision that runs counter to the evidence.

240.    The Secretary's approval of the HIP 2.0 extension exceeded his Section 1115 waiver authority; otherwise violated the Medicaid Act; and was arbitrary and capricious and an abuse of discretion.

### COUNT THREE: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
### (WORK AND COMMUNITY ENGAGEMENT REQUIREMENTS)

241.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

242.    The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

243.    In approving the work requirements of the HIP 2.0 extension, the Secretary purported to waive 42 U.S.C. §§ 1396a(a)(8), (a)(10), and (a)(52) pursuant to Section 1115.

244.    Authorization of work and community engagement requirements is categorically outside the scope of the Secretary's Section 1115 waiver authority.

245.    In addition, the work requirements in the HIP 2.0 extension are not an experimental, pilot, or demonstration project that is likely to promote the objectives of the Medicaid Act.

46

246.    In approving the work requirements in the HIP 2.0 extension, the Secretary relied on factors which Congress has not intended it to consider, entirely failed to consider several important aspects of the problem, and offered an explanation for its decision that runs counter to the evidence.

247.    The Secretary's approval of the HIP 2.0 extension's work requirements exceeded his Section 1115 waiver authority; otherwise violated the Medicaid Act; and was arbitrary and capricious and an abuse of discretion.

### COUNT FOUR: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT (PREMIUM REQUIREMENTS)

248.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

249.    The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

250.    In approving the HIP 2.0 extension's premium requirements and associated penalties for failure to pay, the Secretary purported to waive 42 U.S.C. §§ 1396a(a)(8), 1396a(a)(10), (a)(17), (a)(52) and (a)(14) (insofar as it incorporates §§ 1396o and 1396o-1) pursuant to Section 1115.

251.    Authorization of premium requirements, or penalties for not meeting such requirements, is categorically outside the scope of the Secretary's Section 1115 waiver authority.

252.    In addition, the approved premium requirements and associated penalties in the HIP 2.0 extension are not an experimental, pilot, or demonstration project that is likely to promote the objectives of the Medicaid Act.

253.     In approving the premium requirements in the HIP 2.0 extension, the Secretary relied on factors which Congress has not intended it to consider, entirely failed to consider several important aspects of the problem, and offered an explanation for its decision that runs counter to the evidence.

254.     The Secretary's approval of the HIP 2.0 extension's premium requirements and associated penalties exceeded his Section 1115 waiver authority; otherwise violated the Medicaid Act; and was arbitrary and capricious and an abuse of discretion.

### COUNT FIVE: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
### (REDETERMINATION LOCKOUT)

255.     Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

256.     The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

257.     In approving the HIP 2.0 extension's imposition of the redetermination lockout penalty, the Secretary purported to waive the requirements of 42 U.S.C. §§ 1396a(a)(10) and 1396a(a)(52) pursuant to Section 1115.

258.     The approved redetermination lockout penalty in the HIP 2.0 extension is not an experimental, pilot, or demonstration project that is likely to promote the objectives of the Medicaid Act.

259.     In approving the redetermination lockout penalty in the HIP 2.0 extension, the Secretary relied on factors which Congress has not intended him to consider, entirely failed to consider several

48

important aspects of the problem, and offered an explanation for his decision that runs counter to the evidence.

260. The Secretary's approval of the HIP 2.0 extension's redetermination lockout penalty exceeded his Section 1115 waiver authority; otherwise violated the Medicaid Act; and was arbitrary and capricious and an abuse of discretion.

## COUNT SIX: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT (RETROACTIVE COVERAGE)

261. Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

262. The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

263. In approving the HIP 2.0 extension's elimination of the retroactive coverage required by the Medicaid Act, the Secretary purported to waive 42 U.S.C. § 1396a(a)(34) pursuant to Section 1115.

264. Authorization of the elimination of retroactive coverage is categorically outside the scope of the Secretary's Section 1115 waiver authority.

265. The elimination of retroactive coverage in the HIP 2.0 extension is not an experimental, pilot, or demonstration project that is likely to promote the objectives of the Medicaid Act.

266. In approving the elimination of retroactive coverage in the HIP 2.0 extension, the Secretary relied on factors which Congress has not intended him to consider, entirely failed to

consider several important aspects of the problem, and offered an explanation for his decision that runs counter to the evidence.

267. The Secretary's approval of the HIP 2.0 extension's elimination of retroactive coverage exceeded his Section 1115 waiver authority; otherwise violated the Medicaid Act; and was arbitrary and capricious and an abuse of discretion.

## COUNT SEVEN: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
### (NON-EMERGENCY MEDICAL TRANSPORTATION)

268. Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

269. The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

270. In approving the HIP 2.0 extension's elimination of NEMT benefits for the expansion population (other than for medically frail individuals), the Secretary purported to waive 42 U.S.C. § 1396a(a)(4) (insofar as it incorporates 42 C.F.R. § 431.53) pursuant to Section 1115.

271. The elimination of NEMT benefits in the HIP 2.0 extension is not an experimental, pilot, or demonstration project that is likely to promote the objectives of the Medicaid Act.

272. In approving the elimination of NEMT benefits in the HIP 2.0 extension, the Secretary relied on factors which Congress has not intended him to consider, entirely failed to consider several important aspects of the problem, and offered an explanation for his decision that runs counter to the evidence.

