# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MONTE A. ROSE, JR., *et al.*, | ) | |
| | ) | |
| Plaintiffs. | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 1:19-cv-02848-JEB |
| XAVIER BECERRA, in his official capacity as | ) | |
| Secretary of Health and Human Services, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' UNIFIED RESPONSE IN OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND INTERVENOR-DEFENDANT'S MOTION TO DISMISS AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 3

I.    The Plaintiffs Have Standing To Challenge The Secretary's Decision To Allow Indiana To Bypass Federal Medicaid Requirements In Ways That Harm Them ................ 3

    A.  Plaintiffs Have Standing to Challenge The 2020 Approval. .......................................... 3

    B.  Plaintiffs Have Standing to Challenge the 2023 Letter.................................................. 8

II.    The Secretary's October 2020 Decision to Extend The HIP Project Violates The Administrative Procedure Act ........................................................................................ 10

    A.  The Secretary's 2020 Decision Is Reviewable By The Court ..................................... 10

    B.  The Secretary's Conclusion That The HIP Project Would Promote The Objectives Of The Medicaid Act Was Arbitrary And Capricious. .............................. 12

        1.  The Secretary Improperly Relied On His Preferred Objectives Of Increasing Health And Financial Independence. .............................................. 12

        2.  The Secretary Did Not Reasonably Determine That The Project Would Promote Coverage.......................................................................................... 13

        3.  The Secretary Did Not Reasonably Determine That The Project Would Promote Fiscal Sustainability. ......................................................................... 20

    C.  The Secretary's Approval Of A Ten-Year Extension As An Experiment Violates the APA ...................................................................................................... 22

        1.  The Secretary Did Not Adequately Examine if the Extension Was An Experiment......................................................................................................... 22

        2.  The Secretary Did Not Reasonably Find That The Length Of The HIP Extension Was Necessary ................................................................................. 25

        3.  The Extension Violates Sections 1115(e) And (f). ......................................... 27

        4.  The Extension Violates Sections 1396o And o-1. .......................................... 29

III.  The December 2023 Decision Allowing HIP To Proceed Constitutes Final Agency Action That Violates The APA.................................................................31

    A.  The December 2023 Decision Is Reviewable. ......................................32

    B.  The December 2023 Decision Is Arbitrary And Capricious................35

IV.  The 2020 Approval And December 2023 Decision Should Be Vacated..........................40

CONCLUSION.................................................................................................43

# TABLE OF AUTHORITIES[*]

**CASES**

*Aerosource, Inc. v. Slater*, 142 F.3d 572 (3d Cir. 1998) ................................................. 34

*Aguayo v. Richardson*, 473 F.2d 1090 (2d Cir. 1973) .................................................. 11

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146 (D.C. Cir. 1993) ............. 40, 41

*Am. Clinical Lab'y Ass'n v. Becerra*, 40 F.4th 616 (D.C. Cir. 2022) ................................. 36, 39

*Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017) ............................ 22

*Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d 19 (D.D.C. 2012) ........... 6

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002) .................................................... 28

*Bennett v. Spear*, 520 U.S. 154 (1997) ............................................................... 32

*\*Beno v. Shalala*, 30 F.3d 1057 (9th Cir. 1994) .................................................. 10, 25

*Berry v. U.S. Dep't of Lab.*, 832 F.3d 627 (6th Cir. 2016) ........................................... 33

*Cal. Welfare Rights Org. v. Richardson*, 348 F. Supp. 491 (N.D. Cal. 1972) ............ 22, 23, 28, 29

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ........................... 10, 21

*C.K. v. N.J. Dep't of Health & Hum. Servs.*, 92 F.3d 171 (3d Cir. 1996) ............................ 11

*Claybrook v. Slater*, 111 F.3d 904 (D.C. Cir. 1997) .................................................. 10

*Comcast Corp. v. FCC*, 579 F.3d 1 (D.C. Cir. 2009) ............................................... 3, 41

*Crane v. Mathews*, 417 F. Supp. 532 (N.D. Ga. 1976) ................................................. 29

*Davis v. FEC*, 554 U.S. 724 (2008) ................................................................... 5

*Drake v. FAA*, 291 F.3d 59 (D.C. Cir. 2002) ......................................................... 10

*Duberry v. District of Columbia*, 924 F.3d 570 (D.C. Cir. 2019) ...................................... 9

*EarthLink, Inc. v. FCC*, 462 F.3d 1 (D.C. Cir. 2006) ................................................. 22

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) ............................................... 39

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

*FEC v. Akins*, 524 U.S. 11 (1998) ............................................................... 9

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) ......................................... 32

*Genuine Parts Co. v. EPA*, 890 F.3d 304 (D.C. Cir. 2018) .......................... 16

*Getty v. Fed. Savs. & Loan Ins. Corp.*, 805 F.2d 1050 (D.C. Cir. 1986) .............. 18, 20

*Gresham v. Azar*, 363 F. Supp. 3d 165 (D.D.C. 2019) ........................... 13, 42

*Gresham v. Azar*, 950 F.3d 93 (D.C. Cir. 2020) .................................... 10, 14

*Harmon v. Thornburgh*, 878 F.2d 484 (D.C. Cir. 1989) ............................... 40

*Hormel Foods Corp. v. U.S. Dep't of Agric.*, 808 F. Supp. 2d 234 (D.D.C. 2011) .............. 34

*Humane Soc'y of U.S. v. Jewell*, 76 F. Supp. 3d 69 (D.D.C. 2014) .................. 41

*Humane Soc'y of U.S. v. U.S. Postal Serv.*, 609 F. Supp. 2d 85 (D.D.C. 2009) .............. 34

*Ill. Pub. Telecomms. Ass'n v. FCC*, 123 F.3d 693 (D.C. Cir. 1997) ................. 40

*Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795 (D.C. Cir. 1983) ............... 11

*Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582 (D.C. Cir. 2023) ............ 9

*Metlife Inc. v. Fin. Stability Oversight Council*, 177 F. Supp. 3d 219 (D.D.C. 2016) ............... 11

*Michigan v. EPA*, 576 U.S. 743 (2015) .......................................... 11, 16, 24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
   463 U.S. 29 (1983) ...................................................................... 25

*Music Choice v. Copyright Royalty Bd.*, 774 F.3d 1000 (D.C. Cir. 2014) ................. 11

*NAACP v. Trump*, 298 F. Supp. 3d 209 (D.D.C. 2018) ................................. 40

*Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1 (D.C. Cir. 2005) .................. 9

*NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77 (D.C. Cir. 2012) .................. 6

*Newton-Nations v. Betlach*, 660 F.3d 370 (9th Cir. 2011) ........................... 23, 25

*\*Philbrick v. Azar*, 397 F. Supp.3d 11 (D.D.C. 2019) ................................ passim

*POET Biorefining, LLC v. EPA*, 970 F.3d 392 (D.C. Cir. 2020) ....................... 32

*Pub. Emps. for Envtl. Resp. v. U.S. Fish & Wildlife Serv.*, 189 F. Supp. 3d 1 (D.D.C. 2016) ..... 41

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726
  (D.C. Cir. 2003) ................................................................................................ 35

*Safari Club Int'l v. Jewell*, 842 F.3d 1280 (D.C. Cir. 2016) ....................................... 33

*Shands Jacksonville Med. Ctr., Inc. v. Azar*, 959 F.3d 1113 (D.C. Cir. 2020) ............ 41

*Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77 (D.D.C. 2010) ................................ 40

*Soundboard Ass'n v. FTC*, 888 F.3d 1261 (D.C. Cir. 2018) ...................................... 33

*Spirit Airlines, Inc. v. U.S. Dep't of Transp. & Fed. Aviation Admin.*, 997 F.3d 1247
  (D.C. Cir. 2021) ................................................................................................ 34

*\*Stewart v. Azar*, 313 F. Supp. 2d 237 (D.D.C. 2018) ........................................ passim

*\*Stewart v. Azar*, 366 F. Supp. 3d 125 (D.D.C. 2019) ........................................ passim

*Teton Historic Aviation Found. v. U.S. Dep't of Def.*, 785 F.3d 719 (D.C. Cir. 2015) ................. 8

*United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557 (D.C. Cir. 2010) ................................ 36

*U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590 (2016) ........................... 32

*Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788 (D.C. Cir. 1984) ............... 38

*Young v. U.S. Dep't of Lab.*, No. CV 17-2428 (JDB), 2020 WL 1557170
  (D.D.C. Apr. 1, 2020) ................................................................................... 32, 33


**STATUTES**

42 U.S.C. § 1315 ................................................................................................ passim

42 U.S.C. § 1315(a) ................................................................................................ 28

42 U.S.C. § 1315(e) ....................................................................................... 27, 28, 29

42 U.S.C. § 1315(e)(1) ............................................................................................. 27

42 U.S.C. § 1315(e)(2) ............................................................................................. 27

42 U.S.C. § 1315(e)(6) ............................................................................................. 27

42 U.S.C. § 1315(f) ........................................................................................ 27, 28, 29

42 U.S.C. § 1396a ............................................................................................... 29, 30

42 U.S.C. § 1396a(a)(10)(A) ............................................................................... 7, 29

42 U.S.C. § 1396a(a)(14) ............................................................................ 29, 30, 31

42 U.S.C. § 1396d(i) ................................................................................................ 19

42 U.S.C. § 1396o ...................................................................................... 7, 29, 30, 31

42 U.S.C. § 1396o(a) ............................................................................................... 29

42 U.S.C. § 1396o(b) ............................................................................................... 29

42 U.S.C. § 1396o(f) ........................................................................................... 30, 31

42 U.S.C. § 1396o(h) ............................................................................................... 31

42 U.S.C. § 1396o-1 .................................................................................. 7, 29, 30, 31

42 U.S.C. § 1396o-1(a)(2) ....................................................................................... 30

42 U.S.C. § 1396o-1(a)(2)(B) .................................................................................. 31

42 U.S.C. § 1396o-1(b)(1) ....................................................................................... 30

42 U.S.C. § 1396o-1(b)(1)(B)(ii) ............................................................................. 31

42 U.S.C. § 1396o-1(b)(3)(A)-(B) ........................................................................... 31

42 U.S.C. § 1396o-1(b)(6) ....................................................................................... 31

42 U.S.C. § 3515b .................................................................................................... 11

Deficit Reduction Act of 2005, Pub. L. No. 109-171, 120 Stat 6 (2006) .................... 30

Ind. Code § 12-15-44.5-4(b) ...................................................................................... 8

Ind. Code § 12-15-44.5-4.7(e)(2) ......................................................................... 7, 42

Ind. Code § 12-15-44.5-5 ........................................................................................... 7

Ind. Code § 12-15-44.5-10(b)(2) .......................................................................... 7, 42

Ind. Code § 12-15-44.5-10(c) ..................................................................................... 7

Social Security Act Amendments of 1965, Pub. L. No. 89-97, 79 Stat. 286 ............... 29

Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, 96 Stat. 324 ....... 29

vi

**REGULATIONS**

42 C.F.R. § 431.412(c)(2) ........................................................................ 27

42 C.F.R. § 431.420 ............................................................................... 32

42 C.F.R. § 431.420(d) ........................................................................... 28

**OTHER AUTHORITIES**

H.R. Rep. No. 97-757 (1982)................................................................... 30

Letter from Chiquita Brooks-LaSure, Adm'r, CMS, to Dawn Stehle, Deputy Dir. for Health &
    Medicaid, Ark. Dep't of Hum. Servs.  (Dec. 21, 2021), https://bit.ly/3IJa9Nj................ 38

Letter from Chiquita Brooks-LaSure, Adm'r, CMS, to Marie Matthews, Medicaid Dir., Mont.
    Dep't of Pub. Health & Hum. Servs. (Dec. 21, 2021), https://bit.ly/3UAM6a0 ..............38

Letter from Daniel Tsai, Deputy Admin. and Dir. CMCS, to Jamie Kuhn, State Medicaid Dir.,
    Wis. Dept't of Health Servs. (Nov. 17, 2023), https://bit.ly/4aaPrlP ............................. 37

Letter from Mehreen H. Rashid, Acting Dir., State Demonstrations Grp., CMS, to Traylor Rains,
    Chief Medicaid Dir., Okla. Health Care Auth. (Nov. 1, 2023), https://bit.ly/3QkFOsJ ... 38

State Plan Amendment IN-15-0001-MM1, https://bit.ly/3UldszM ............................................. 42

**INTRODUCTION**

The Court has recognized that a primary purpose of the Medicaid Act is to furnish medical coverage to low-income people who cannot afford to pay for necessary health care. The Secretary has awarded Indiana a Section 1115 project that authorizes it to reduce coverage by imposing premiums on very low-income people and evading Medicaid's requirements for three-months' retroactive coverage and non-emergency medical transportation (NEMT). As Plaintiffs' opening brief shows, the Secretary approved an extension of the HIP project to further alternative objectives that are found nowhere in the statute and that this Court has repeatedly rejected—improving beneficiary health, increasing their financial independence, and transitioning them to commercial coverage. Tellingly, Federal Defendants have not defended those objectives here.

