UNITED STATES DISTRICT COURT
DISTRICT OF THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MONTE A. ROSE, JR., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 1:19-cv-02848-JEB |
| XAVIER BECERRA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY OF INTERVENOR-DEFENDANT
INDIANA FAMILY AND SOCIAL SERVICES ADMINISTRATION
IN SUPPORT OF ITS MOTION TO DISMISS**

THEODORE E. ROKITA
Attorney General of Indiana

JAMES A. BARTA (DC Bar 1032613)
Solicitor General

CAROLINE M. BROWN (DC Bar 438342)

Office of the Attorney General

Brown & Peisch PLLC                     IGC South, Fifth Floor
1225 19th St. NW, Suite 700             Indianapolis, Indiana 46204
Washington, D.C. 20036                  Tel: (317) 232-0709
Phone: (202) 499-4258                   Fax: (317) 232-7979
Email: cbrown@brownandpeisch.com        Email: James.Barta@atg.in.gov

*Counsel for Intervenor-Defendant
Indiana Family and Social Services Administration*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION ........................................................................................................................... 1

ARGUMENT ................................................................................................................................... 1

I.      Plaintiffs Lack Standing ...................................................................................................... 1

        A.      Plaintiffs must demonstrate standing for each claim ............................................. 2

        B.      Plaintiffs lack standing to seek vacatur of the waiver ........................................... 2

        C.      Plaintiffs lack standing to challenge the December 2023 decision ........................ 7

II.     The Waiver Accords with Section 1115 and Reasoned Decisionmaking ............................ 8

        A.      CMS rationally concluded a waiver is likely to advance Medicaid objectives ...... 8

              1.      The waiver is inextricably linked to expanded coverage for
non-mandatory populations and benefits ...................................................... 8

              2.      CMS rationally concluded that the challenged features would sustain
Medicaid coverage and additional benefits ................................................. 12

        B.      CMS rationally concluded the other requirements of Section 1115 were met ...... 14

III.    To the Extent the December 2023 Decision Is Reviewable, It Should Be Upheld ........... 16

        A.      CMS's exercise of discretionary authority is unreviewable ................................ 16

        B.      CMS's decision is rational regardless .................................................................. 17

IV.    Vacatur of the HIP Approvals Is Unwarranted .................................................................. 20

CONCLUSION .............................................................................................................................. 21

# TABLE OF AUTHORITIES

**CASES**

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
   937 F.3d 559 (D.C. Cir. 2019) ............................................................................ 14

*BellSouth Corp. v. FCC*,
   162 F.3d 1215 (D.C. Cir. 1999) ........................................................................... 11

*Citizens for Resp. & Ethics in Wash. v. FEC*,
   892 F.3d 434 (D.C. Cir. 2018) ............................................................................ 17

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ................................................................................................. 6

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ........................................................................................... 6, 7

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ............................................................................................ 18

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ............................................................................................ 13

*FERC v. Elec. Power Supply Ass'n*,
   577 U.S. 260 (2016) ........................................................................................ 8, 17

*Genuine Parts Co. v. EPA*,
   890 F.3d 304 (D.C. Cir. 2018) ............................................................................ 19

*Georgia v. Brooks-LaSure*,
   2022 WL 3581859 (S.D. Ga. Aug. 19, 2022)* ................................................ 10, 21

*Gresham v. Azar*,
   363 F. Supp. 3d 165 (D.D.C. 2019) .................................................................... 4, 9

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................................................... 6

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012) ............................................................................................... 3

*Philbrick v. Azar*,
   397 F. Supp. 3d 11 (D.D.C. 2019) ...................................................................... 4, 9

*Sec'y of Labor v. Twentymile Coal Co.*,
   456 F.3d 151 (D.C. Cir. 2006) ............................................................................ 16

CASES [CONT'D]

*Stewart v. Azar,*
    313 F. Supp. 3d 237 (D.D.C. 2018) (*Stewart I*) ................................................................. 2, 4, 9

*Stewart v. Azar,*
    366 F. Supp. 3d 125 (D.D.C. 2019) (*Stewart II*) ........................................................................ 2

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) .................................................................................................................. 2

*Warth v. Seldin,*
    422 U.S. 490 (1975) .................................................................................................................. 2

STATUTES

42 U.S.C. § 1315(a)* ........................................................................................................... 12, 13, 18

42 U.S.C. § 1315(e)(4) .................................................................................................................. 15

42 U.S.C. § 1315(f) ....................................................................................................................... 15

42 U.S.C. § 1396a(k) ..................................................................................................................... 11

42 U.S.C. § 1396o .................................................................................................................... 15, 16

42 U.S.C. § 1396o-1 ...................................................................................................................... 15

42 U.S.C. § 1396o-1(b)(6) ............................................................................................................. 16

42 U.S.C. § 1396u-7(b)(2) ............................................................................................................. 11

Ind. Code § 12-15-44.5-10(a) ..................................................................................................... 3, 9

Ind.Code § 12-15-44.5-10(b)(1)–10(b)(8) ...................................................................................... 3

Ind. Code § 12-15-44.5-10(c) .......................................................................................................... 3

REGULATIONS

42 C.F.R. § 430.420(d) ............................................................................................................ 16, 17

42 C.F.R. § 430.420(d)(2) ....................................................................................................... 16, 17

42 C.F.R. § 431.420(d)(2) ............................................................................................................... 7

42 C.F.R. § 435.915 ........................................................................................................................ 7

42 C.F.R. § 440.300 *et seq.* ......................................................................................................... 11

REGULATIONS [CONT'D]

42 C.F.R. § 447.52(b)(1)...................................................................................13

OTHER AUTHORITIES

CMS, *IN-15-0002, Alternative Benefit Plan Cost-Sharing*,
    https://provider.indianamedicaid.com/ihcp/StatePlan/Suffix/ABP/ABP1-4.pdf.....................5

CMS, *IN-15-0002, Alternative Benefit Plan Populations*,
    https://provider.indianamedicaid.com/ihcp/StatePlan/Suffix/ABP/ABP1-1.pdf.....................5