273.     The Secretary's approval of the HIP 2.0 extension's elimination of NEMT benefits exceeded his Section 1115 waiver authority; otherwise violated the Medicaid Act; and was arbitrary and capricious and an abuse of discretion.

## COUNT EIGHT: VIOLATION OF THE TAKE CARE CLAUSE, ARTICLE II, SECTION 3, CLAUSE 5

274.     Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

275.     Plaintiffs have a non-statutory right of action to have enjoined and declared unlawful official action that is ultra vires.

276.     The United States Constitution provides that "All legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const., art. I, § 1. Congress is authorized to "make all laws which shall be necessary and proper for carrying into Execution" its general powers. *Id*. §§ 1, 8.

277.     The Defendants' actions, as described herein, seek to undermine the ACA, including its expansion of Medicaid, and represent a fundamental alteration to those statutes.

278.     After a federal law is duly enacted, the President has a constitutional duty to "take Care that the Laws be faithfully executed." *Id*. art. II, § 3.

279.     The Take Care Clause is judicially enforceable against presidential action that undermines statutes enacted by Congress and signed into law. *See, e.g.*, *Angelus Milling Co. v. Comm'r*, 325 U.S. 293, 296 (1945) ("Insofar as Congress has made explicit statutory requirements, they must be observed and are beyond the dispensing power of [the Executive Branch]."); *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 612-13 (1838).

51

280.    The Take Care Clause limits the power of the President and the officers he personally appoints, including Defendant Azar, and ensures that the President and his officers will faithfully execute the laws that Congress has passed.

281.    Under the Constitution, the President and his officers lack the authority to rewrite congressional statutes or to direct federal officers or agencies to effectively amend the statutes he is constitutionally required to execute.

282.    The Administrator of CMS has expressed the desire to "fundamentally transform Medicaid."

283.    The power to "transform" a congressional program is a legislative power vested in Congress. An effort to "transform" a statute outside that legislative process is at odds with the President's constitutional duty to take care that the laws be faithfully executed.

284.    The Medicaid population targeted by the HIP 2.0 extension approval is the expansion population, which Congress added to Medicaid by passing the Affordable Care Act. The Executive Branch has repeatedly expressed its hostility to the Affordable Care Act and its desire to undermine its operation. An effort to undermine the Affordable Care Act by undoing the extension of Medicaid to the expansion population is at odds with the President's duty to take care that the laws be faithfully executed.

285.    The President's Executive Order set out herein directs agencies to take action contrary to the ACA, Medicaid, and other laws passed by Congress.

286.    The Defendants' actions, as described herein, followed that Executive Order.

287.    The Defendants' actions, as described herein, seek to redefine the purposes and objectives of the Medicaid Act, including through the approval of the HIP 2.0 extension and represent a fundamental alteration of Medicaid.

288.   The Defendants' actions, as described herein, seek to undermine the ACA, including its optional expansion of Medicaid, and represent a fundamental alteration to those statutes.

289.   Accordingly, the Defendants' actions are in violation of the Take Care Clause and are ultra vires.

290.   Plaintiffs will suffer irreparable injury if the Secretary's actions following the President's Executive Order are not declared unlawful and unconstitutional because those actions have injured or will continue to harm Plaintiffs.

291.   Plaintiffs are in danger of suffering irreparable harm and have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask that this Court:

1.   Declare that Defendants' issuance of the Dear State Medicaid Director Letter violates the Administrative Procedure Act, the Social Security Act, and the United States Constitution in the respects set forth above;

2.   Declare that Defendants' approval of the Indiana HIP 2.0 extension application violates the Administrative Procedure Act, the Social Security Act, and the United States Constitution in the respects set forth above;

3.   Preliminarily and permanently enjoin Defendants from implementing the practices purportedly authorized by Dear State Medicaid Director Letter and the approval of the Indiana HIP 2.0 extension application;

4.   Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

5.   Grant such other and further relief as may be just and proper.

September 23, 2019

Thomas J. Perrelli
    (D.C. Bar No. 438929)
Ian Heath Gershengorn
    (D.C. Bar. No. 448475)
Devi M. Rao
    (D.C. Bar No. 1004146)
Natacha Y. Lam
    (D.C. Bar. No. 1030168)
Zachary M. Blau
    (D.C. Bar No. 1600714)
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900, Washington, DC 20001
Phone: 202-639-6004
TPerrelli@jenner.com
IGershengorn@jenner.com
DRao@jenner.com
NLam@jenner.com
ZBlau@Jenner.com

*Counsel to National Health Law Program*

Respectfully submitted,

By: /s/ Jane Perkins
Jane Perkins
Catherine McKee
National Health Law Program
200 N. Greensboro Street, Suite D-13
Carrboro, NC 27510
Phone: 919-968-6308 (x101)
perkins@healthlaw.org
mckee@healthlaw.org

/s/ Adam Mueller
Adam Mueller
Amanda Hall
Indiana Legal Services, Inc.
151 N. Delaware St. #1850
Indianapolis, IN 46204
Phone: 317-829-3174
adam.mueller@ilsi.net
amanda.hall@ilsi.net

*Counsel for Plaintiffs*

54