With his focus elsewhere, the Secretary failed to account for the significant, documented coverage loss that this project produces—for example, the 26,000 beneficiaries who lost coverage entirely in 2017 and 2018 because they failed to pay a premium. And while Defendants argue that the project would promote fiscal sustainability, the Secretary neither made any finding that the project would actually save the State money, nor balanced any purported fiscal benefits against the documented loss in coverage.

Rather than engage with these facts, Indiana seeks to raise the stakes by claiming that expansion population coverage will end without the Section 1115 approval. This claim is alarmist and incorrect. The expansion population does not depend on the project for coverage. Rather, the expansion population is separately covered through the Indiana state Medicaid plan. Moreover, the state law that Indiana cites to support its extreme assertions does not actually say what Indiana claims it does. It certainly does not condition coverage for the expansion population on the existence of a Section 1115 approval. In any event, Indiana ignores that the Court has already

found that a state threat to terminate its Medicaid expansion cannot transform a coverage-reducing project into a coverage-promoting one. *See Stewart v. Azar*, 366 F. Supp. 3d 125 (D.D.C. 2019); *Philbrick v. Azar*, 397 F. Supp. 3d 11 (D.D.C. 2019), *aff'd*, No. 19-5293, 2020 WL 2621222 (D.C. Cir. May 20, 2020), *vacated and remanded on other grounds sub nom. Becerra v. Gresham*, 142 S. Ct. 1665 (2022).

Similarly, Defendants offer no meaningful response to Plaintiffs' claim that the Secretary did not adequately explain how the HIP project, now in its 17th year, maintains any experimental value. Indiana even goes so far as to argue that it need not show any experimental value at all—a proposition wholly at odds with Section 1115's text. Nor can Defendants find support in the record for why extending the project for another decade was necessary. In fact, the Secretary's December 2023 decision letter confirms there is no experiment here. With a glaring lack of reasoned decisionmaking, the Secretary spends pages and pages citing research, including from Indiana, concluding that premiums deter and reduce Medicaid coverage. But then, he allows the premiums to remain in place until 2030, stating the decision is due to concerns about potential disruption during a COVID unwinding process (set to end only months later) and ignoring the fact that re-instating the premiums will be what creates disruption (because Indiana has not imposed premiums since March of 2020). The letter marks a 180-degree turn from actions the Secretary took in other states, where he refused to extend authorities allowing premiums and the elimination of NEMT during this same time period on the grounds that such waivers are inconsistent with the objectives of the Medicaid Act.

The Secretary engaged in arbitrary and capricious decisionmaking. His 2020 approval and 2023 re-approval of HIP failed to rationally consider how the project's heightened barriers to coverage could possibly remain experimental or promote the Medicaid Act's central purpose of

furnishing medical assistance to low-income people. Plaintiffs respectfully request that this Court grant their motion for summary judgment and vacate the 2020 approval and 2023 re-approval.

## ARGUMENT

**I.     The Plaintiffs Have Standing To Challenge The Secretary's Decision To Allow Indiana To Bypass Federal Medicaid Requirements In Ways That Harm Them.**

The Secretary's 2020 approval of the HIP project and his 2023 letter reaffirming that approval harm low-income Hoosiers including Plaintiffs. Federal Defendants incorrectly assert that Plaintiffs have failed to show "that they will be affected by any relevant section 1115 waiver." Fed. Br. at 13. To the contrary, Plaintiffs have submitted declarations that detail the "real … threat of future injury" posed by the approval of the project. *Stewart v. Azar* ("*Stewart I*"), 313 F. Supp. 3d 237, 250 (D.D.C. 2018). As this Court has explained, in addition to the well-established injury posed by agency action that "threaten[s] an individual's ability to obtain Medicaid coverage," an increase in premiums constitutes a direct "financial loss [that] falls in the heartland of Article III standing." *Id.* at 251. The challenged agency actions subject Plaintiffs to premiums they otherwise would not have to pay—that alone is sufficient for standing.

### A.     Plaintiffs Have Standing To Challenge The 2020 Approval.

Federal Defendants only argue that Plaintiffs lack standing to challenge the 2020 approval on the basis that they have failed to establish injury-in-fact. *See* Fed Br. at 13. They do not contest causation or redressability. And as for injury-in-fact, Federal Defendants concede that this Court has already determined "that any increase in premiums would be sufficient injury-in-fact for purposes of Article III standing." *Id.* at 14. Therefore, so long as the approval subjects at least one Plaintiff to higher premiums, Plaintiffs have established injury-in-fact to support standing to challenge the project. *See Comcast Corp. v. FCC*, 579 F.3d 1, 6 (D.C. Cir. 2009).

*Premium Requirements.* The approval allows Indiana to ignore the Medicaid Act's prohibition on charging premiums to individuals with income below 150% of the federal poverty level (FPL) and to require all Plaintiffs to pay premiums in order to receive the full constellation of benefits that Indiana has chosen to make available to Medicaid beneficiaries. AR 1575, 1598-99. Defendants' argument that Plaintiffs with income under 100% of FPL cannot establish injury because they will not suffer the most extreme consequence—total loss of coverage—holds no water. *See* Fed Br. at 14-15, Ind. Br. at 20. It is based on a mischaracterization of what the approval accomplishes. Indiana does not need a waiver to cover vision, dental, and chiropractic services— indeed, the State covers those benefits through its state Medicaid plan. The approval enables Indiana to withhold those benefits only from expansion population individuals who fail to pay premiums. AR 1575, 1591, 1598-99. Thus, Plaintiffs Monte A. Rose and Chelsey Lang stand to lose coverage for these services only if they do not pay premiums, an impending injury that is a direct result of the 2020 approval. *See* Monte Rose, Jr. Decl. ¶ 13 (March 15, 2024), ECF No. 54-2 ("Rose Decl.") ("Since [enrolling in HIP], I have used my coverage to obtain new glasses and to receive dental care, which I had not been able to access previously."); Chelsey Lang Decl. ¶ 9 (March 18, 2024), ECF No. 54-3 ("Vision and dental coverage have also been very important to me. With vision coverage, I have been able to get my prescription updated. In terms of dental, I have been able to get routine cleanings.").

But even if Federal Defendants were correct that at least one Plaintiff must establish that she is likely to lose her Medicaid coverage entirely if she fails to pay premiums, Plaintiff Emily Rames has done so. *See* Emily Rames Decl. (March 13, 2024), ECF No. 54-4 ("Rames Decl."). Her "gross income in 2023 was approximately $17,790," *id.* ¶ 2, which is above the FPL, making her subject to termination from the Medicaid program for nonpayment of premiums. Federal

Defendants allege that Plaintiff Rames' "declaration does not establish the size of her household." Fed. Br. at 15. This misrepresents her declaration. She explains that Indiana re-approved her for Medicaid coverage in November or December of 2023, Rames Decl. ¶ 10, and that "[g]iven [her] income, if [she] d[oes] not pay the monthly premium, [she] will lose [her] Medicaid coverage." *Id*. ¶ 13. Therefore, her declaration clearly establishes that her income level is above 100% of FPL for her household size, meaning she will lose coverage if she does not pay premiums.

As this Court has previously concluded, a plaintiff who has standing to challenge one part of a Section 1115 approval has standing to challenge the approval "as a whole." *Stewart I*, 313 F. Supp. 3d at 253, 258 (finding Plaintiffs have standing to challenge approval "writ large" where they showed injury from one component of approval); *Stewart v. Azar* ("*Stewart II*"), 366 F. Supp. 3d 125, 136 (D.D.C. 2019) ("Because the Court will examine whether the [1115 waiver project] reapproval as a whole—rather than its individual components—violates the APA, it will again consider only whether Plaintiffs have standing to bring that global challenge." (emphasis omitted) (citing *Davis v. FEC*, 554 U.S. 724, 734 (2008)). Accordingly, the injury caused by the premium requirements is sufficient for standing to challenge the approval as a whole, which includes waivers of the Medicaid requirements to provide retroactive coverage and NEMT. However, these other components of the waiver also injure Plaintiffs.

*Waiver of NEMT*. Defendants argue that the harms Plaintiffs assert from the waiver of NEMT are too speculative to support standing. Fed. Br. at 15; Ind. Br. at 20-21. Not so. For example, Plaintiff Rose, in his declaration, details chronic health conditions that necessitate medical appointments. He explains that he relies on his bike as his primary mode of transportation because he has no driver's license or car. He has missed medical appointments due to a lack of transportation. *See* Rose Decl. ¶ 8. This combination of a need for regular medical care and a lack

5

of reliable transportation makes it "virtually certain" that Plaintiff Rose will have a need for NEMT in the future. *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 83 (D.C. Cir. 2012) (finding Medicaid recipient requiring prescription inhalers for chronic asthma was "virtually certain to need Medicaid prescription coverage on a monthly basis for the foreseeable future"). This makes Defendants' invocation of cases like *Clapper v. Amnesty International* unavailing—the need for NEMT is not a "mere possibility." Fed Br. at 15. Nor does a health plan's separate decision to provide NEMT eliminate the injury. *Contra* Fed. Br. at 15; Ind. Br. at 21. Managed care plans are under no obligation to provide NEMT at all, much less an effective NEMT program. And, as Mr. Rose states in his declaration, he has "tried to use transportation services available through [his] health plan" but it has sometimes "fall[en] through on the day of the appointment" causing him to go without care. Rose Decl. ¶ 8.

*Waiver of Retroactive Coverage*. Federal Defendants' argument that Plaintiffs cannot show harm resulting from the retroactive coverage requirement is even more lacking. They only argue that Plaintiffs fail to show harm because of their assertion that "none of the Plaintiffs have established that they are above the FPL and therefore at risk of having their coverage terminated for nonpayment of premiums." Fed. Br. at 16; *see also* Ind. Br. at 21-22 (generally arguing that any harm posed by the lack of retroactive coverage is too speculative). But as explained above, Plaintiff Rames has done so. Given her current health condition, Rames Decl. ¶¶ 7-8, there is a "substantial probability" that were she disenrolled for nonpayment of premiums, she would have health care needs go unmet during a gap in coverage. *Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d 19, 36 (D.D.C. 2012).