CMS, *IN-15-0003, Alternative Benefit Plan*,
    https://provider.indianamedicaid.com/ihcp/StatePlan/Suffix/ABP/ABP2-1.pdf................4, 11

CMS, *IN-15-0024, Benchmark-Equivalent Benefit Package*,
    https://provider.indianamedicaid.com/ihcp/StatePlan/Suffix/ABP/ABP1-3.pdf;.....................5

CMS, *IN-22-0006, Alternative Benefit Plan*,
    https://provider.indianamedicaid.com/ihcp/StatePlan/Suffix/ABP/ABP2-5.pdf...................11

FSSA, POWER Account Contributions, https://www.in.gov/fssa/hip/about-
    hip/power-accounts/...............................................................................................14

Indiana Register, Office of the Secretary of Family and Social Services, *Indiana
    Medicaid* (Feb. 13, 2015),
    https://www.in.gov/fssa/hip/files/HIPSPAPublicNotice1.pdf ...................................4

Letter from Gov. Pence to President Obama, at 2 (Oct. 2, 2014),
    https://www.in.gov/fssa/hip/files/
    Governor_Pence_Letter_to_President_Obama.pdf ...............................................9

Letter from Gov. Pence to Sec'y Sebelius, HHS, at 2 (Nov. 15, 2013),
    https://www.in.gov/fssa/hip/files/
    Letter_from_Governor_Pence_to_Secretary_Sebelius.pdf .....................................9

*State Plan Amendment (SPA) #: IN-0001-MM1*, at 3,
    https://www.medicaid.gov/sites/default/files/State-resource-center/Medicaid-
    State-Plan-Amendments/Downloads/IN/IN-15-0001-MM1.pdf ...............................4

## INTRODUCTION

At times, plaintiffs' brief reads more like an attack on Section 1115 than on the waiver itself. Plaintiffs focus on how a few HIP components do not themselves increase coverage, seeking to make it dispositive that a portion of beneficiaries lost coverage for failure to make POWER Account contributions. But Section 1115 requires the focus to be on the Secretary's judgment regarding the likely impact of an entire project, not its individual components.

Viewed as a whole, there can be no question that the waiver for HIP increases coverage. Indiana's expansion of Medicaid coverage to adults under the Affordable Care Act has always been conditioned on Indiana being able to provide coverage through HIP, using POWER Accounts. Yanking authorization for POWER Accounts would destroy the very foundation of the deal that the federal government and Indiana struck in 2015 to expand Medicaid. That sets this case apart from others concerning work requirements added years after States expanded Medicaid. Plaintiffs are not challenging requirements added after expansion but the precondition for it.

Plaintiffs' failure to appreciate that POWER Accounts and member contributions are a necessary precondition for HIP's coverage of non-mandatory populations and benefits taints every aspect of their analysis—from standing to the merits to the remedy. Vacating the waiver for HIP will not redress plaintiffs' alleged injuries, but will threaten needless harm to hundreds of thousands of members who depend on HIP.

## ARGUMENT

## I.   Plaintiffs Lack Standing

Plaintiffs lack standing to seek vacatur of the 2020 waiver and 2023 decision. Plaintiffs have not demonstrated an injury from those decisions that would be redressable by a favorable

1

judgment. Vacating the waiver would result in plaintiffs losing benefits they wish to retain, and plaintiffs cannot demonstrate an injury in fact from several components they seek to challenge.

### A.  Plaintiffs must demonstrate standing for each claim

Plaintiffs invoke POWER Account contributions to request vacatur of the entire waiver, including on grounds unrelated to the contributions themselves, such as the waiver's duration and experimental nature. Pls. Reply (Dkt. 59) at 3–5. But those contributions cannot support unrelated claims. Plaintiffs must demonstrate standing for "each claim . . . press[ed]" and "each form of relief . . . s[ought]." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). And they "cannot rest" their "claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). So plaintiffs—who asserted separate claims against different aspects of the waiver, Dkt. 50-1 at 34–39 (Suppl. Compl. ¶¶ 179–210)—must demonstrate an injury from each aspect.

*Stewart v. Azar*, 313 F. Supp. 3d 237 (D.D.C. 2018) (*Stewart I*), is not to the contrary. In that case, the Court held that plaintiffs had standing to seek vacatur as a remedy if they demonstrated standing to challenge any one component. *Id.* at 253. That is because the Secretary decides whether to approve a project "*as a whole*," and vacatur operates on the approval. *Id.*; *see Stewart v. Azar*, 366 F. Supp. 3d 125, 136 (D.D.C. 2019) (*Stewart II*) (similar), *appeal dismissed*, No. 19-5095, 2020 WL 13562855 (D.C. Cir. Jan. 8, 2020). The Court, however, did not suggest that a plaintiff who suffers no injury from a project component—say, the non-assurance of transportation—has standing to argue against that component. That would contravene the principle that parties generally must assert their "own legal rights and interests." *Warth*, 422 U.S. at 499.

### B.  Plaintiffs lack standing to seek vacatur of the waiver

Plaintiffs cannot demonstrate standing to seek vacatur of the entire 2020 waiver. Under HIP, plaintiffs must make POWER Account contributions to obtain vision, dental, and chiropractic

coverage and avoid cost sharing. State Br. (Dkt. 58) at 19–20. Plaintiffs do not deny that they want to retain those benefits, *see* Pls. Reply 4, even describing vision and dental as "very important," Dkt. 54-3 ¶ 9; Dkt. 54-2 ¶ 13; Dkt. 54-4 ¶ 7. Vacating the waiver would not allow plaintiffs to keep those benefits while relieving them of a requirement to make POWER Account contributions, whether plaintiffs are above 100% of the federal poverty line or below it. State Br. 19–20.