*Indiana's Threats*. Unlike Federal Defendants, the State does dispute Plaintiffs' ability to establish causation and redressability regarding the 2020 approval. *See* Ind. Br. at 19-22. None of

Indiana's arguments are persuasive.[1] Indiana argues that Plaintiffs lack standing to challenge the waiver because they currently "use HIP and benefit from the coverage it provides." *Id*. at 19. But plaintiffs do not have to forego benefits now in order to challenge an impending threat to those benefits. That is not the law. *See, e.g.*, *Philbrick*, 397 F. Supp. 3d at 22; *Stewart I*, 313 F. Supp. 3d at 250-52. Moreover, Indiana's argument rests on an incorrect characterization of the legal basis for Plaintiffs' Medicaid coverage. As the 2020 approval itself explains, "affected groups *derive their eligibility* through the Medicaid state plan." AR 1588. Contrary to Indiana's assertions, vacatur of the 2020 approval would not result in the termination of Plaintiffs' coverage. That would require additional action by the State that may not ever occur.

As Plaintiffs explained, federal law does not permit Indiana to terminate coverage of the expansion population. *See* Pls.' Br. at 18. Even if it did, state law does not require it. *Cf*. Ind. Br. at 19. Nothing in the state law conditions coverage on the approval or continuation of a Section 1115 project. In arguing otherwise, Indiana ignores several critical features of the state law. First, it does not even mention Section 1115 waiver authority, and not all aspects of HIP require a waiver. *See, e.g.*, Ind. Code § 12-15-44.5-5 (requirements for participating managed care plans). Second, state law expressly permits the Secretary of the Indiana Family and Social Services Administration to "make changes" to HIP elements, even those otherwise listed as non-negotiable, if "required by federal law." *Id*. § 12-15-44.5-10(c). Third, some of the non-negotiable HIP elements are no longer part of the approved HIP project, *see id*. §§ 12-15-44.5-10(b)(2), 12-15-44.5-4.7(e)(2) (listing the six-month lockout penalty for failure to pay premiums as non-negotiable), and yet the State is still

---

[1] Indiana's argument that Plaintiffs lack standing to challenge the waiver of 42 U.S.C. §§ 1396o and 1396o-1 because they "do not claim to be" categorically needy also fails. Ind. Br. at 22. The restrictions on states' ability to impose premiums, set out in these provisions, expressly apply to "individuals described in section 1396a(a)(10)(A)." The populations included in HIP are described in that provision.

providing coverage to the expansion population. Finally, state law explicitly indicates under what circumstances HIP "shall" be terminated, and the listed circumstances do not include the lack of Section 1115 approval for certain HIP elements. *See id.* § 12-15-44.5-4(b). Therefore, despite Indiana's threats, it is far from guaranteed that Indiana will end the expansion, if even possible, and doing so would depend on multiple future decisions of governmental actors. As this Court has previously explained, even if Indiana "were able to 'unexpand' Medicaid (far from a foregone conclusion) … as the record stands today, the Court can grant meaningful relief." *Stewart I*, 313 F. Supp. 3d at 252-53. *Compare Teton Historic Aviation Found. v. U.S. Dep't of Def.*, 785 F.3d 719, 724-25 (D.C. Cir. 2015) (purchaser of aircraft parts showed redressable injury even if it could not prove that invalidating Department of Defense policy would force the Department to sell or accept the purchaser's bid). In sum, Plaintiffs have established that they have Article III standing to challenge the 2020 approval of Indiana's Section 1115 project.

### B.  Plaintiffs Have Standing To Challenge The 2023 Decision Letter.

Defendants separately argue that Plaintiffs lack standing to challenge the 2023 letter on the basis that its vacatur would not redress their injuries. *See* Fed Br. at 16-17; Ind. Br. at 22-23. Federal Defendants argue it is "simply speculative" that "CMS would both voluntarily reevaluate and then rescind demonstration authorities" should the Court vacate the decision letter. Fed. Br. at 16. However, vacatur would not merely provide CMS with an option to "voluntarily reevaluate" the project that it could decline to exercise. Instead, it would reopen the agency's review, which was only terminated through the agency's issuance of its December 2023 letter. Plaintiffs need not show that CMS would ultimately rescind the waivers to establish standing. "A court can redress a plaintiff's injury in fact in such cases even though the agency [] might later reach the same result

for a different reason." *Stewart I*, 313 F. Supp. 3d at 253 (cleaned up) (quoting *FEC v. Akins*, 524 U.S. 11, 25 (1998)).

Moreover, that Indiana could act pursuant to the 2020 approval does not vitiate Plaintiffs' standing to also challenge the 2023 letter. Consider, for example, the D.C. Circuit's decision in *National Parks Conservation Association v. Manson*. In that case, the court held that Plaintiffs had standing to challenge the Department of the Interior's withdrawal of an adverse-impact letter under the Administrative Procedure Act. 414 F.3d 1 (D.C. Cir. 2005). The withdrawal of that letter affected the State of Montana's decision to approve a permit for a coal-fired power plant that allegedly harmed the environment, but the State could have approved the permit regardless of the federal government's issuance of the letter. The Plaintiffs satisfied redressability even though "a federal district court ruling in favor of National Parks would not directly determine whether the Roundup Plant will get its permit [because] the effect of such a ruling would not be far removed." *Id.* at 6. That a court decision to set aside the federal letter "would significantly affect" the State's action was sufficient for redressability. *Id* at 7.

In other cases, the D.C. Circuit has explained that plaintiffs can satisfy standing when their requested relief would remove an "absolute barrier" to relief, "even if other barriers remain." *Duberry v. District of Columbia*, 924 F.3d 570, 583 (D.C. Cir. 2019) (cleaned up); *see also Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 593 (D.C. Cir. 2023) ("A ruling for [the plaintiffs] could 'remove this barrier' to lifting the rule, which is enough for standing to challenge it." (citation omitted)). "The law is clear that a party has standing to pursue a claim so long as the relief sought will constitute a 'necessary first step on a path that could ultimately lead to relief fully redressing the [claimant's] injury.'" *Duberry*, 924 F.3d at 583 (citation omitted). The 2023 letter reaffirms the 2020 approval, allowing the HIP project to proceed. Thus, vacatur of the

letter would remove a barrier on Plaintiffs' path to relief that would fully redress their injury. That is sufficient for standing.

## II.   The Secretary's October 2020 Decision To Extend The HIP Project Violates The Administrative Procedure Act.

### A.   The Secretary's 2020 Decision Is Reviewable By The Court.

The Secretary seeks to insulate his approval from judicial review by arguing that the decision is committed to agency discretion by law. Fed. Br. at 18-19. However, "[t]he APA embodies a basic presumption of judicial review." *Stewart I*, 313 F. Supp. 3d at 254 (cleaned up), making the exception for agency discretion "very narrow" and barring judicial review only in those "rare instances" where "there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971). This Court has already concluded that is not the case with respect to Section 1115, as has "[e]very court which has considered the issue." *Stewart I*, 313 F. Supp. 3d at 256 (quoting *Beno v. Shalala*, 30 F.3d 1057, 1067 (9th Cir. 1994)). As the Court explained, the criteria Congress imparted with respect to the Secretary's approval of Section 1115 waivers are clear, "readily app[licable]," and "a far cry from those traditionally deemed unreviewable." *Id.* at 255; *see also Gresham v. Azar*, 950 F.3d 93, 98-99 (D.C. Cir. 2019) ("Section 1315 approvals are not among the rare 'categories of administrative decisions that courts traditionally have regarded as committed to agency discretion.'" (citation omitted)), *vacated and remanded on other grounds sub nom. Becerra v. Gresham*, 142 S. Ct. 1665 (2022).

The cases the Secretary cites, Fed. Br. at 18-19, provide no basis for the Court to revisit its earlier conclusion. *See Drake v. FAA*, 291 F.3d 59, 62 (D.C. Cir. 2002) (finding no meaningful standard against which to judge dismissal of a complaint where the statute authorized such dismissal "'when the Secretary ... is *of the opinion* that the complaint does not state facts that warrant an investigation'" (citation omitted)); *Claybrook v. Slater*, 111 F.3d 904, 908-09 (D.C.

Cir. 1997) (finding decision of agency representative to adjourn a meeting whenever "he determines it to be in the public interest" was committed to agency discretion). Unlike the bald grants of discretion in these cases, the Secretary's Section 1115 waiver authority is pegged to time-limited experiments to promote objectives set out in the Medicaid Act. The Secretary's approval pursuant to Section 1115 waiver authority is therefore judicially reviewable.

In the alternative, Defendants contend that the Court must be particularly deferential here because it is reviewing the Secretary's "predictive judgments." Fed. Br. at 20; Ind. Br. at 24.[2] But "making a predictive judgment" is not a get-out-of-APA-free card whereby the agency "need not engage in reasoned decisionmaking." *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 821 (D.C. Cir. 1983); *see also Music Choice v. Copyright Royalty Bd.*, 774 F.3d 1000, 1015 (D.C. Cir. 2014) (predictive judgment must be based "on sufficient evidence"). To treat "the predictive nature of the judgment 'as though it were a talisman under which any agency decision is by definition unimpeachable,'" would leave "the arbitrary and capricious standard of judicial review ... effectively nullified." *Int'l Ladies' Garment Workers' Union*, 722 F.2d at 821-22 (citation omitted). A "[p]redictive judgment must be based on reasoned predictions." *Metlife Inc. v. Fin. Stability Oversight Council*, 177 F. Supp. 3d 219, 237 (D.D.C. 2016); *see also Stewart I*, 313 F. Supp. 3d at 259 (agency is required to engage in "'reasoned decisionmaking'" (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). Any predictive judgments allegedly made here failed

---

[2] Defendants rely on *Aguayo v. Richardson*, 473 F.2d 1090 (2d Cir. 1973) and *C.K. v. New Jersey Department of Health & Human Services*, 92 F.3d 171 (3d Cir. 1996), but the courts in those cases do not engage in the "searching" assessment of the record demanded under Supreme Court and D.C. Circuit precedent. *See C.K.*, 92 F.3d at 183; *Aguayo*, 473 F.2d at 1103-05. And *Aguayo*—on which *C.K.* rests—was decided in 1973, when HHS reviewed Section 1115 waivers under federal human subject protections—meaning that HHS used technical review panels of outside experts to evaluate the research design and possible harmful effects of the experiment on the participants. *See* 42 U.S.C. § 3515b.

this basic requirement. Moreover, predictive judgment was not primarily on display as the HIP project has been evaluated on multiple occasions. The Secretary need not have relied on any predictions given the mountain of actual evidence in the record regarding this exact project and similar ones in other states.

### B. The Secretary's Conclusion That The HIP Project Would Promote The Objectives Of The Medicaid Act Was Arbitrary And Capricious.

In his 2020 approval, the Secretary committed the same errors this Court has repeatedly found incongruous with reasoned decisionmaking. Defendants cannot avoid that the 2020 approval was yet another instance in which the Secretary impermissibly promoted his preferred objectives over Medicaid's core purpose of providing medical coverage and failed to reasonably conclude that the project would promote coverage or fiscal sustainability.