Consider plaintiff Emily Rames whose "income level is above 100% FPL." Pls. Reply 5. Under state law, Rames can receive Medicaid coverage "only" through HIP, Ind. Code § 12-15-44.5-10(a), and to provide coverage through HIP consistent with state law, FSSA must require POWER Account contributions, § 12-15-44.5-10(b)(1)–10(b)(8). Vacating the waiver thus would not redress Rames's alleged injury. Instead, it would prevent Indiana from providing coverage to Rames and others in the Medicaid expansion population. Plaintiffs question whether state law in fact requires contributions as a condition of coverage, arguing that "federal law" "'require[s]'" coverage regardless. Pls. Reply 7 (quoting Ind. Code § 12-15-44.5-10(c)). As a Spending Clause statute, however, Medicaid cannot "require" States to undertake action; it can only "create incentives for States to act." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577 (2012). As the Supreme Court made clear, whether Indiana expands Medicaid to adults not included in mandatory coverage groups is Indiana's "choice" to make. *Id.* at 588. And from the outset, Indiana has made clear through requirements in state law that it will cover persons like Rames only if it can require contributions to POWER Accounts. *See* State Br. 7–10, 25–26.

Plaintiffs try to sever the connection between the waiver and coverage by arguing that "the expansion population does not depend on the project for coverage," claiming this population is instead covered by "separate, distinct, and perpetual coverage in the State's state plan." Pls. Reply 41–42; *see id.* at 4, 7. But the state plan cannot override state law. Nor is it distinct from HIP; in

fact, the two are intertwined. The state plan was amended in February 2015 only after CMS approved HIP. *See State Plan Amendment (SPA) #: IN-0001-MM1*, at 3, https://www.medicaid.gov/sites/default/files/State-resource-center/Medicaid-State-Plan-Amendments/Downloads/IN/IN-15-0001-MM1.pdf. The amendment's implication "coincide[d] with the Centers for Medicare & Medicaid Services' (CMS) approval of the state's Healthy Indiana Plan (HIP) 2.0 § 1115 Demonstration Waiver (11-W-00296/5)." Indiana Register, Office of the Secretary of Family and Social Services, *Indiana Medicaid* (Feb. 13, 2015), https://www.in.gov/fssa/hip/files/HIPSPAPublicNotice1.pdf. And the state plan expressly requires the Medicaid expansion population who desire coverage, including for vision, dental, and chiropractic services, to "make a contribution to their Personal Wellness and Responsibility (POWER) account." CMS, *IN-15-0003, Alternative Benefit Plan*, https://provider.indianamedicaid.com/ihcp/StatePlan/Suffix/ABP/ABP2-1.pdf. Thus, even if the state plan controlled, the requirement to make POWER Account contributions would remain.

That distinguishes this case from the ones plaintiffs cite. *See* Pls. Reply 7. In those cases, the Secretary had authorized States to impose *new* limitations on coverage for populations the State already covered through Medicaid. *See, e.g.*, *Stewart I*, 313 F. Supp. 3d at 243 (noting that Kentucky's Medicaid expansion in 2014 resulted in coverage of "more than 428,000 new residents" before the Secretary approved new restrictions through a Section 1115 wavier in 2018); *Gresham v. Azar*, 363 F. Supp. 3d 165, 171 (D.D.C. 2019) (noting that Arkansas expanded Medicaid coverage in January 2014, providing health coverage to more than 278,000 newly eligible individuals, before the Secretary approved new restrictions through a Section 1115 waiver in 2018) (subsequent history omitted); *Philbrick v. Azar*, 397 F. Supp. 3d 11, 18 (D.D.C. 2019) (noting that New Hampshire adopted the ACA Medicaid expansion in 2014, covering 53,000 new residents, before the Secretary approved new restrictions on coverage through a Section 1115 waiver in 2018), *aff'd*,

4

No. 19-5293, 2020 WL 2621222 (D.C. Cir. May 20, 2020), *vacated and remanded*, 142 S. Ct. 1665 (2022). By contrast, plaintiffs target components integral to Indiana's Medicaid expansion.

Vacatur of the waiver would not remedy any putative injury for plaintiffs Monte Rose and Chelsey Lang either. Because their incomes are below 100% of the federal poverty line, neither will be disenrolled for failure to make POWER Account contributions. S.A.R. 1581. Rose and Lang assert an injury from the fact that they will lose "vision, dental, and chiropractic services" "if they do not pay premiums." Pls. Reply 4. But the state plan—which plaintiffs argue dictates the terms of coverage absent the waiver—specifies that the base benefit package for persons at or below 100% of the federal poverty line "excludes dental and vision services, except as required under EPSDT." CMS, *IN-15-0024, Benchmark-Equivalent Benefit Package*, https://provider.indianamedicaid.com/ihcp/StatePlan/Suffix/ABP/ABP1-3.pdf; *see* CMS, *IN-15-0002, Alternative Benefit Plan Populations*, https://provider.indianamedicaid.com/ihcp/StatePlan/Suffix/ABP/ABP1-1.pdf (stating that the Medicaid population receives HIP Basic Plan benefits absent contributions). And Rose and Lang would be required to make co-payments—something they need not do if they make contributions. CMS, *IN-15-0002, Alternative Benefit Plan Cost-Sharing*, https://provider.indianamedicaid.com/ihcp/StatePlan/Suffix/ABP/ABP1-4.pdf.   So   plaintiffs would not be entitled to dental, vision, and chiropractic benefits if the waiver were vacated.

Additional problems surround plaintiffs' claims attacking other aspects of the waiver. Only one of the three plaintiffs—Rose—now asserts injury from waiver of non-emergency medical transportation (NEMT). Pls. Reply 5. Rose argues he is "virtually certain" to need NEMT because he needs "regular medical care" and lacks "reliable transportation." *Id.* at 5–6. Rose, however, ignores critical earlier admissions, including that he needs transportation only if "medical appointments are too far to bike" and that his "primary medical provider" is "close to [his] home." Dkt.

54-2 ¶¶ 8, 15. Only a "new hospital" and "most diagnostic services" are "not nearby." *Id.* ¶ 15. Yet Rose does not aver that he has a health condition likely to require a hospital visit or whichever diagnostic services are not nearby. His "allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up).