### 1. The Secretary Improperly Relied On His Preferred Objectives Of Increasing Health And Financial Independence.

Federal Defendants urge this Court to ignore the "other objectives" put forth by the Secretary in approving HIP and instead focus on how the project would allegedly promote coverage and fiscal sustainability. Fed. Br. at 21. But they cannot escape that these "other objectives" formed the crux of the Secretary's decision as part of the agency's general approach to Section 1115 waivers at the time of the 2020 approval. The Secretary granted approval of the project in large part on the basis that it would improve health, AR 1555-57, 1563-64, increase financial independence, AR 1556-57, and facilitate the transition of beneficiaries to commercial coverage, AR 1555-57, 1565-66. While Federal Defendants understandably do not defend these justifications before the Court, *see* Fed. Br. at 21, 9, Indiana does, *see* Ind. Br. at 34-35. However, the State gives the Court no reason to depart from its prior holdings that improving health and increasing financial independence are not standalone objectives of the Medicaid Act. *See* Pls.' Br. at 16-17. Even if health and financial independence could be considered, the Secretary neither

reasonably concluded that the project would advance those objectives nor weighed any gains with respect to those objectives against the certain coverage loss, rendering his decision arbitrary and capricious. *See* Pls.' Br. 25-27 (citing *Stewart II*, 366 F. Supp. 3d at 145, 148).

### 2. The Secretary Did Not Reasonably Determine That The Project Would Promote Coverage.

Defendants recognize that they must defend the approval as having adequately examined "how the project would implicate the 'core' objective of Medicaid: the provision of medical coverage to the needy." *Gresham v. Azar*, 363 F. Supp. 3d 165, 181 (D.D.C. 2019), *aff'd*, 950 F.3d 93 (D.C. Cir. 2020), *vacated and remanded on other grounds sub nom. Becerra v. Gresham*, 142 S. Ct. 1665 (2022). Accordingly, they argue that the Secretary did reasonably determine that the HIP project would promote coverage, in particular by ensuring the fiscal sustainability of the program. *See* Fed. Br. at 20-22; *see also* Ind. Br. at 24-28. But despite Defendants' efforts to rehabilitate the approval, the Secretary did not "adequately analyze" the effects of the project on coverage. *Stewart II*, 366 F. Supp. 3d at 140 (citation omitted).

***Coverage Loss.*** As Plaintiffs' Opening Brief explained, the Secretary failed to adequately consider the uncontroverted and voluminous evidence in the record establishing that the HIP premiums have caused massive coverage loss. *See* Pls.' Br. at 20-22; AR 5959 (evaluation showing that in 22 months in 2015 and 2016, 46,000 eligible individuals were not enrolled and 13,550 people lost coverage for nonpayment), 4764 (evaluation showing that in 2017 and 2018, more than 26,000 beneficiaries lost coverage for nonpayment). Defendants point to nothing in the approval letter that shows otherwise.

First, they highlight the statement that individuals below 100% of FPL do not lose coverage for failure to pay. *See* Fed. Br. at 23; Ind. Br. at 31. That ignores that those individuals lose coverage of vision, dental, and chiropractic services and become subject to cost-sharing

requirements, and it does not address the evidence in the record regarding coverage loss for individuals above 100% of FPL.

Second, they point to an evaluation noting that beneficiaries generally find HIP coverage affordable. *See* Fed. Br. 23; Ind. Br. at 31 (citing AR 1570); *see* AR 4646-47, 4797 (evaluation finding that most of the 27 current HIP beneficiaries interviewed were satisfied with HIP, in part due to affordability). However, the same evaluation noted that other members and providers interviewed were dissatisfied with HIP, in part due to the loss of coverage for failure to pay premiums. AR 4797. Regardless, these interview results do nothing to refute the uncontroverted data in the record documenting substantial coverage loss as a result of the premiums.

Finally, Defendants refer to portions of the approval that Plaintiffs have already explained do not respond to the concerns raised about coverage loss. *Compare* Fed. Br. at 23, Ind. Br. at 32 (coverage loss decreased over time, and CMS would continue to monitor data) *and* Ind. Br. at 31 (the amount of the premiums is based on income and capped), *with* Pls.' Br. at 21-22. *See Gresham*, 950 F.3d at 103 ("Nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking."). In short, the Secretary simply did not grapple with the data in the record demonstrating that premiums cause thousands of individuals to lose Medicaid coverage every year. *See Stewart I*, 313 F. Supp. 3d at 263.

As for the waiver of retroactive coverage, the Secretary did not adequately address the evidence in the record showing that the waiver would reduce coverage and access to services. *See* Pls.' Br. at 22-23. Federal Defendants concede, as they must, that the waiver eliminates some coverage. *See* Fed. Br. at 25; *Stewart II*, 366 F. Supp. 3d at 143 (noting that "restricting retroactive eligibility will, by definition, <u>reduce</u> coverage" (quoting *Stewart I*, 313 F. Supp. 3d at 265)). For its part, Indiana contends that the waiver will have little effect because "few beneficiaries" use

14

retroactive coverage. Ind. Br. at 11 n.1, 32. However, the record showed that a sizeable number of individuals incurred coverable expenses during the retroactive period. *See* AR 1564 n.9; *see also* AR 7203 (citing a later Indiana report noting that an even higher percentage of eligible beneficiaries had incurred expenses, at a higher average amount, and highlighting data from other states indicating the importance of retroactive coverage for the expansion population). Finally, while Indiana points to the notion that continued outreach and enrollment and the "Fast Track" process will mitigate coverage loss, *see* Ind. Br. at 32 (citing AR 1564-65), comments in the record pointed out that these long-standing features of HIP do not act as a substitute for retroactive coverage, *see* Pls.' Br. at 23.

Similarly, while commenters explained that the waiver of NEMT would impede access to care, the Secretary did not deal with the evidence they presented. *See* Pls.' Br. at 23-24. Defendants argue that the Secretary reasonably concluded that the waiver would not reduce access to care, based on a 2016 evaluation. *see* Fed. Br. at 24. However, commenters warned the Secretary that the evaluation was deeply flawed. *E.g.*, AR 7214-15, 8112; *see also* AR 6043 (evaluation noting that some individuals were unable to participate in the survey due to language barriers). Even taking the evaluation as valid, the Secretary cherry-picked—simply ignoring the parts of the evaluation suggesting that the waiver reduces access to care. *E.g.*, AR 6047-48 (individuals with MCO-provided NEMT were more likely than those without NEMT to schedule health care appointments), AR 6052 (among individuals who missed scheduled appointments, those without NEMT were more likely than those with NEMT to report a transportation problem as a reason for missing appointments). Likewise, the Secretary ignored the findings in a subsequent HIP evaluation indicating lack of adequate transportation is a problem, AR 4659, 4797, and the significant research commenters cited demonstrating that effective NEMT improves access to care,

*e.g.*, 7162, 7213-15, 8112-13, 8223-29. *See Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) (holding that an "agency cannot ignore evidence that undercuts its judgment").

**Coverage Promotion:** Plaintiffs Opening Brief explained that the Secretary did not reasonably conclude that the HIP project would promote coverage. *See* Pls.' Br. at 24-25. While Federal Defendants and Indiana disagree, their arguments are unconvincing.

Indiana's main argument is that the project promotes coverage because, without the approval, state law would require Indiana to terminate coverage of the entire Medicaid expansion population. *See*, *e.g.*, Ind. Br. at 24-26, 28, 29 ("Clearly, providing expanded Medicaid coverage to the more than 570,000 Hoosiers covered in 2020 ... is superior to not expanding coverage at all…."), 38-39. But the Secretary did not approve the project on that basis, so the Court cannot rely on that logic now. *See Michigan*, 576 U.S. at758 (noting "the foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action"). Even if the Secretary had approved the project on this basis, the Court has already explicitly rejected this theory of justification. *See Philbrick*, 397 F. Supp. 3d at 25-27; *Stewart II*, 366 F. Supp. 3d at 131-32, 153-55. There is no "limiting principle" to this argument, as the entire Medicaid program is optional. *Stewart II*, 366 F. Supp. 3d at 154. On this logic, the Secretary could approve whatever waivers a state requested, "no matter how few people remain on Medicaid thereafter because <u>any</u> waiver would be coverage promoting compared to a world in which the state offers no coverage at all." *Id*.

Federal Defendants principally argue that the Secretary reasonably determined that the project promotes coverage via fiscal sustainability—by saving money, it makes it more viable for the state to cover optional populations and services. *See* Fed. Br. at 21-22; 33. However, Section 1115 does not allow the Secretary to approve a project on that basis alone, *see* Pls.' Br. at 17-19.

16

The Court has explained multiple times why a project cannot be deemed coverage-promoting simply because, without the approval, the state will drop optional populations or services due to fiscal strain. *See Stewart II*, 366 F. Supp. 3d at 153-55; *Philbrick*, 397 F. Supp. 3d at 25-27. Federal Defendants do not engage with those reasons.[3] Even if the Secretary could have relied on a cost savings rationale to extend HIP, he did not make any finding that the project would in fact enhance fiscal sustainability or balance any cost savings against the well-documented coverage loss, rendering his conclusion that the project would promote the objectives of Medicaid arbitrary and capricious. *See* Subsection 3, below. *See also Stewart II*, 366 F. Supp. 3d at 152 (noting that both the D.C. Circuit and the Supreme Court have recognized that a project that increases fiscal sustainability by impeding or curtailing access to coverage, including coverage of an optional service—prescription drugs—may not advance the objectives of Medicaid).

Aside from fiscal sustainability, Federal Defendants strain to find other "coverage-promotion rationales" in the approval. They cite brief snippets from the approval letter out-of-context. Fed. Br. at 21-22. For example, they point to a vague statement that HIP's "incentives for individuals to enroll as soon as possible and to obtain preventive services" could reduce the cost of coverage. Fed. Br. at 21 (citing AR 1561). Similarly, they argue that the Secretary found that the project "promoted 'continuity of coverage and care,'" Fed. Br. at 21 (citing AR 1563), but that

---

[3] Federal Defendants and Indiana also seem to make a somewhat simpler argument, claiming the project promotes coverage because it includes optional services. *See* Ind. Br. at 26; Fed. Br. at 23-24 (arguing that premiums result in coverage gains because HIP Plus includes optional services). It cannot be that any project that includes optional services automatically passes muster. The relevant inquiry for the Secretary is whether a project, on balance, promotes the objectives of the Medicaid Act. *Stewart I*, 313 F. Supp. 3d at 265. The baseline against which a project is judged is full compliance with the Medicaid Act—here, for purposes of Federal Defendants' argument, no waiver permitting Indiana to impose premiums on individuals below 150% of FPL. The relevant baseline does not change based on the choices the State would make regarding coverage of optional populations or services if its requested waiver were not approved. *See Philbrick*, 397 F. Supp. 3d at 25-27; *Stewart II*, 366 F. Supp. 3d at 153-55.

misrepresents what he said in the approval itself. *See* AR 1564 ("To increase awareness of the waiver of retroactive eligibility and promote the objectives of the Medicaid program (e.g., continuity of coverage and care), Indiana will continue to provide outreach and education about how to apply for and receive HIP coverage...."). To the extent that these snippets suggest that the waiver of retroactive coverage would promote coverage, they are conclusory and illogical. *See* Pls.' Br. at 24-25. The agency must provide more than "conclusory statements" to prove it "consider[ed] [the relevant] priorities." *Getty v. Fed. Savs. & Loan Ins. Corp.*, 805 F.2d 1050, 1057 (D.C. Cir. 1986).