Rose, moreover, overlooks that the waiver will injure him only if he someday requires medical services that are not close to his home and his managed care plan will not provide transportation. No facts, however, demonstrate that is likely to occur. Rose admits that his plan provides transportation. Dkt. 54-2 ¶ 8. There is no evidence that his plan will cease providing needed transportation, and while Rose claims that transportation "sometimes falls through," *id.*, "[p]ast" injury "does not in itself show a present case or controversy," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). And Rose does not explain why (or how often) transportation has fallen through in the past, providing no factual basis for assuming that it would fall through again (or that transportation from another non-plan source would be any more reliable). Did Rose fail to communicate his pickup location clearly? Did he fail to arrive at the pickup location on time? Was there an unforeseen accident or delay? Rose's declaration does not say, even though it is his burden to demonstrate a "certainly impending" injury or at least a "substantial risk" of one. *Clapper*, 568 U.S. at 414 & n.5.

Just as only Rose asserts injury relating to NEMT, only Rames asserts injury relating to retroactive coverage. Pls. Reply 6. Rames, however, does *not* argue that any of her past medical bills would meet the eligibility criteria for retroactive coverage. She relies entirely on assertions of future injury, claiming her "current health condition" creates a "substantial probability" she will be "disenrolled for nonpayment of premiums," have a "gap in coverage," and incur medical bills. *Id.* That does not follow. Rames nowhere avers in her declaration that her (unspecified) health

6

condition prevents her from working or making POWER Account contributions. Nor does Rames provide any factual basis for concluding that any (unspecified) health expenses incurred during a (hypothetical) gap in coverage would satisfy the criteria for retroactive coverage. *See* 42 C.F.R. § 435.915. She ignores those criteria entirely. Her theory of future injury is "too speculative" to carry her burden to provide evidence sufficient to establish standing. *Clapper*, 568 U.S. at 401.

**C.  Plaintiffs lack standing to challenge the December 2023 decision**

Plaintiffs lack standing to challenge the December 2023 decision as well. As explained, State Br. 22, that letter does not inflict a distinct injury redressable through a favorable judgment because vacating the letter would not remove Indiana's authority to operate HIP consistent with the 2020 waiver. Plaintiffs admit that vacating the decision would not remove Indiana's authority to "act pursuant to the 2020 approval." Pls. Reply 9. They nevertheless argue the 2023 decision inflicts an injury because vacating it constitutes "a barrier on Plaintiffs' path to relief." *Id.* at 9–10. Plaintiffs, however, misapprehend what the decision does.

In the December 2023 letter, CMS did not "reaffirm[] the 2020 approval." *Contra* Pls. Reply 9. Rather, as an exercise of agency discretion, CMS decided against "withdrawing [any] authorities" at present. S.A.R. 1. The December 2023 decision, moreover, does not prevent CMS from reexamining authorities later. As CMS stated, "CMS reserves its authority to take appropriate action in the future, as part of its ongoing oversight and monitoring of the HIP demonstration." S.A.R. 1; *see* 42 C.F.R. § 431.420(d)(2) (permitting the Secretary to "withdraw waivers . . . based on a finding that the demonstration project is not likely to achieve the statutory purpose").

**II.      The Waiver Accords with Section 1115 and Reasoned Decisionmaking**

**A.      CMS rationally concluded a waiver is likely to advance Medicaid objectives**

Plaintiffs' claims fail on the merits regardless. Although plaintiffs primarily challenge the December 2020 waiver on the ground that a few components reduce coverage, there is a fundamental tension between their position and Section 1115. Whereas Section 1115 defers to the Secretary's judgment and at most provides for "narrow," deferential review, *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016), plaintiffs demand for judicial review to be "'searching,'" Pls. Reply 11 n.2. Whereas Section 1115 asks about the "project" as a whole, plaintiffs focus on fragments of the project. Pls. Reply 14. And whereas Section 1115 exudes sensitivity to the Secretary's predictive judgment about "likely" impacts, plaintiffs fault the Secretary for not providing precise "per-person" cost estimates before the research is finished. Pls. Reply 20–21.

None of that is consistent with Section 1115. Approached with due regard for the Secretary's judgment, the decision to grant a waiver for HIP was rational regardless of how one construes Medicaid's objectives. The 2020 waiver ensured the continued coverage of hundreds of thousands of Hoosiers through an innovative, consumer-driven Medicaid expansion program that is unique to Indiana and that, contrary to plaintiffs' assertions, provides valuable benefits not otherwise available. Even the challenged HIP components support Indiana's efforts to cover "non-mandatory benefits and eligibility groups" by improving Medicaid's sustainability. S.A.R. 1564. The Secretary rationally balanced those benefits against commenters' concerns in concluding that, on the whole, HIP was likely to promote the Medicaid statute's objectives.

**1.      The waiver is inextricably linked to expanded coverage for non-mandatory populations and benefits**

Plaintiffs cannot deny that expanding Medicaid in Indiana to hundreds of thousands of Hoosiers promotes coverage. Nor can plaintiffs deny that Indiana made one thing abundantly clear:

it was willing to expand Medicaid only if it could be done through HIP. State Br. 6–13, 24–26. As Indiana repeatedly told the federal government, "Indiana will not expand traditional Medicaid." Letter from Gov. Pence to President Obama, at 2 (Oct. 2, 2014), https://www.in.gov/fssa/hip/files/ Governor_Pence_Letter_to_President_Obama.pdf. Indiana would expand Medicaid only if it could "maintain the consumer-driven model on which the [HIP] program is predicated," including "the requirement that Healthy Indiana Plan members make monthly account contributions" into "a Health Savings Account-like account." Letter from Gov. Pence to Sec'y Sebelius, HHS, at 2 (Nov. 15, 2013), https://www.in.gov/fssa/hip/files/Letter_from_Governor_Pence_to_Secretary_Sebe- lius.pdf. State law thus specifies that HIP is the "only" vehicle through which Indiana will cover the Medicaid expansion population. Ind. Code § 12-15-44.5-10(a). And if the choice is between not expanding Medicaid and granting a waiver, clearly granting the waiver promotes coverage.