Finally, Defendants point to the statement in the approval that the SUD/SMI program expands coverage. *See* Fed. Br. at 21; Ind. Br. at 27. As Plaintiffs have explained, it is appropriate for the Court to treat the SUD/SMI program as separate from the HIP project. *See* Pls.' Br. at 14 (citing *Stewart I*, 313 F. Supp. 3d at 258). Defendants cannot contest that the SUD/SMI program applies to a broader swath of Medicaid beneficiaries than HIP, has a shorter duration, and has goals that differ from the HIP project. *See* Pls.' Br. at 14-15. Indiana's arguments focus on form over substance. It is true that Indiana submitted "a single application packet" to renew HIP and the SUD/SMI program, Ind. Br. at 27, but the packet contained two separate application documents— one for HIP and one for the SUD/SMI program. *See* AR 8235-87, 8288-8315; *Stewart I*, 313 F. Supp. 3d at 258 (finding that "[a]lthough packaged inside the same application," the SUD program was "wholly distinct" from Kentucky HEALTH). It is also true that the Secretary issued a single approval for the SUD/SMI program and HIP, but he treated the SUD/SMI program as distinct by requiring a separate implementation plan, monitoring protocol, mid-point assessment, and evaluation. *See* Pls.' Br. at 14-15. The fact that the 138-page federal evaluation of HIP includes a single paragraph (with no quantitative data) on the SUD program does not show otherwise. *Cf.*

Ind. Br. at 27. Finally, Indiana is wrong that this case is distinguishable from *Stewart I* on the grounds that the expansion population "cannot receive Medicaid coverage, including coverage for substance use disorders, except through HIP." Ind. Br. at 27. As described above, the expansion population in Indiana derives its eligibility from the state Medicaid plan, as did the expansion population in Kentucky. What is more, as in *Stewart I*, 313 F. Supp. 3d at 259, the Secretary made no finding that any of the waivers permitting Indiana to implement the HIP features were "necessary" for the State to carry out the SUD/SMI program. That is not surprising, as the Secretary has solicited and approved many SUD and/or SMI programs in other states without granting waivers of retroactive coverage or NEMT or allowing states to charge premiums.

But even assuming for argument's sake that the SUD/SMI program were part of HIP, its effect on coverage is limited. The SUD/SMI program permits the State to cover services when provided in facilities that meet the definition of an institution for mental diseases (IMD). AR 1578-79, 1610-11; *see* 42 U.S.C. § 1396d(i) (defining IMD). Without the approval, Indiana is able (and in some instances required) to cover these services when provided in other facilities or on an outpatient basis. *See* AR 8185-88. The Secretary did not weigh the benefits of the IMD services to the HIP population, against the loss of coverage they will experience due to premiums, the waiver of retroactive coverage, and the elimination of NEMT. *See Stewart I*, 313 F. Supp. 3d at 265. Obviously, for the many thousands of individuals who never enroll in Medicaid coverage or lose coverage for failure to pay premiums, the SUD/SMI program "does nothing to 'furnish ... medical assistance.'" *Id*. Finally, the Secretary could not possibly have balanced the coverage loss from HIP against any purported coverage gains—from the HIP optional benefits or from the SUD/SMI program—as he "never provided a bottom-line estimate" of coverage loss. *Philbrick*, 397 F. Supp. 3d at 23 (quoting *Stewart II*, 366 F. Supp. 3d at 140).

### 3. The Secretary Did Not Reasonably Determine That The Project Would Promote Fiscal Sustainability.

While the Court has found that the Secretary may take fiscal sustainability into account in determining whether a project promotes the objectives of Medicaid, it has cautioned that he must adequately explain why the project "advances that objective and why, if it is adverse to other Medicaid objectives, he could reasonably conclude that, on balance, it promotes the objectives of the Act." *Stewart II*, 366 F. Supp. 3d at 149. Here, the Secretary "fell short" on both fronts. *Id*.

First, the Secretary failed to adequately explain why the project would advance fiscal sustainability in Indiana. The Secretary "made no finding that [the HIP project] would save [Indiana] any amount of money or otherwise make the program more sustainable in some way." *See id.* Federal Defendants disagree, highlighting the Secretary's statement that NEMT "is expected to improve" fiscal sustainability. *See* Fed. Br. at 22 (citing AR 1572). But that conclusory statement flies in the face of the only relevant evidence in the record, which indicates that providing NEMT is cost-effective for states. *E.g.*, AR 7215, 8113, 8224-25; *see Getty*, 805 F.2d at 1055 ("Stating that a factor was considered ... is not a substitute for considering it."). What is more, Indiana told CMS that it was not requesting the NEMT waiver to save money. AR 3300; *see Philbrick*, 397 F. Supp. 3d at 31 (finding conclusion that the project would enhance fiscal sustainability arbitrary and capricious, especially where the State "disclaimed such motivation").

Indiana argues that the Secretary need not have made a more detailed finding regarding fiscal sustainability, as evidence in the record shows that the waiver of retroactive coverage and the premiums save the State money. *See* Ind. Br. at 33. But the record does not show that those features save money. Nor does the record support any theory that those features could save money other than via causing coverage loss. *See Stewart II*, 366 F. Supp. 3d at 150 (noting that saving money through a reduction in coverage is "precisely what the Ninth Circuit said [in *Newton-*

*Nations* and *Beno*] states cannot do with a § 1115 waiver"). Indiana claims otherwise, arguing that a report indicating that "more enrollees ... obtain[ed] preventative care over time" proves that the waiver of retroactive coverage has positive fiscal effects. Ind. Br. at 32. However, the cited report was not published until after the 2020 approval, so it cannot be considered now. *See Citizens to Preserve Overton Park*, 401 U.S. at 420 (noting that court review "is to be based on the full administrative record that was before the Secretary at the time he made his decision"). Regardless, the report does not link an increase in preventive care (based on interviewees' observations) to the waiver of retroactive coverage, much less to a reduction in per-person costs. *See* AR 4309. Likewise, Indiana's argument that the premiums and POWER Accounts save money "by changing" behavior, Ind. Br. at 33, is not supported by the evidence in the record. *Cf.* Pls.' Br. at 25-26 (dispelling the notion that premiums improve health outcomes); AR 7216-19, 7229-32, 8094-95, 8136 (commenters explaining that the POWER Accounts are not well-understood and do not influence behavior). And, while Indiana claims that the costs of administering premiums has decreased over time, Ind. Br. at 33, nothing in the record assesses the costs of administering premiums in Indiana or balances those costs against the minimal revenue that may accrue.

In short, the Secretary "has not marshaled substantial evidence for [his decision that the project would promote fiscal sustainability] and, indeed, has ignored contrary evidence in the record." *Stewart II,* 366 F. Supp. 3d at 150. Neither Federal Defendants nor Indiana point to any finding, reasonably based on the evidence in the record, about the financial effects of the project.

Second, the Secretary failed to reasonably compare "the benefit of savings to the consequences for coverage." *Id*. Although the Secretary did say he weighed the loss of NEMT against the gains to fiscal sustainability, AR 1572, his calculation was limited to a single element of the project (NEMT) and was not based on a rational assessment of the impact of that feature, as

described above. Thus, the issue is not, as Federal Defendants contend, that Plaintiffs simply disagree with how the Secretary weighed the evidence, Fed. Br. at 25-26, but rather that the Secretary failed to "examine all relevant factors and record evidence" in reaching his conclusion about the impact of the NEMT waiver. *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017). Federal Defendants' appeal to "expert judgment" cannot save them, as any expert assessment must still be reasonable. *See EarthLink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006). Here, it was not.

### C. The Secretary's Approval of A Ten-Year Extension As An Experiment Violates the APA.

Defendants proceed as if a ten-year extension of a Section 1115 project is business as usual. Quite the opposite. Defendants' arguments that the Secretary adequately examined whether this 10-year extension was "experimental" would excise that requirement from the statute—wiping out any distinction between Section 1115 demonstrations and states' administrations of their standard Medicaid programs. Similarly, the approval fails to justify the unprecedented length of the extension. The Secretary did not even consider whether that drastic duration was necessary. Even had he provided a reasonable explanation, in granting the 10-year approval, he bypassed the statute's strict limits on extensions of state-wide comprehensive Section 1115 projects.

### 1. The Secretary Did Not Adequately Examine If The Extension Was Experimental.

Federal Defendants incorrectly portray Plaintiffs as arguing that a project must "be experimental in the 'scientific' sense." Fed Br. at 27 (quoting *Cal. Welfare Rights Org. v. Richardson (CWRO)*, 348 F. Supp. 491, 498 (N.D. Cal. 1972)). But unlike in *CWRO*, Plaintiffs are not seeking to hold the Secretary "to standards of scientific precision" by challenging the approval on the basis of methodological defects. 348 F. Supp. at 498. Indeed, the Court in *CWRO* found that

because the approved project was limited in scope and duration (only one year), it had "no occasion here to attempt to determine at what point an experiment must be held to cease and a standard program to begin." *Id*. That is the fundamental issue that Plaintiffs raise in this case. *See* Pls.' Br. at 29-30. Critically, the Court in *CWRO* opined on that issue: "[T]he Secretary would abuse his discretion if he were to approve a project ... subjecting an unreasonably large population to the experiment or continuing it for an unreasonably long period." *CWRO*, 348 F. Supp. at 498. That is just what the Secretary has done here.

Federal Defendants try to avoid this conclusion. They argue that the Secretary satisfied his obligation to only approve an experimental project because he explained that despite the long-standing nature of HIP, it maintained "experimental potential," as project features have evolved over time. Fed. Br. at 27; *see* Ind. Br. at 35. That argument reads the experimental requirement out of the statute. *See* Pls.' Br. at 30. If accepted, it would mean that Section 1115 gives the Secretary the authority to grant the same waivers to the same state forever, so long as the state tweaks project elements (say, by changing the amount of the premiums slightly each year, *see* AR 1601-02). That cannot be right.

Federal Defendants also contend that the pieces of the approval describing the goals of the project, requiring an evaluation, and subjecting the project to monitoring show that the Secretary determined that the project would yield useful data. *See* Fed. Br. 27. However, the Secretary did not even attempt to explain how additional data gathering would "actually demonstrate something different" from the data gathered in Indiana since 2008 or the data gathered in other states over the course of two decades. *Newton-Nations v. Betlach*, 660 F.3d 370, 381 (9th Cir. 2011); *see, e.g.*,

AR 7194-96, 8097, 8197, 8206 (cataloguing redundant research proving that premiums deter and reduce enrollment among low-income individuals).[4]

Likewise, the statement noting that Indiana has not conducted a "comprehensive and conclusive" evaluation of the effects of certain features of the project, AR 1558, cannot save the approval. *Cf.* Ind. Br. at 35 (citing AR 1558); Fed. Br. at 27. Again, that logic would render the experimental requirement in Section 1115 meaningless, allowing the Secretary to continue approving a project for as long as the state failed—due to incompetence or willful neglect—to conduct a fulsome evaluation of the project. Relatedly, Federal Defendants and Indiana highlight that the COVID-19 public health emergency interrupted implementation of the premiums. *See* Ind. Br. at 35; Fed. Br. at 27-28. But at the time of the approval, the public health emergency had been in place for only eight months, a small fraction of the time that had passed since the State first imposed premiums in 2008. Moreover, the Secretary did not say that the project satisfied the experimental requirement due to the public health emergency, and as a result, the Court cannot rely on that explanation now. *See Michigan*, 576 U.S. at 758.