Plaintiffs argue that this Court has already rejected this theory. Pls. Reply 16. As mentioned above, however, plaintiffs' cases involve situations in which the Secretary authorized *new* limita- tions on coverage for populations the State already covered through Medicaid. *See, e.g.*, *Stewart I*, 313 F. Supp. 3d at 243 (noting that Kentucky's Medicaid expansion in 2014 resulted in coverage of "more than 428,000 new residents" before the Secretary approved new restrictions through a Section 1115 wavier in 2018); *Gresham*, 363 F. Supp. 3d at 171 (noting that Arkansas expanded Medicaid coverage in January 2014, providing health coverage to more than 278,000 newly eligi- ble individuals, before the Secretary approved new restrictions through a Section 1115 waiver in 2018); *Philbrick*, 397 F. Supp. 3d at 19 (noting that New Hampshire adopted the ACA Medicaid expansion in 2014, covering 53,000 new residents, before the Secretary approved new restrictions on coverage through a Section 1115 waiver in 2018). In this case, however, plaintiffs no longer challenge the community engagement requirements that Indiana added to HIP *in 2018*. Rather,

plaintiffs challenge HIP elements undergirding the deal that Indiana and CMS struck *in 2015* that enticed Indiana to expand Medicaid coverage to previously ineligible citizens.

That makes this case far more like *Georgia v. Brooks-LaSure*, 2022 WL 3581859 (S.D. Ga. Aug. 19, 2022), in which the court upheld work requirements that undergirded a federal-state deal expanding Medicaid to new beneficiaries. In that case, the court rejected CMS's attempt to revoke work requirements that were part of Georgia Pathways, a demonstration project to expand Medicaid coverage to persons who met certain work requirements. *See id.* at *3. Observing that work requirements were required under state law, the court held that CMS's revocation of approval was arbitrary and capricious because CMS "failed to consider or weigh the (likely) possibility that rescinding would mean less Medicaid coverage" in Georgia. *Id.* at *9. The court rejected arguments that approving the project with work requirements would be "coverage reducing." *Id.* As the court explained, it was "fundamentally inapt" to compare Georgia's project to the ones that this Court had considered in *Stewart, Gresham*, and *Philbrick* because, unlike the work requirements in those cases, Georgia's applied "only to *new . . .* beneficiaries." *Id.* at *15. The same is true here. Plaintiffs are challenging the original basis for Medicaid expansion in Indiana, not requirements bolted on later. CMS thus rationally concluded that HIP would expand coverage.

Plaintiffs fall back on a procedural objection, arguing that CMS "did not approve" HIP based on the benefits of expanding Medicaid. Pls. Reply 16. That is incorrect. In granting the waiver, CMS was well aware that Indiana law "prohibit[s] the continuation of Medicaid expansion . . . except through HIP." S.A.R. 8240. CMS also recognized that Indiana's coverage of the Medicaid expansion population is "optional" and that Indiana "'ha[s] flexibility to start or stop the expansion.'" S.A.R. 1556 n.2. With good reason, CMS concluded that a waiver for HIP would serve an "important objective of the Medicaid program" by "expanding the scope of coverage."

S.A.R. 1555. As CMS put it, a waiver would "help Indiana to continue to cover non-mandatory benefits and eligibility groups (such as the Patient Protection and Affordable Care Act (ACA) expansion population and dental and vision benefits)." S.A.R. 1562. CMS was "'not required to author an essay'" on the issue. *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1224 (D.C. Cir. 1999).

Even apart from expanding Medicaid to a new population, the waiver increases benefits for Medicaid recipients. State Br. 26–27. By enrolling in HIP Plus and making contributions to POWER Accounts, the Medicaid expansion population gains access to non-mandatory benefits, including vision, dental, and chiropractic coverage, a greater number of visits for essential health services, and coverage for additional services (*e.g.*, bariatric surgery). *Id.*; *see* CMS, *IN-15-0003, Alternative Benefit Plan*, https://provider.indianamedicaid.com/ihcp/StatePlan/Suffix/ABP/ABP2-1.pdf; CMS, *IN-22-0006, Alternative Benefit Plan*, https://provider.indianamedicaid.com/ihcp/StatePlan/Suffix/ABP/ABP2-5.pdf. The waiver also provides additional benefits for persons with substance use disorders (SUD) and serious mental illness (SMI). State Br. 27.

Plaintiffs do not dispute that these benefits are "optional." Pls. Reply 17 n.3. Instead, plaintiffs argue that these optional benefits cannot be considered because the "baseline against which a project is full compliance with the Medicaid Act." *Id.* That makes no sense. As previously explained, State Br. 35, the Medicaid expansion population—unlike other groups covered by Medicaid—is entitled only to a "benchmark" package of benefits (which CMS now refers to as an "alternative benefit plan"), based on a benchmark selected by the State, that must include ten categories of "essential health benefits." 42 U.S.C. §§ 1396a(k), 1396u-7(b)(2); 42 C.F.R. § 440.300 *et seq.* That benefit package does not include vision, dental, or chiropractic services or the additional mental-health benefits provided. So Indiana can be in "full compliance" yet withhold these benefits. It thus was perfectly reasonable for the Secretary to conclude that approval of the waiver

would promote the objectives of Medicaid by providing additional benefits to this population, especially as so much of it—approximately 70% in 2020—was enrolled in HIP Plus. S.A.R. 6775.

Plaintiffs additionally reprise arguments that the "SUD/SMI program" cannot be considered part of HIP. Pls. Reply 18. Critically, however, plaintiffs continue to overlook that the Medicaid expansion population cannot receive any benefits apart from HIP. Contrary to their suggestion, the only option available to adults over 100% of the federal poverty line under the "state Medicaid plan" requires POWER Account contributions. *Contra* Pls. Reply 19; *see* pp. 3–4, *supra*. So it was reasonable for the Secretary to consider those additional benefits in approving the waiver for HIP. And while plaintiffs may not think those benefits are significant standing alone, *see* Pls. Reply 19, Section 1115 requires the focus to be on the "project." 42 U.S.C. § 1315(a). Considering that the HIP waiver ushered in coverage for the Medicaid expansion population, that it provided new and additional benefits, and that it eliminated otherwise applicable copayments for services— all in return for minimal POWER Account contributions—the Secretary rationally concluded that approving the waiver would likely "expand[] . . . coverage." S.A.R. 1555.