Even more puzzling, Indiana argues that Section 1115 waivers are not restricted to experimental, pilot, or demonstration projects. Ind. Br. at 35. That ignores the text of the statute. *See, e.g., Stewart I*, 313 F. Supp. 3d at 254 (noting that the statute requires the Secretary, before approving a Section 1115 project, to examine whether the project is an experimental, pilot, or

---

[4] Indiana argues that studies conducted in other states have no bearing on whether HIP is experimental because "Indiana's population and program is not identical to what exists elsewhere," and Plaintiffs do not establish that POWER Accounts "are identical in all respects to premiums." Ind. Br. at 36. There is no question that Indiana's project includes premiums. *See* AR 1575, 1576. Indiana also ignores that it is the Secretary's obligation to reasonably explain how, given the abundant evidence in the record documenting the effects of premiums on individuals eligible for Medicaid, Indiana's project had experimental value. In addition, the evidence cited in the December 2023 approval further establishes that the premiums have no experimental foundation.

demonstration project). Indiana's view is not surprising, given that it refers to HIP as a "fixture" in the State, Ind. Br. at 24, and indicates that it has continued the project because of its opposition to a "traditional Medicaid entitlement program," *id.* at 7. *But see Beno*, 30 F.3d at 1069 (explaining Section 1115 was not enacted to allow states "to evade federal requirements").

In sum, nothing in the approval indicates that the Secretary made a rational judgment, supported by evidence in the record, that in 2020 the HIP project qualified as an experimental, pilot, or demonstration project under Section 1115. *See Newton-Nations*, 660 F.3d at 381 (finding it "questionable whether the Secretary could have" found a project imposing cost-sharing had any research value given that "the effects of cost sharing on the poor" had been "heavily studied" over the prior 35 years).

### 2. The Secretary Did Not Reasonably Find That The Length Of The HIP Extension Was Necessary.

Contrary to Federal Defendants' assertion, Plaintiffs' challenge to the 10-year approval does not reflect a policy disagreement, but rather a disagreement about whether the Secretary can run roughshod over the limits to his Section 1115 authority and ignore his obligation to engage in reasoned decisionmaking. *See* Pls.' Br. at 32-34; *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency must provide "a satisfactory explanation for its action" that draws a "rational connection between the facts found and the choice made" (citation omitted)).

The Secretary entirely failed to consider, let alone explain, whether a 10-year approval was necessary. He listed the factors he considered in determining the approval period of HIP features and whether the 10-year period was necessary was nowhere on that list. *See* AR 1557-58 (citing Indiana's request; whether the policies had been in place "over a sufficient period of time to support" a 10-year renewal; and "the importance, performance, and potential effectiveness" of the

components as the considered factors). To argue that the Secretary did consider whether the 10-year extension was necessary, Federal Defendants point to a statement in the approval that the duration of the project could facilitate a more comprehensive evaluation of the project features. *See* Fed. Br. at 30-31. But Plaintiffs explained why, to the extent that section of the approval could constitute a finding that it was necessary to approve HIP for another decade, it was arbitrary and capricious. *See* Pls.' Br. at 33.[5] Lacking a meaningful response, Federal Defendants misconstrue Plaintiffs' argument regarding the Secretary giving Indiana permission to vary the amount of the premiums each year. *See* Fed. Br. at 32. Plaintiffs are simply pointing out the illogic involved in, on the one hand, claiming that "programmatic changes with each extension" has made evaluation difficult, AR 1572, and on the other hand, giving Indiana free rein to implement programmatic changes on an even more frequent basis. This inconsistency undermines any argument that in issuing the 10-year approval, the Secretary was primarily concerned with ensuring a more rigorous evaluation. *See* Pls.' Br. at 33.

Finally, neither Federal Defendants nor Indiana provide a meaningful response to Plaintiffs' argument that the 10-year approval is inconsistent with existing CMS policy. *See* Pls.' Br. at 33-34. They point to nothing in the approval showing that the project was "routine" or "non-complex" or explaining how the long-standing waivers could at once have proven "successful" and yet need to be studied for an additional decade. The Secretary did say that "initial promising evidence" for the HIP policies made a 10-year approval "appropriate," *see* Fed. Br. at 32; AR

---

[5] And, while the Secretary stated that the duration of the project would enable the state to conduct a longitudinal beneficiary survey, AR 1572-73, the longitudinal member survey included in the evaluation design (approved in March of 2023), spans only one year, AR 0557, calling into question any suggestion that the 10-year period was necessary.

1558, but this statement in no way resolves that inconsistency. Further, his assertion is completely unsupported by the evidence in the record, *see* Pls.' Br. at 20-28.

### 3.   The Extension Violates Sections 1115(e) And (f).

Defendants argue that Section 1115(e) does not apply to a state-wide comprehensive demonstration project if the state requests any changes to the terms and conditions governing the project. *See* Fed. Br. at 28; Ind. Br. at 36. That conflicts with the unambiguous language of the statute. In Section 1115(e)(1), Congress stated: "The provisions of this subsection *shall apply to the extension of any* State-wide comprehensive demonstration project ... for which a waiver of compliance with requirements of subchapter XIX is granted under subsection (a)." 42 U.S.C. § 1315(e)(1) (emphasis added).

Contrary to Federal Defendants' argument, the use of the word "may" in Section 1115(e)(2) does not implicitly qualify the clear language in Section 1115(e)(1). *See* 42 U.S.C. § 1315(e)(2). Rather, Section 1115(e)(2) simply indicates that a state is free to seek an extension of up to 3 years (or 5 years for a project involving dual eligibles). Similarly, nothing in the text of Section 1115(e)(6) permits a state to escape application of Section 1115(e) simply by proposing minimal changes to its project. Instead, Section 1115(e) dictates that if a request to extend a state-wide comprehensive project is granted, the extension must be under the existing terms and conditions. *Id*. § 1315(e)(6).

Plaintiffs' reading of the statute does not, as Federal Defendants claim, *see* Fed. Br. at 27, lead to absurd results. If a state application to extend a state-wide comprehensive project proposes modifications that are "substantial" enough to transform the existing project into a new project, then the state would, in effect, not be requesting an extension at all. 42 C.F.R. § 431.412(c)(2). It

is far from "untenable" for CMS to make that distinction.[6] Further, requiring an extension to operate under the existing terms and conditions is consistent with the limits Congress established in Section 1115(a). The Secretary can only grant waivers that are "necessary" to enable the state to carry out an "experimental, pilot, or demonstration" project. 42 U.S.C. § 1315(a). Thus, he can only approve an extension if additional time is necessary to allow the state to finish conducting its experiment. There is nothing absurd about the statute ensuring that the experiment continue undisturbed, as mid-stream modifications could diminish the usefulness of the results. Indeed, the restriction is wholly consistent with the broader text and purpose of Section 1115. In addition, Federal Defendants ignore that Sections 1115(e) and (f) only apply to a subset of Section 1115 projects—those that are state-wide and comprehensive. It makes sense that Congress would place additional, specific limits on the extension of the projects that have the broadest reach and effects. *See CWRO*, 348 F. Supp. at 498 ("[T]he Secretary would abuse his discretion if he were to approve a project ... subjecting an unreasonably large population to the experiment or continuing it for an unreasonably long period.").

Finally, Federal Defendants turn to the legislative history to support their erroneous reading of the statute. *Cf. Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) (noting that when the statutory language is unambiguous and "the statutory scheme is coherent and consistent," the "inquiry ceases" (citation omitted)). However, nothing in the cited materials conflicts with Plaintiffs' argument. Congress could at once "provide for a simplified renewal or extension process," Fed. Br. at 29-30, and place limits on the length of extensions.

---

[6] As a matter of practice, Federal Defendants are not correct that a state can never request modifications of the terms and conditions of a state-wide comprehensive project. *See* Fed. Br. at 29. CMS permits states to request amendments during an approval period, *see* AR 1584-85, and CMS has the authority to withdraw waivers or expenditure authorities. 42 C.F.R. § 431.420(d).

Given that none of the numerous HIP renewals have been exempt from Section 1115(e), and that Sections 1115(e) and (f) only permit one initial and one subsequent extension, the Secretary exceeded his authority in issuing the 2020 HIP extension. *See* Pls.' Br. at 32.

**D.    The Extension Violates Sections 1396o And o-1.**

Plaintiffs' argument that the Secretary lacked statutory authority to approve the HIP premiums is straightforward: Congress purposefully placed Medicaid's premium and cost sharing provisions in 42 U.S.C. §§ 1396o and 1396o-1, not Section 1396a. Sections 1396o and 1396o-1 extensively describe the premiums and cost sharing that states can impose through state plan amendments or waivers, and they bar states from imposing premiums on individuals described in 42 U.S.C. § 1396a(a)(10)(A), *i.e.*, categorically needy groups, including the expansion population, with household incomes below 150% of FPL.

Defendants' argument that Section 1115 gives the Secretary authority to waive those strict limits ignores the structure of the statute as a whole and the history and wording of the relevant provisions. *See* Fed. Br. at 32-36; Ind. Br. at 37. Premiums and cost sharing were originally authorized, with scant statutory discussion, in Section 1396a(a)(14). *See* Social Security Act Amendments of 1965, Pub. L. No. 89-97, § 1902(a)(14), 79 Stat. 286, 346. After two courts ruled that Section 1115 gave the Secretary the power to allow states to charge enrollees heightened cost sharing, *see Crane v. Matthews*, 417 F. Supp. 532 (N.D. Ga. 1976); *CWRO*, 348 F. Supp. 491, Congress added a new Section 1396o to the Medicaid Act and set forth, in detail, the premium and cost sharing options available to states. Contrary to Federal Defendants' claim, *see* Fed. Br. at 33, Section 1396o independently requires states to comply with the limits included therein. *See* 42 U.S.C. § 1396o(a), (b) ("[t]he State plan shall provide...."). At the same time, Congress amended Section 1396a(a)(14), using wording unique among the provisions of Section 1396a, to provide that premiums and cost sharing "may be imposed only as provided in" Section 1396o. *See* Tax

29

Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, 96 Stat. 324, 367. If Congress intended for Section 1396o to have no independent legal significance, but to simply flesh out Section 1396a, it would have at least referenced Section 1396a in Section 1396o. It was logical for Congress to keep Section 1396a(a)(14) as a cross-reference to Section 1396o—that ensured that Section 1396a remained an exhaustive list of all state plan elements. With these changes, Congress expressed its expectation that states utilize the flexibilities set forth in Section 1396o, "mak[ing] further exercise of the Secretary's demonstration authority unnecessary." H.R. Rep. No. 97-757, pt. 1, at 6 (1982).

The Secretary argues that Plaintiffs incorrectly read Section 1396o(f) as a grant of waiver authority, when it in fact limits that authority and, in so doing, presumes that Section 1115 extends to Section 1396o. Fed. Br. at 34. That misstates Plaintiffs' position, which is: When acting through any waiver authority, the Secretary must abide by the limits in Section 1396o(f). If the Secretary could use Section 1115 to ignore the requirements of Section 1396o, then he could also ignore the limits in Section 1396o(f). That reading would render Section 1396o(f) superfluous. *See* Pls.' Br. at 40.

Further, in arguing that the Secretary can waive Section 1396o-1, Defendants misunderstand the significance of that provision. Section 1396o-1 gives states more options for imposing charges on beneficiaries. Congress authorized the options in a stand-alone provision outside of Section 1396a and, this time, it did not refer to Section 1396o-1 in Section 1396a(a)(14). *See* Deficit Reduction Act of 2005, Pub. L. No. 109-171, §§ 6041-6043, 120 Stat 6, 81, 85, 86 (2006). While adding to the flexibilities available to states, Congress continued to bar premiums on categorically needy individuals with incomes below 150% of FPL. *See* 42 U.S.C. § 1396o-

1(a)(2), (b)(1). This bar is not, as Federal Defendants claim, Fed. Br. at 35, affected by subsection 1396o-1(b)(6), which preserves Section 1396o(f)'s limits on the Secretary's waiver authority.