## 2. CMS rationally concluded that the challenged features would sustain Medicaid coverage and additional benefits

Even apart from the obvious—without HIP there would be no Medicaid expansion—the waiver supports coverage of non-mandatory benefits and eligibility groups by ensuring Medicaid operates more efficiently, improving beneficiary health, decreasing the need for acute services, and helping persons whose financial situation improves stay off Medicaid. State Br. 28–33. Plaintiffs attempt to nitpick CMS's analysis. They argue the Secretary made "no finding that [the HIP project] would save [Indiana] any amount of money." Pls. Reply 20. Quite the contrary: CMS repeatedly stated that the waiver would improve HIP's sustainability. S.A.R. 1562, 1564, 1571–

72. Any Medicaid administrator knows services cost money. *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 426 (2021). If it were costless to eliminate contributions from POWER Accounts, provide retroactive coverage, or assure nonemergency medical transportation, one wonders why anyone—plaintiffs included—would care about this case. At bottom, plaintiffs' complaint reduces to the fact that CMS did not provide precise "per person cost[]" estimates. Pls. Reply 21. But Section 1115 does not require excruciating details—only a reasonable judgment call that HIP was "likely" to advance the Medicaid statute's objectives. 42 U.S.C. § 1315(a).

Plaintiffs also argue there is no evidence that any "features could save money other than via causing coverage loss." Pls. Reply 20; *see id.* at 17. That ignores an "independent evaluation reported that HIP Plus members had higher participation and utilization rates for preventative services, primary care, and specialty services, as well as better prescription adherence rates compared to HIP Basic members." S.A.R. 1564; *see* S.A.R. 1543–55, 6384–86. It also ignores a 2016 report that suggested that not providing non-emergency transportation would not impact beneficiaries' ability to attend appointments. S.A.R. 1562. Significantly, moreover, plaintiffs ignore that members who make POWER Account contributions—which are as low as $1 per month—are no longer subject to otherwise applicable cost sharing. It is hard to reconcile plaintiffs' insistence that requiring a $1 per month contribution for HIP Plus is so burdensome where the beneficiary's alternative is copayments of up to $4 per visit for outpatient services and $75 per inpatient stay. *See* 42 C.F.R. § 447.52(b)(1). Little wonder then that HIP participants have overwhelmingly reported that their minimal POWER Account contributions are "worthwhile to obtain expanded benefits" and eliminate "cost sharing." S.A.R. 4279; *see* S.A.R. 8250, 8252 (similar survey data).

Nor is there any merit to plaintiffs' accusation that CMS considered only one side of the equation. *Contra* Pls. Reply 13, 21–22. As explained, the 2020 approval discusses the concerns

plaintiffs raise, explaining why other features of HIP mitigate those concerns. State Br. 31–33. Plaintiffs may prefer the stance taken by comments critical of the waiver. *See* Pls. Reply 15, 20. CMS, however, was entitled to disagree—so long as it considered the problem's important aspects. *See Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 581 (D.C. Cir. 2019). It did do this, devoting pages of analysis to critical comments. CMS had no obligation to demonstrate with mathematical precision that the benefits flowing from the waiver would outweigh alleged detriments.

### B.      CMS rationally concluded the other requirements of Section 1115 were met

Plaintiffs' other arguments regarding the waiver are easily dispatched. The Secretary was on sound footing in concluding that Indiana's program was a demonstration project: It is unique as the only Medicaid program in the country to have consumer-driven health savings accounts (the POWER Accounts).[1] Consistent with HIP's status as a demonstration, the Secretary required robust monitoring, evaluation, and reporting of almost every aspect of HIP, well beyond what is otherwise required of a State operating a standard Medicaid program. *See* S.A.R. 1558, 1642–1646. Furthermore, the Secretary adequately explained his judgment that a 10-year extension period was necessary to "facilitate certain aspects of the rigor of the demonstration's evaluation," including "enabl[ing] the state to conduct well-designed longitudinal beneficiary surveys to track

---

[1] Plaintiffs also gloss over the distinctions between member contributions to a POWER and "premiums," asserting that "[t]here is no question that Indiana's project includes premiums." Pls. Reply at 24 n.4. Even though the Secretary concluded that he needed to waive the restriction on "enrollment fees, premiums, and similar charges" to authorize HIP member contributions, there are substantial differences between traditional premiums and HIP contributions. The POWER account, including member contributions are used to pay the first $2500 in annual health expenses, which means they operate more like a pre-payment of cost-sharing. Unspent funds rollover to the subsequent year, reducing monthly contributions in the following years. *See* FSSA, POWER Account Contributions, https://www.in.gov/fssa/hip/about-hip/power-accounts/. Members who complete all of their preventive services can double those reductions against future contributions. *Id.* Moreover, when a member leaves HIP, any unspent funds related to the member's own contributions are refunded to them. *Id.* None of these features apply to "premiums" in the traditional sense.

beneficiary outcome over time, including after separation from the demonstration and the Medicaid program, and evaluate the program's longer-term effects on beneficiary health insurance/coverage, employment, income, and health outcomes." S.A.R. 1558. Plaintiffs overlook significant changes to HIP in arguing there was nothing further left to research. *See* State Br. 35 (listing various changes).

The Secretary's decision was consistent with Section 1115(e) and (f) as well. In arguing those provisions control all extensions, Pls. Reply 29–31, plaintiffs overlook that Section 1115(e) and (f) apply only to extensions where limited or no changes are proposed. To qualify, an extension must "be on the same terms and conditions (including applicable terms and conditions relating to quality and access of services, budget neutrality, data and reporting requirements, and special population protections) that applied to the project before its extension." 42 U.S.C. § 1315(e)(4); *see* § 1315(f) (Secretary must propose any changes within 45 days and negotiate them within 30 days). The timeframes governing these extensions are necessarily short because there is no time for the full review and negotiation that accompanies an approval under Section 1115(a). In 2020, however, CMS made numerous changes to the terms and conditions, including making previously approved authorities conditional on the outcome of a case before the Supreme Court, *see e.g.*, S.A.R. 1554–1555, 1559, and imposing more robust monitoring and evaluation protocols, S.A.R. 1558.