Indiana argues that the omission of Section 1396o-1 from Section 1396a(a)(14) does not matter because Section 1396o references Section 1396o-1. Ind. Br. at 37. But Section 1396o does not incorporate Section 1396o-1, and it only refers to Section 1396o-1 in two of ten extensive subsections. *See* 42 U.S.C. § 1396o(f), (h). Similarly, the Secretary argues that Section 1396o-1 simply describes exceptions to Section 1396o, so a waiver of Section 1396o necessarily includes a waiver of Section 1396o-1. Fed. Br. at 33, 35. However, Section 1396o-1 does more than describe alternatives to Section 1396o; it establishes new requirements on states opting to impose cost sharing and premiums. *See*, *e.g.*, 42 U.S.C. § 1396o-1(a)(2)(B), (b)(1)(B)(ii) (requiring that total aggregate out-of-pocket costs imposed not exceed 5% of household income); *id.* § 1396o-1(b)(3)(A)-(B) (excluding designated populations from premiums and cost sharing). In any case, the Secretary in fact waived Section 1396o-1 (Social Security Act Section 1916A), undercutting his argument that no separate waiver of Section 1396o-1 is necessary. AR 0014, 1575. Accordingly, Sections 1396o and 1396o-1 are not waivable, and the Secretary acted beyond the scope of the statute when he allowed Indiana to impose premiums on very low-income people.

## III.   The December 2023 Decision Allowing HIP to Proceed Constitutes Final Agency Action That Violates The APA.

Defendants urge this Court to refrain from reviewing the December 2023 decision letter on the merits. Understandably so—the letter is the epitome of arbitrary decisionmaking. It again approves HIP, in particular the premium requirements, even while spending the majority of its pages on the robust and one-sided body of evidence that demonstrates why imposing heightened premiums on Medicaid beneficiaries is at odds with Medicaid's core purpose. But Defendants cannot use reviewability as an escape hatch from the deficiencies of its reasoning.

### A. The December 2023 Decision Is Reviewable.

*Final Agency Action*. Federal Defendants insist that the 2023 decision letter is not "final agency action" and is therefore, unreviewable. Fed. Br. at 37-38. This argument fails. The 2023 letter satisfies both requirements for final agency action: (1) the decision "mark[s] the consummation of the agency's decisionmaking process;" and (2) it is a decision by which "rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178, (1997) (cleaned up). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). The 2023 letter satisfies this standard.

First, the 2023 letter constitutes the completion of the Secretary's decisionmaking process regarding its review of Indiana's demonstration authorities. Federal Defendants' only argument to the contrary is that the letter states that the Secretary's decision is "subject to further review as part of its ongoing oversight and monitoring." Fed. Br. at 37. However, as the Supreme Court has explained, the "possibility" of revising a decision "is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal." *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 598 (2016); *see also Young v. U.S. Dep't of Lab.*, No. CV 17-2428, 2020 WL 1557170, at *12 (D.D.C. Apr. 1, 2020) ("An agency's decision may still be final even if it is made to inform another agency's decision, which will in turn impact plaintiffs' concrete interests."). Indeed, Federal Defendants' argument would lead to the absurd conclusion that no Section 1115 approval is final agency action, as every Section 1115 project is subject to agency oversight and monitoring. *See* 42 C.F.R. § 431.420. Nor does the fact that the Secretary's explanation that the decision was based on "preliminary" evidence vitiate finality. *See POET*

*Biorefining, LLC v. EPA*, 970 F.3d 392, 405 (D.C. Cir. 2020) (rejecting EPA's argument that its guidance "d[id] not represent the consummation of agency decision making because it [was] explicitly premised on the agency's current understanding of the science, which itself [was] expressly recognized as under development." (cleaned up)).

Second, as explained above in the context of standing, it is clear that "the claimed consequences for [Plaintiffs] [can] be properly attributed to the [2023] letter." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1273 (D.C. Cir. 2018). "For all practical purposes, the findings represent[]" authorization for Indiana to resume premium requirements without intervention by the federal government; "that is, a result that directly affects the parties." *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016) (cleaned up). This satisfies *Bennett*'s second prong. Federal Defendants' position that the consequences to the Plaintiffs only flow from the 2020 approval, and therefore, the 2023 letter cannot also constitute final agency action, is incorrect. It is far from unusual for courts to review circumstances where agencies decline to reverse course from a prior decision. *See, e.g.*, *Berry v. U.S. Dep't of Lab.*, 832 F.3d 627, 634 (6th Cir. 2016) (explaining that there can be more than one "'final agency action' in a particular administrative proceeding" especially where a court is asked to review an "after-the-fact decision by the agency whether its initial decision should remain in place in light of new evidence."); *Young*, 2020 WL 1557170, at *12 (finding plaintiffs satisfied the requirement that legal consequences flow from an agency policy when the policy "increased the probability that plaintiffs' claims for compensation [would] be denied" by impacting another agency's ultimate assessment of those claims). The Secretary decided to undertake a review of his prior decision. He cannot now avoid scrutiny of that review's result.

Federal Defendants rely on language from an inapposite Third Circuit case to suggest that if the result of an agency letter is to retain the status quo, it does not constitute final agency action. *See* Fed. Br. at 37-38 (citing *Aerosource, Inc. v. Slater*, 142 F.3d 572, 580 (3d Cir. 1998)). Federal Defendants' cited language, *see* Fed. Br. at 37-38, comes from the Third Circuit's conclusion that the FAA's decision not to rescind prior publications *that were themselves not reviewable*, "because their conclusions were tentative and indicative of an on-going investigation," was not reviewable. *Aerosource Inc.*, 142 F.3d at 579-80. That is a distinct set of circumstances from those present here. In cases like *Humane Society of United States v. United States Postal Service*, courts have found that an agency's denial of a request to reconsider a decision can still constitute final agency action even if the denial results in a continuation of the status quo. 609 F. Supp. 2d 85, 94 (D.D.C. 2009). There, the court explained that the agency's decision to reiterate its position that a bird fighting magazine was not nonmailable "affected the legal status of [the magazine] as mailable material, it was therefore a final agency action." *Id.*; *see also Spirit Airlines, Inc. v. U.S. Dep't of Transp. & Fed. Aviation Admin.*, 997 F.3d 1247, 1252 (D.C. Cir. 2021) (rejecting the agency's argument that an agency notice announcing a decision related to approved flight schedules at Newark Airport was not reviewable "because airlines may legally operate flights not included on their preapproved schedules"). The December 2023 letter similarly affects the legal status of Indiana's ability to require Plaintiffs to pay premiums.

The other cases cited by Federal Defendants do not dictate a different conclusion. In *Hormel Foods Corp. v. United States Department of Agriculture*, the court's determination that an agency letter declining to rescind the approval of certain labels did have legal consequences depended on the court's determination that the letter was not a final decision by the agency; it did not "create[] a binding norm that [was] *finally determinative* of the issues or rights to which it is

addressed." 808 F. Supp. 2d 234, 246 (D.D.C. 2011) (emphasis added) (cleaned up). The court explained that the relevant letter "merely indicate[d] that [the agency] [was] in the process of evaluating [the issue], a process that, *when culminated, may determine legal rights*, but d[id] not now do so." *Id*. (emphasis added). Here, the process has "culminated." Also inapposite is *Reliable Automatic Sprinkler Co. v. Consumer Product Safety Commission*. *See* Fed. Br. at 38. There, the D.C. Circuit concluded that the Commission's decision to inform the company of a preliminary determination, and request that it undertake corrective action in response, was not final agency action. *See* 324 F.3d 726, 729 (D.C. Cir. 2003). But critically, this conclusion depended on the Consumer Product Safety Act's requirement that the agency only make such a determination after conducting a formal on-the-record adjudication. *Id*. Thus, under those circumstances, only a decision after that statutorily required process took place would constitute final agency action.

*Not Committed to Agency Discretion*. Indiana presses a slightly different argument in the hope of achieving the same result. The State asserts that the 2023 letter is unreviewable because the decision to allow Indiana to proceed with the waiver is committed to agency discretion. Indiana relies on cases holding that decisions not to initiate enforcement proceedings are presumptively unreviewable. *See* Ind. Br. at 37. But this is not a decline-to-enforce case. The Secretary has not declined to initiate an enforcement action that could result in the imposition of penalties. Instead, he has allowed Indiana's project to proceed. As explained above, the agency's Section 1115 decision is reviewable by the Court. *See* Section II.A., *supra*.

## B.     The December 2023 Decision Is Arbitrary And Capricious.

The Secretary's decision to allow Indiana to move forward with its demonstration violates the APA's bar on arbitrary and capricious agency decisionmaking. Federal Defendants rely heavily on conclusory language in the beginning of the decision letter regarding the allegedly disruptive

effect of withdrawing demonstration authorities during the COVID-19 unwinding. They do so to support their unsuccessful attempt at arguing that the decision to allow Indiana to proceed with the project was "reasonable and reasonably explained," Fed Br. at 38, a difficult task given the letter's focus on and endorsement of the very evidence that belies the agency's decision.

Federal Defendants assert that given the possibly disruptive effect, "CMS balanced the potential harms of withdrawing its approval and determined that on balance, the risk to coverage of doing so was too great." *Id*. at 40. But no reading of the 2023 decision letter could support this conclusion—that an unknown and unquantified potentially disruptive effect of withdrawing the demonstration authorities would outweigh the known and well-documented evidence of the negative and disruptive effect these same authorities in fact have on coverage. *Contrast* AR 0002 (stating without any supportive evidence that withdrawing the authorities "may lead to inaccuracies") *with* AR 0004 (summarizing the evidence as demonstrating that "[b]eneficiaries who are subject to premiums appear to experience greater *disruptions* in Medicaid coverage") (emphasis added). The letter's few unsupported statements about potential disruption stand in stark contrast to the pages and pages of robust evidence establishing premiums' disruptive effect on coverage for very low-income people. *See United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010) (explaining that "'conclusory or unsupported suppositions'" are insufficient to support an agency's decision under the APA) (citation omitted). Further, the letter ignores that the unwinding process ends in the summer of 2024, while the approval permits the premium requirements to continue through 2030. The Secretary had to have "examined the relevant data and articulated a satisfactory explanation for its action including *a rational connection between the facts found and the choice made*." *Am. Clinical Lab'y Ass'n v. Becerra*, 40 F.4th 616, 624 (D.C. Cir. 2022) (emphasis added) (cleaned up). He did not do so.

36

Indiana's argument that withdrawing the authorities could cause other disruptions to coverage fares no better. Take one example: Indiana asserts "that HIP beneficiaries had already been told that contributions would be required again and changing course could cause confusion." Ind. Br. at 39. But this cannot possibly serve as an example of how a withdrawal of the waiver authorities would disrupt coverage. To the extent that removing the requirements would cause confusion among beneficiaries, a withdrawal of the authorities would mean that all beneficiaries would retain coverage for the full set of Medicaid benefits that Indiana chooses to provide whether or not they made premium payments, *i.e.*, no disruption to coverage would result.

Defendants push back on Plaintiffs' claim that a disruption-based justification is nonsensical for a policy that has not been in place for four years. *See* Fed. Br. at 38; Ind. Br. at 38. However, they cannot escape the fact that the 2023 letter introduces a change to the status quo, casting doubt on any disruptive effect claimed by the Secretary or the State compared to the disruptive effect of an actual change in policy.