Finally, the plain statutory text forecloses any suggestion that the Secretary exceeded his authority under Section 1115. Plaintiffs concede that Section 1115 allows the Secretary to waive any provision of Section 1902 of the Social Security Act, Pls. Mem. (Dkt. 54-1) at 39, and here the Secretary waived "Section 1902(a)(14) insofar as it incorporates Section 1916 and 1916A," S.A.R. 1575. Plaintiffs treat Section 1916 and 1916A (42 U.S.C. §§ 1396o and o-1) as independent bars to the Secretary's authority to waive the requirements of Section 1902. Pls. Reply 30–31. But

the limitations described in Section 1916(f) presume that the Secretary may grant waivers for some "deduction, cost sharing, or similar charge," and Section 1916(f) disclaims that its additional limitations apply to measures imposed under Section "[1916](a)(3) and (b)(3) and section 1396o-1." 42 U.S.C. § 1396o; *see* § 1396o-1(b)(6) ("Nothing in this subsection shall be construed . . . as affecting the authority of the Secretary through waiver to modify limitations on premiums and cost sharing"). The Secretary acted within his statutory authority.

## III.   To the Extent the December 2023 Decision Is Reviewable, It Should Be Upheld

### A.   CMS's exercise of discretionary authority is unreviewable

There is a threshold problem with plaintiffs' challenge to the December 2023 decision: the action is committed to agency discretion. State Br. 37. Plaintiffs do not dispute that an "agency decision not to institute enforcement proceedings" is "presumptively unreviewable." *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006) (internal citations omitted). Their only argument is that "this is not a decline-to-enforce case." Pls. Reply 35. That is precisely what this case is. Plaintiffs overlook that CMS undertook review of the waiver authorities pursuant to 42 C.F.R. § 430.420(d), S.A.R. 837–38, which permits—but does not require—the Secretary to "withdraw waivers . . . based on a finding that the demonstration project is not likely to achieve the statutory purpose," 42 C.F.R. § 430.420(d)(2); *see* State Br. 38. And contrary to plaintiffs' characterization, the December 2023 decision did not "reaffirm[]" Indiana's waiver authorities. Pls. Reply 9. CMS simply said it was "not taking any action now." S.A.R. 1.

The absence of any legal standard by which to judge the December 2023 decision makes it particularly clear that the decision is committed to agency discretion. In arguing that the December 2023 decision is invalid, plaintiffs do not identify any statute or regulation that might supply a "meaningful standard" for evaluating the Secretary's exercise of discretion. *Twentymile Coal*, 456 F.3d at 156. That is because none exists. The only regulation that speaks to the issue here "imposes

no constraints on the [Secretary's] judgment." *Citizens for Resp. & Ethics in Wash. v. FEC*, 892 F.3d 434, 439 (D.C. Cir. 2018). That regulation simply states that the Secretary "may" act if a threshold finding is made. 42 C.F.R. § 430.420(d)(2). The December 2023 letter announcing CMS's decision not to withdraw the waiver authorities is not subject to judicial review.

### B.    CMS's decision is rational regardless

Whether or not the decision is subject to judicial review, CMS rationally declined to withdraw previously approved authorities for HIP. Plaintiffs focus on the alleged impacts of the required POWER Account contributions while minimizing other considerations. Pls. Reply 35–39. In the absence of any legal standard that requires the Secretary to prioritize a single consideration under 42 C.F.R. § 430.420(d), however, the scope of judicial review is "narrow." *Elec. Power Supply Ass'n*, 577 U.S. at 292. "A court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *Id.* It must uphold the decision if "the agency has examined the relevant considerations and articulated a satisfactory explanation for its action." *Id.* (cleaned up). CMS offered that explanation here, explaining that waivers are generally approved for a fixed term and that modifying a core element of HIP during the complex process of unwinding the changes made during the COVID-19 public health emergency would be too disruptive. State Br. 38.

Plaintiffs argue that reimposing POWER Account contributions would be more disruptive than eliminating them. Pls. Reply 37. But that back-of-the-envelope math ignores that POWER Accounts are the "central component of the HIP design," and, post-pandemic, required under state law. S.A.R. 2025, 8240, 8250. Eliminating the requirement that beneficiaries make POWER Account contributions would require a redesign of the entire project, modifications to "eligibility systems," and changes to "managed care plan contracts." S.A.R. 2. The true "policy change" would be what plaintiffs propose: rebuilding HIP without its central supporting beam. Pls. Reply 37. At

17

the best of times, that would be a complex, difficult, and time-consuming undertaking—and when CMS issued its letter, Indiana had the "complex and difficult" task of reversing other pandemic-era program changes and reevaluating eligibility for hundreds of thousands of enrollees. S.A.R. 2252; *see* S.A.R. 1–2. With reason, CMS was concerned that altering HIP, managed care contracts, and eligibility systems could "lead to inaccuracies in beneficiary eligibility determinations . . . and result in beneficiaries being inadvertently disenrolled and delays to new beneficiary enrollment." S.A.R. 2.

Plaintiffs continue to compare CMS's December 2023 decision to decisions made with respect to other States' projects, such as Wisconsin's. Pls. Reply 37–38. As plaintiffs admit, however, CMS did not withdraw authorities from other States midway through the demonstration period. *See id.* at 38. Plaintiffs argue that is a "distinction without a difference" because the "waiver authorities are unlikely to promote Medicaid's core purpose of providing coverage." *Id.* But plaintiffs ignore that Section 1115's requirements only apply where a State submits or renews an application for a demonstration project. 42 U.S.C. § 1315(a). No standard constrains the Secretary's discretion when it comes to making decisions about whether to withdraw authorities. Timing matters for another reason as well: "In general, CMS approves demonstrations for a fixed term." S.A.R. 2. Deviating from typical CMS practice would have required the agency to reasonably explain why it was "changing position." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Far from supporting a change, however, Indiana's reliance interests and the threatened disruption counseled against a sea change during an already turbulent time. *See* S.A.R. 1–2.