The attempt to rely on a single sentence in the letter referring to the "[e]vidence on the effects of premiums in the HIP demonstration" as "preliminary and … interrupted due to the COVID-19" public health emergency, likewise falls short. Fed Br. at 38. Defendants cannot ignore that the Secretary has repeatedly recognized the persuasiveness of the evidence demonstrating that HIP premiums have a negative effect on coverage. CMS has relied on this exact evidence to support its decision to no longer grant Wisconsin a Section 1115 waiver to impose premiums on Medicaid beneficiaries, even as that state also focused on COVID-19 unwinding. *See* Letter from Daniel Tsai, Deputy Admin. and Dir. CMCS, to Jamie Kuhn, State Medicaid Dir., Wis. Dep't of Health Servs. (Nov. 17, 2023), https://bit.ly/4aaPrlP. The federal agency's specific reliance on evidence regarding Indiana's premium requirements, gathered while the HIP Basic—HIP Plus

structure was in place, undermines Indiana's attempt to draw meaningful distinctions for the purposes of the Secretary's decisionmaking. *See* Ind. Br. at 39.

Federal Defendants, too, resist comparisons to "CMS's treatment of premium requirements in several other demonstrations." Fed. Br. at 39. They point to just one difference between Indiana's demonstration and those in other states—whether CMS was considering a current demonstration or a renewal. *Id*. at 40. But that is a distinction without a difference as far as the Secretary's conclusion that these waiver authorities are unlikely to promote Medicaid's core purpose of providing coverage.

That distinction also cannot explain why CMS did not consider a wind-down period, as it has in other states, to address the potential disruptive effect of discontinuing waiver authorities. *See Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 797 (D.C. Cir. 1984) (finding agency must consider reasonably obvious alternatives and explain its reasons for rejecting them). For example, after concluding that "premiums … are not likely to promote the objectives of Medicaid," CMS gave multiple states (Montana and Arkansas) one year "to implement necessary changes to wind down the premium requirement." Letter from Chiquita Brooks-LaSure, Adm'r, CMS, to Marie Matthews, Medicaid Dir., Mont. Dep't of Pub. Health & Hum. Servs. 1 (Dec. 21, 2021), https://bit.ly/3UAM6a0; Letter from Chiquita Brooks-LaSure, Adm'r, CMS, to Dawn Stehle, Deputy Dir. For Health & Medicaid, Ark. Dep't of Hum. Servs. 2 (Dec. 21, 2021), https://bit.ly/3IJa9Nj. Similarly, CMS afforded Oklahoma an additional year to continue its waiver of the NEMT requirement "to align with current CMS policy regarding sunsetting NEMT waivers." Letter from Mehreen H. Rashid, Acting Dir., State Demonstrations Grp., CMS, to Traylor Rains, Chief Medicaid Dir., Okla. Health Care Auth. 1 (Nov. 1, 2023), https://bit.ly/3QkFOsJ. No logical reasoning supports the Secretary's decision to treat Indiana

differently than these other states considering the like circumstances and identical evidence. Federal Defendants' only response is to assert that CMS might decide to take action on premium requirements in the future. *See* Fed. Br. at 40-41. This not only reveals the weaknesses of the Secretary's justification for the decision to reaffirm Indiana's authorization to impose premiums through 2030, but it ignores the fact that the possibility of revisiting a decision in the future does not make that decision any less arbitrary.

Finally, Defendants argue that they did not need to "re-analyze" the waivers of retroactive coverage and NEMT. Fed Br. at 41; *see also* Ind. Br. at 40. But the December 2023 decision letter refers to these specific demonstration authorities in addition to the premium requirements. AR 0001. The letter announces the Secretary's conclusion of "the review of the authorities approved in the HIP demonstration, *including* the premium requirement." *Id*. (emphasis added); *See also* AR 1076 (February 12, 2021 letter from CMS to Indiana explaining that CMS would also "review those other *authorities*" approved as part of the project) (emphasis added). Thus, while the agency's review was not limited to premium requirements, it failed to provide any explanation whatsoever for its decision to allow the other waiver authorities to proceed. This constitutes a failure to "reasonably consider[] the relevant issues." *FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021). A decision to allow Indiana to proceed with the waiver of these requirements, without even acknowledging the relevant data regarding their negative effect on coverage, is arbitrary and capricious. *See Am. Clinical Lab'y Ass'n*, 40 F.4th at 624. This is especially so given Federal Defendants' claim that CMS "balanced the potential harms of withdrawing its approval and determined that, on balance, the risk to coverage of doing so was too great." Fed Br. at 40. CMS could not have balanced allegedly competing impacts on coverage without considering the impact of key waiver authorities that were included in the project.

**IV.     The 2020 Approval And December 2023 Decision Should Be Vacated.**

"[B]oth the Supreme Court and the D.C. Circuit Court have held that remand, along with vacatur, is the presumptively appropriate remedy for a violation of the APA." *Philbrick*, 397 F. Supp. 3d at 32 (quoting *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 78 (D.D.C. 2010)). Defendants seek to avoid vacatur, but they do not overcome this presumption.

Federal Defendants ask the Court to limit relief to "application of the particular demonstration waivers" to the individual plaintiffs. Fed. Br. at 41. The Court has denied this limit when vacating previous Section 1115 approvals and should continue to do so here. *See Philbrick*, 397 F. Supp. 3d at 32 (noting that, as is the case here, Defendant did not cite an APA case granting this limited relief); *Stewart II,* 366 F. Supp. 3d at 155 (noting that, as here, the cases Defendants cited concerned standing). *See also*, *e.g.*, *NAACP v. Trump*, 298 F. Supp. 3d 209, 243 (D.D.C. 2018) (noting courts have repeatedly "reject[ed] the government's invitation to confine its grant of relief strictly to the plaintiffs"); *Ill. Pub. Telecomms. Ass'n v. FCC*, 123 F.3d 693, 693 (D.C. Cir. 1997); *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) (stating the "ordinary result" when a court finds an agency action unlawful is to vacate the action).

Defendants also urge remand without vacatur. Fed. Br. at 43; Ind. Br. at 40-42. This decision is controlled by the two-factor assessment of "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (citation omitted). Neither factor weighs against vacatur here.

Indiana briefly raises the first factor. Ind. Br. at 40. However, as explained above, the HIP approval contains serious, substantive errors—errors that the Court has repeatedly pointed out to

the Secretary as "major shortcomings." *Stewart I*, 313 F. Supp. 3d at 273; *Philbrick*, 397 F. Supp. 3d at 32. Moreover, the agency cannot arrive at the same conclusions on remand because the actions taken were not statutorily authorized. *See Humane Soc'y of U.S. v. Jewell*, 76 F. Supp. 3d 69, 137 (D.D.C. 2014), *aff'd*, 865 F.3d 585 (D.C. Cir. 2017).

Both Defendants focus on the disruptive consequences of vacatur. Fed. Br. at 42-43; Ind. Br. at 40-42. However, the second factor "is weighty only insofar as the agency may be able to rehabilitate its rationale for the regulation." *Comcast Corp.*, 579 F.3d at 9.[7] Here, for the reasons Plaintiffs have described, the approval cannot be rehabilitated. Even if the Court does reach the second factor, it weighs in favor of vacatur. Defendants' arguments are highly speculative and legally questionable. *See Pub. Emps. for Envtl. Resp. v. U.S. Fish & Wildlife Serv.*, 189 F. Supp. 3d 1, 3 (D.D.C. 2016) ("[F]orecasted harms [that] are imprecise or speculative" do not warrant "departure from the presumptive remedy of vacatur."). By contrast, there is no question that, without vacatur, low-income people will experience significant barriers to obtaining health coverage and necessary care.

Defendants raise an alarmist argument that vacatur would eliminate the very existence of HIP, resulting in chaos. Fed. Br. at 42; Ind. Br. at 42. As explained above, the repercussions of vacatur are not so cut and dry. "HIP" is the name the State uses to refer to coverage for the expansion and other populations and the name of the Section 1115 project. However, the expansion population does not depend on the project for coverage. Since February 2015, the expansion population has been covered through separate, distinct, and perpetual coverage in the State's state

---

[7] Indiana cites *Shands Jacksonville Medical Center, Inc. v. Azar*, 959 F.3d 1113 (D.C. Cir. 2020). Ind. Br. at 40. Refusing to grant vacatur, *Shands* distinguished *Comcast* and *Allied-Signal*, noting that, unlike the fact pattern before it, those cases were not addressing whether vacatur or make whole relief is required when an agency concedes the invalidity of the rule and the sole issue before the court is the adequacy of the remedy that the agency devised. 959 F.3d at 1118.

Medicaid plan. *See* State Plan Amendment IN-15-0001-MM, https://bit.ly/3UldszM. The expansion population's state Medicaid plan coverage will not be affected by vacatur of the Section 1115 project.

Indiana counters that state law only permits coverage of the expansion population through HIP and only if HIP contains "certain specified elements." Ind. Br. at 41. But, as described above in the context of standing, the state law does not mention experimental waiver authority; it allows for changes to HIP if required by federal law; and while some of the "specified elements" are no longer part of HIP, Indiana has nevertheless continued coverage. *See* Ind. Code §§ 12-15-44.5-10(b)(2), 12-15-44.5-4.7(e)(2). At any rate, Indiana can continue to refer to expansion population coverage as HIP without the Section 1115 project in place.

Defendants also argue against vacatur by suggesting that resultant confusion could cause Medicaid enrollees to experience disrupted or lost coverage. Fed. Br. at 42; Ind. Br. at 42. Indiana has not imposed premium requirements for the last four years, so disruption could only come from the State starting them back up. Any concern for potential disruption during the remaining few months of Indiana's COVID unwinding, *see* Fed. Br. at 42, is undermined by the fact that the Secretary rejected other states' requests to continue premiums and NEMT waivers during unwinding, with no negative ramifications for coverage. And while vacatur would require the State to restore NEMT and three-months retroactive coverage, there is no reason to believe that would be particularly disruptive, given that Indiana is currently providing that coverage to the vast majority of Medicaid enrollees, including certain HIP beneficiaries, and that managed care plans have stepped in to offer NEMT to expansion enrollees. In other Section 1115 cases, the Court has vacated projects that included active waivers of retroactive eligibility. *See Gresham*, 363 F. Supp. 3d at 183-84; *Philbrick*, 397 F. Supp. 3d at 32-33.

Finally, in attempting to distinguish *Stewart II*, Federal Defendants repeat the very error that the Secretary made in approving HIP—they dismiss the "great deal of harm," Fed. Br. at 42, that the waivers have caused and will continue to cause low-income individuals in Indiana. Allowing the approval to remain in effect will indisputably disrupt access to health insurance coverage and medically necessary care for tens of thousands of Medicaid enrollees. There is no reason to deviate from the presumptive remedy of vacatur in this case.

## CONCLUSION

For the reasons stated above and in their opening brief, Plaintiffs respectively ask the Court to grant their Motion for Summary Judgment and vacate the 2020 approval and 2023 letter.

Dated: May 1, 2024

Respectfully submitted,

/s/ Ian Heath Gershengorn
Ian Heath Gershengorn
Thomas J. Perrelli
Erica S. Turret
JENNER & BLOCK
1099 New York Ave., Suite 900
Washington, DC 20001
(202) 639-6869
Igershengorn@jenner.com
Eturret@jenner.com

*Counsel to National Health Law Program*

/s/ Jane Perkins
Jane Perkins
Catherine McKee
NATIONAL HEALTH LAW PROGRAM
1512 E. Franklin St., Ste. 110
Chapel Hill, NC 27514
(919) 968-6308 (x101)
perkins@healthlaw.org
mckee@healthlaw.org

Adam Mueller
INDIANA JUSTICE PROJECT
1100 W 42nd St. Suite 200
Indianapolis, IN 46208
(317) 912-1135 ext. 800
amueller@injp.org

*Counsel for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 1, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send an electronic notice to all authorized CM/ECF filers.

By:     <u>/s/ Ian Heath Gershengorn</u>
          Ian Heath Gershengorn