Nor are plaintiffs correct that POWER Account contributions "have a negative effect on coverage." Pls. Reply 37–39. As explained above, in 2020, CMS rationally concluded that the evidence for HIP was "promising." S.A.R. 1558; *see* State Br. 24–33; pp. 12–14, *supra*. In fact, a

*federal* evaluation had concluded that HIP expanded coverage and benefits: The "first and most important lesson learned from Indiana's Section 1115 demonstration," the evaluation reported, "is that the demonstration project "resulted in a program that achieved a key goal of both the ACA and the state—a significant expansion in health insurance coverage." S.A.R. 4308; *see* S.A.R. 4279. Despite citing that federal evaluation of Indiana's HIP, the December 2023 letter nowhere acknowledges the evaluation's "most important" finding, survey data favorable to HIP, or evidence supporting CMS's original assessment. Instead, the December 2023 letter asserts no such evidence exists. *See* S.A.R. 10 ("CMS is not aware of specific evidence from any state that demonstrates that charging premiums . . . facilitates coverage directly or indirectly"). That head-in-the-sand approach hardly inspires confidence that CMS's latest pronouncement is reasonable, let alone correct. *See Genuine Parts Co. v. EPA*, 890 F.3d 304, 312–13 (D.C. Cir. 2018) ("'an agency cannot ignore evidence contradicting its position'"). And it contrasts sharply with CMS's "careful[] review[]" of both arguments for and against HIP three years earlier. S.A.R. 1566.

Plaintiffs also say CMS could have considered "a wind-down period" as it had in other States. Pls. Reply 38. Again, plaintiffs overlook that CMS wound down programs in other States "in connection with a State's application either for a new demonstration approval or to renew an otherwise expiring demonstration project." Fed. Br. (Dkt. 55) at 39. No changes were introduced midstream. Additionally, when CMS directed Montana and Arkansas to wind down their premiums in 2021, neither State faced the problem Indiana faced in December 2023—reevaluating eligibility for all Medicaid beneficiaries and unwinding changes from the COVID-19 emergency. S.A.R. 1–2. And while CMS directed Oklahoma to wind down its non-assurance of NEMT in 2023, altering requirements related to POWER Accounts would be a much more significant lift. POWER Accounts are HIP's "central" feature, and unlike NEMT, required under state law. S.A.R.

2025, 8240, 8250. CMS could rationally suppose Indiana would face greater disruption than Oklahoma.

Finally, plaintiffs fault CMS for not specifically discussing authorities related to "retroactive coverage and NEMT." Pls. Reply 39. But plaintiffs cite no statutory or regulatory provision that required CMS to evaluate those or any other authorities for HIP. Nor do plaintiffs identify evidence regarding retroactive coverage and NEMT that CMS did not have before it in 2020 and that might support a different conclusion regarding those authorities.

## IV.   Vacatur of the HIP Approvals Is Unwarranted

Plaintiffs' request for vacatur overreaches. Although the three individuals who filed this lawsuit may be unhappy with some aspects of HIP, it is undisputed that the overwhelming majority of HIP enrollees are "satisfied with the program" and "would pay more to stay in the program." S.A.R. 8250, 8252. As explained above, moreover, vacating the waiver undergirding HIP would disrupt coverage for the entire Medicaid expansion population and threaten the provision of opinion benefits. *See* pp. 3–5, *supra*; State Br. 42. Plaintiffs are simply mistaken that Indiana's "state plan" provides "separate, distinct, and perpetual coverage." Pls. Reply 42. In actuality, the state plan incorporates HIP's essential features, requiring (for example) the Medicaid expansion population to make POWER Account contributions and enroll in HIP Plus. *See* pp. 3–5, *supra*.

Although plaintiffs cite *Stewart*, *Gresham*, and *Philbrick* in passing, Pls. Reply 42–43, plaintiffs do not grapple with the fundamental distinctions between those cases and this one. As explained above, in those cases, this Court vacated waivers for new requirements placed on populations already covered under Medicaid. *See* pp. 4–5, *supra*. Here, by contrast, plaintiffs seek to do away with essential prerequisites for Indiana's expansion of Medicaid to new populations. *See* pp. 3–4, 8–11, *supra*. In *Stewart*, *Gresham*, and *Philbrick*, the new requirements had not been

or were not fully implemented. State Br. 42. In this case, however, plaintiffs no longer challenge newly added work requirements but contribution requirements in place since HIP's inception in 2008 and since its expansion in 2015. All of the concerns CMS had with withdrawing Indiana's authority to impose contributions a few months ago thus counsel against vacatur.

Nor does the approval contain incurable errors. Pls. Reply 40. Many of plaintiffs' critiques go to what the Secretary did or did not say—a type of problem that could be addressed on remand. *See, e.g.*, at 16 ("the Secretary did not approve the project on that basis"); *id.* at 19 ("[t]he Secretary did not weigh the benefits"); *id.* at 21 ("the Secretary failed to reasonably compare"). Precedent points the same way. This case does not present the same issues as *Stewart*, *Gresham*, and *Philbrick*. It is much closer to *Brooks-LaSure* in which the court held that CMS had acted arbitrarily for *withdrawing* approvals undergirding the expansion of Medicaid. *See* pp. 8–11, *supra*. If it was arbitrary for CMS to withdraw approvals in that situation, it likewise would be arbitrary here. Remand is the proper remedy for any putative issue.

## CONCLUSION

The Court should deny plaintiffs' motion for summary judgment, grant FSSA's motion to dismiss, and enter judgment in FSSA's favor. In all events, the Court should not vacate the 2020 waiver or 2023 decision.

Respectfully submitted,

THEODORE E. ROKITA
Indiana Attorney General

By: /s/ James A. Barta
James A. Barta (D.C. Bar 1032613)
Solicitor General

Office of the Indiana Attorney General
302 W. Washington St.
Indiana Government Center South, 5th Floor
Indianapolis, IN 46204-2770
Phone:  (317) 232-0709
Fax:  (317) 232-7979
Email: James.Barta@atg.in.gov

Caroline M. Brown (D.C. Bar 438342)
Brown & Peisch PLLC
1225 19th St. NW, Suite 700
Washington, D.C. 20036
Phone: (202) 499-4258
Email: cbrown@brownandpeisch.com

*Counsel for Intervenor-Defendant*
*Indiana Family and Social Services Administration*

22